Bland, Chancellor.
Before we proceed to the consideration of this case, it may be well, for the better understanding of the whole matter, to advert to the law as it before stood, as well as to some of the special estate acts, which the General Assembly had been induced to pass in relation to similar cases before the passage of the general acts under which this case has been brought before the court.
Among the various rights which an owmer may exercise over his property is that of directing, by his contract, his will, or otherwise, that his real estate shall be converted into personalty, or that his personalty shall be converted into realty. This right of conversion, however regarded at law, has long, in equity, been held to be a well established incident to every absolute ownership. And as equity considers that which has thus been directed to be done as having actually been done, in every case, except in dower; (a) it thenceforward, and, for almost all purposes, treats the estate as being, in the eye of equity, real or personal according to the character which its owner has thus stamped upon it. The exercise of such an act of ownership gives rise to a variety of principles, in relation to property so disposed of, (b) the *190 existence of which it may be will to recollect, although none of them need now be particularly noticed further than as they may he illustrative of the analogous consequences in cases of a similar conversion made without the consent of the owner.
Here the inquiry is as to the extent of the power of the Court of Chancery over the property of infants. It is admitted by all, that a guardian or trustee cannot merely as such make an absolute and total change in the nature of an infant’s estate; and also, that the Court of Chancery can direct or sanction no alteration whatever, in the nature of an infant’s estate, which his guardian or trustee might not of himself lawfully make, (c) In general, the court will not suffer the personal estate of an infant to be, in any way, changed into real; or his real estate to be converted into personalty. For the alteration of property is as far as possible to be avoided consistently with the idea of preserving the interests of the proprietor, (d) But, apart from this general rule, there are many cases in which the court will, for the manifest convenience and advantage of the infant, direct or sanction the making of an absolute purchase of real estate with his personalty, or with the rents ■and profits or proceeds of his estate; and thus, in fact, convert his personalty into realty. This, however, is never done without a complete saving to the infant of all his rights by continuing to consider, during his infancy, the property as personalty to the same extent as before such conversion was made. Because the court can neither do nor sanction any act which may, in its consequences, impair the rights of the infant, or those who may claim under him, either by altering the nature of his property; (e) or by changing his domicil so as to cast it into a different course of succession. (f) But in the conversion of an infant’s personalty into realty, by clearing off incumbrances, he being, in respect of such real estate, liable as debtor, so that, as in fact the debtor himself pays the debt, there *191 is not nor need be any saving of his rights, (g) Nor, upon the samo ground, is there any saving of the infant’s rights, where his personalty is applied to the keeping in repair of the edifices upon his real estate. (h)
On the other hand there are cases in which, that which is ordidinarily and technically considered as a part of the real estate of an infant may be converted into personalty; that is, the timber or mineral part of the inheritance may be sold and converted into personalty. (i) But the various kinds of perennial vegetable growth, such as timber standing upon the land, like coal and other minerals of which the soil itself may be, in part, composed, are, all of them, although legally held to be, while resting in their natural positions, a part of the realty, in many respects more properly regarded as the mere products of the land; to be gathered as portions of the rents and profits of the inheritance, as much so as corn, or any other of the industrial fruits of the earth, the taking of which timber or mineral products not being properly a conversion, but only a mode of enjoyment and perception of the profits of the estate; (j) and like all rents and profits derived from the inheritance, when so taken, must be regarded as personalty, (k) So considered the selling of timber or coal from the land of an infant can, with no more propriety, be regarded as a conversion of his real estate into personally, than the selling of its annual crops of grain or tobacco.
All the cases to be found in the English hooks which speak of the conversion of an infant’s real estate into personalty, merely for his advantage and convenience, are cases which relate to nothing more than the timber and mineral part of the inheritance. For it has been distinctly declared, that there is no instance of binding the inheritance of an infant by any discretionary act of this court; that as to personal tilings, as in the composition of debts, it has been done; but never as to the inheritance, for that would be assu *192 ming a legislative authority, the doing of that which is properly the subject of a private act of parliament. (l) Nor have I been able to find any case in the English books in which the court has undertaken to change the nature of an infant’s inheritance by selling the land itself, and investing the proceeds of the sale for his benefit; or in which the court has sanctioned any such sale made by the guardian or trustee of an infant.
In the management of a lunatic’s estate, in England, looking to his maintenance and the payment of his debts, if the court sees that his advantage would be promoted by selling a part of his real estate, inconvenient, ill conditioned, &c. for these purposes, it would have no difficulty in doing so without making any saving of his rights over the property into which it had been converted ; (m) such as is here made by our acts of Assembly when a sale is made of a lunatic’s real estate for his maintenance, &c. (n) But where, under our act of Assembly, a portion of an infant’s real estate is required to be sold to save his personalty, no saving is directed to be made for the benefit of any one. (o)
In England the conversion of an infant’s personal into real estate, by the purchase of lands, has been rarely or ever prohibited by the court, when made with a proper saving of the infant’s rights; because of the great additional security which is thus given to his property. Such a conversion is regarded as a permanently safe investment of the infant’s personalty; which, with due care, may always be made without loss, and can seldom fail to be advantageous to him; (p) particularly during the prevalence of those epidemic speculation fevers, which for some seasons have been attended with such frightful ruin in Europe; (q) and have many times spread so much confusion and distress over our country, (r) It is declared, however, that all changes in the nature of an infant’s property should be avoided as far as practicable; and that none should be made without an entire saving of his rights; or whereby *193 Ms estate might be deteriorated, or exposed to any new and additional perils. Thus demonstrating, that, in England, no court of justice lias ever presumed, for any purpose of general advantage merely, however plausible or apparently safe, to interfere with the right of property of an infant, or indeed of any one. And it also appears, that in those cases where the parliament in the plenitude of its sovereign power lias directed any such alteration of property to be made, it has most usually done so with a saving of the rights of its infant owner, (s)
In England there are many modes of investing money, other than by the purchase of real estate, so as to preserve it in perfect safety, and yet keep it constantly productive. In this country it is not so. There are here comparatively few, or, perhaps, no such perfectly safe and productive forms of investing money, other than by the purchase of land, or upon the mortgage of real estate, as in England; and therefore, considering the peculiar circumstances of our country, the conversion of an infant’s personal estate into realty, by way of a permanently safe investment, is much more obviously justifiable or even commendable here than in England. (t)
On the other hand, apart from those kinds of conversion of the realty into personalty, by the sale of timber, coal, &c. it is, upon the same consideration, evident, that, in this country, no investment can be any thing like so safe as in land to which there is a clear title; and that the conversion of a clear fee simple estate in land can never be made with any prospect of placing the fund in the same degree of absolute security, or without incurring some expense and loss, such as costs and commissions ; and can rarely he so completed as to result in any general and permanent advantage to the infant. Consequently, there being no shadow of authority to be found in the English books, it would be difficult here to find any tenable ground upon which a court of justice could sustain itself in making a conversion of an infant’s real estate into personalty; or in so dealing with it, upon the pretext of its being for Ms advantage as to diminish its value, or to subject it to any new and additional perils. (u)
In mortgage cases it, is, however, said, that the court will order an infant’s real estate, that is, regarding his equity of redemption *194 as such, to be sold for his peculiar benefit and advantage. But the advantage of a sale of the realty, in such cases, is most manifest ; for, if, instead of ordering a sale, the court were to pass a decree of foreclosure, the whole estate would be lost to the infant; whereas, if it should be worth more than the mortgage debt, by a sale, the surplus would thus be saved, and returned to him. Hence it is obvious, that in all such cases the infant, by a sale, may gain but cannot lose; and therefore the sale, or conversion of such real estate into personalty for the payment of the debt must be advantageous to him. (w)
*195 And so loo real estate in the hands of an infant heir or devisee may, in various other modes of judicial proceeding be converted *196 into personalty for the payment of debts; in all which cases, the surplus, if any, goes as a residuum of the realty to the heir or *197 devisee from whom the body of the realty was taken. (x) And upon a like ground of necessity to satisfy the just claims of others, in partition cases, where it is impracticable to make any just partition of the real estate, or where a partition cannot be made of it without much disadvantage, there, as well by the long established power of the court, as by positive legislative enactment, a real estate in which an infant has an interest in common with others may be sold, and a share of the proceeds of the sale, consisting of personalty, may be awarded to the infant. (y)
The courts of justice of England, acting in accordance with these general principles and holding the rights of property, particularly those of an infant, to be in all respects sacred and inviolable, but upon the ground of some great and overruling necessity, have cautiously abstained from meddling with all such rights in any way. And therefore it is, that the English Court of Chancery has never, except in the cases above mentioned, undertaken to dispose of an infant’s land, or inheritance in real estate; and that, although many cases have arisen, in which the income of an infant’s estate has been found to be entirely insuflicient for his sup *198 port; yet it Las rarely occurred, that the court has broken in upon the capital of even his personal estate for the mere purpose of maintenance, though it has frequently done so for his education and putting him out in life, (z)
*199 By an act of Assembly, passed before the revolution, it was, among other things, expressly declared, that if the estate of an infant was so small, that its yearly profits and increase would not extend to a free education and maintenance of him, he should be bound apprentice to a trade until he arrived at full age; unless some relation or charitable person would maintain and educate him for the small increase of his estate, without any diminution of the principal, (a) Soon after the revolution, the Legislature declared, that in case the produce of the estate was not sufficient to maintain and educate the minor, in a proper manner, the Orphans Court might allow the guardian to apply a part of the principal of the infant’s personal estate, not exceeding one-tentli annually, to the purpose of his education. (b) And, afterwards, by the testamentary system, it was declared, that the Orphans Court should ascertain the amount to be annually expended in the maintenance and education of the orphan; regard being had to his future situation, prospects and destination; and, if it should be deemed ad van *200 tageous to the ward, might allow the guardian to exceed the income of the estate; to cut down and sell wood, to make use of the principal; and to sell a part of it; provided, that no part of the real estate should, on account of such maintenance, or education, be diminished without the approbation of the Court of Chancery as well as of the Orphans Court. (c)
By a special estate act, passed before the act to direct descents, after reciting, that three hundred and fifty acres of land had descended to the. five daughters of John Worthington, deceased, as his heirs in co-parcenary; and that their mother, also then dead, had, by her will, directed her real estate to be sold, and the money arising from the sale to be put out at interest for their benefit; that one of the co-parceners was married to John Cradoclc, who claimed a partition; but, that a partition of so small a parcel of land would lessen the value, and be detrimental to the interests of the co-parceners, it was directed, that the land which had so descended should be sold, that part of the money, arising from the sale, should be paid to such of the parceners as were married, or of lawful age, to receive the same; and, that the residue should be put out on interest for the benefit of the other co-parceners, *201 until they should attain such age or marry, (d) By another special act, passed at the same session, after reciting, that Caleb Davis had died intestate, leaving but very little personal estate; seised of one tract of land containing two hundred acres; and of another parcel containing ninety-nine acres; which were not, and could not be rented for more than sufficient to discharge the annual assessment; and leaving four infant daughters, who were greatly distressed, and who could not he educated, or maintained, unless by a sale of their inheritance; it was directed, that the land should be sold; that the interest of the purchase money should be applied to their education and maintenance; and that the principal should be divided and paid to them as they respectively arrived at the age of sixteen. (e) By another special act, it was stated, that Joseph Walker died intestate, seised of an improved lot of ground in Pig point, which would have then sold for one thousand pounds; but, from a decay of the improvements, since that time, had been so reduced in value, that its rents were wholly unequal to the necessary repairs; that the son and heir at law of the deceased, being then but four years old, before he arrived at full age the lot would be of no value. Whereupon it was directed, that the lot should be sold, and that the money arising from the sale should be put out at interest for the benefit of the heir, (f)
In another special act it was set forth, that several lots of ground in Baltimore town, which had descended to, and been made over to three infants, were then useless- to them, and very heavily burthened with taxes; but would he of great advantage to the said children if leased out on ground rents for ninety-nine years renewable forever. Whereupon it was directed, that the lots should be leased with the approbation of the Orphans Court, (g) It was stated in a special act passed on the petition of Sarah Parran, that her husband Richard Parran died seised of two tracts of land, one in Calvert, and another in Charles county, and personal estate to a considerable amount; that at the time of his death he was much indebted, and left the petitioner his widow, and three daughters; and that it would be for the benefit of the children to sell the land in Charles county, to save a part of the personal estate; where *202 upon it was enacted, that the land in Charles county, containing two hundred and fourteen acres, should be sold, and the proceeds applied towards the payment of the debts due from Richard Par-ran, deceased; but that no part thereof should be paid to Sarah Parran, nor should she be entitled to any more of the personalty than if this act had not been passed, (h)
Since the alteration of the common law by the act to direct descents, on its being represented to the General Assembly, by the petition of William Wirt, a minor, that he was entitled to the moiety of a house and lot in Bladensburg, that he had received a classical education, and was then engaged in the study of the law; but, that his personal estate, with the annual value of his real estate, were insufficient to enable him to prosecute his studies with advantage; it was enacted, that his interest in the house and lot should be sold, and the proceeds applied towards his education and use. (i) At the next session of the General Assembly, by the petition of Judith Wallace, on behalf of herself and her children, it was represented, that her husband John Wallace died intestate in the year 1789, leaving the said widow and five children, and seised of a tract of land containing eighty or ninety acres which was rich, but entirely destitute of timber and firewood; the expense of procuring which exhausted the annual profits of the land. Whereupon it was enacted, that the land so descended should be sold; and, with the proceeds, other land should be purchased in which the widow should have her right of dower, and which should be held, and pass as the land which had been sold, (j) In addition to these many other similar estate acts have been passed, in almost every one of which it appears, that the General Assembly were, in some way, satisfied of the truth of the facts as stated; and that it would be exceedingly difficult, if not altogether impracticable, to provide for the maintenance and education of the infants in any other manner than by the proposed sale of their real estate. (k)
In all, or almost all of these cases, it is evident, that the Legislature interposed merely for the purpose of removing a temporary *203 disability in order to give relief under a then pressing necessity; and to confer a capacity on infants to do acts necessary to enable them to obtain maintenance and education, or to discharge a duty to creditors who had claims upon their property. No material injustice could arise from any legislative interposition to such an extent; because the infant’s property was not to he applied to any purpose for which it was not generally or specially bound. To authorize a sale of an infant’s imperishable estate for any other purpose, would be not merely to endow him with a capacity to act for his own support, or in discharge of an obvious duty; hut, in effect, to divest him of his property, or to force him to make an alienation of it, according to the fanciful opinions and notions of others; in all cases with much risk to the whole, and the certain loss of a part in commissions to the agents employed to make the sale; and in many cases without the least just occasion for such alienation. (l)
This application, for the sale of the real estate of these infants, is founded upon the provisions of several public and general acts of Assembly, by which, among other things, it is declared, that where any infants shall be possessed of any real estate, it shall be lawful for the Chancellor, upon the petition of the guardian or prochein ami of such infants, after summoning them, and their appearance by guardian, to be appointed by the Chancellor, to issue a commission to not less than three discreet and sensible men, freeholders of the county where such lands may lie, to view and ascertain, by competent and disinterested evidence, the value of such lands, taking into consideration the quality, local situation, improvements, with all the advantages, and also the disadvantages and incumbrances attending the same; and to determine whether it would he to the interest and advantage of the infants, that such land should he sold; (m) and report the same to the court with their reasons therefor. Provided, that such report shall not be conclusive, but the court may, in its discretion, examine witnesses, and have other testimony, and shall decree a sale only in those cases where, under all circumstances, the court shall be satisfied, that a sale would be for the interest and advantage of the infants. And it is further declared, that in case of the death of the infant, *204 without issue, the proceeds of sale shall be considered as real estate, and shall descend to those heirs who would be entitled to the land if it had not been sold. (n)
There is every reason to believe, that these public and general acts of Assembly, which it is proposed by this petition to have put in execution, were passed in consequence of the numerous applications which had been previously made to the Legislature for authority, by special estate acts, so to dispose of the property of infants, as most judiciously and effectually to maintain and educate them; and in order to turn over to the courts of justice a class of cases which, evidently, belong moré properly to the judicial than to the legislative department of the government. But these laws, like some others of no less utility and importance, lay open to the most latitudinous construction, and pernicious application; and therefore require to be carefully considered, and in each case very guardedly carried into effect. (o)
By virtue of the power of eminent domain, which belongs to ours as to all other governments, private property may be taken for public use, on a just compensation being made. But it may be safely assumed, that the Legislature can, by no act, take the property of an adult citizen from him and give it to another, for any purpose, with or without compensation; and that no adult citizen can be compelled to use, apply, or alienate his property in any way whatever merely with a view to his own benefit and advantage. The holding and the application of private property, at the pleasure of its owner, so it be not as a nuisance or made injurious to others, according to the fundamental principles of our government, are rights so absolute, that no power in the land can touch or control them in any degree whatever. Infants, it is clear, hold their property by the same kind of absolute and Uncontrollable rights as adults. It is the duty of the state to protect a If her citizens; but more especially her infants, for whom she is bound to provide maintenance and education, in case they should be without parents or pecuniary means. The state has a deep interest in the proper maintenance and education of her infants; and, consequently, it must be within the constitutional competency of her government to make any legal provision necessary to facilitate the application of the property of infants to such purposes, as well for her own *205 benefit as to prevent such infants from becoming idle paupers and a burthen to the community; and therefore no law which provides for the preservation of their property, and the proper application of their estates to their maintenance and education, can be deemed an infringement of their rights.
An infant may, apparently, succeed to property which cannot, in strictness, be said to belong to him, because of the claims of others. The creditors of the ancestor from whom the estate descended, must be first paid before any part of it can be applied to the use of the infant heir. An act of Assembly which facilitates the application of such an estate to the payment of the debts of its late owner, merely gives to it its proper direction; and therefore, instead of violating, affirms the right to it, as deduced from its deceased owner. Nor can any law which goes no further than to provide for the application of an infant’s estate to his maintenance and education, be regarded as, in any respect, a violation of such infant’s right of property. An infant is, in general, incompetent to contract; but he may, by contract, bind himself for his maintenance and education; and hence a legislative enactment, which facilitates such an application of his estate, co-operates with the infant’s legally qualified right to contract, in discharge of a duty to himself, without trenching upon any of his rights.
The several tribunals of the judicial department of our government, have been framed and established with a view to the determination of matters in controversy between individuals. The Orphans Courts have been entrusted with authority to appoint guardians for infants; and to see that such guardians perform their duty as prescribed by law'; and the Court of Chancery has been invested with a similar and more extensive power in regard to the care of infants and their estates. (p) But neither of those courts, nor any other of the tribunals of the republic have been, or can constitutionally be clothed with a discretionary power to sell and dispose of the property of any one, infant or adult, merely for his own interest and advantage, apart from the maintenance and education of such infant owner. Such a powmr is not judicial in its nature; and therefore, cannot be conferred upon or exercised by any branch of the judicial department.
To coerce the payment of debts, and to make sale of property for that purpose ; or to provide for, and enforce the application of *206 an infant’s property to his maintenance and educaiibn, may well be regarded as the natural course and necessary result of a judicial power; as the proper exercise of judicial functions. But to institute an inquiry as to the propriety of disposing of any property, and the selling of it, and investing the proceeds of the sale in other property merely for the general interest and advantage of its infant owner, without reference to any peculiar circumstances, as in the before mentioned cases of a conversion of one lcind of property into another, has nothing of the aspect or character of an exercise of judicial authority about it. Such a proceeding puts in issue, and determines no matter in controversy, either as to the claim of a debt, or of maintenance, or of any other right which had been denied, disputed, or neglected. It has nothing judicial even in its appearance. The proceeding is merely that of a trader, who, upon inquiry, conceives it to be to his interest and advantage to carry his property into the market, and to sell it for the purpose of making a more profitable investment of its proceeds. But the several judicial tribunals of the republic are unfitted and incompetent to act as traders; they have not been organized for any such purpose, and cannot constitutionally be clothed with any such power. An arbitrary and discretionary power, in a court of justice, to sell and dispose of the property of a citizen, in any case in which the court should be induced to believe that it would be for his own interest and advantage, could not fail, in many instances, to be productive of the greatest mischief. But the exercise of such an authority over the property of an infant, would be pernicious in the extreme; not having the means, or the power to object, or to complain pending the proceeding, the helpless infant might be plundered without mercy; and that very court of justice which was intended as his shield, might be made the instrument of the iniquity.
Upon these considerations, therefore, I am of opinion, that these public acts, now proposed to be executed, so far as they clothe this court with a new and more enlarged jurisdiction, must be so construed as to confine them to those cases only where it is proper and necessary to sell the infant’s estate for his maintenance and education; that the general terms, £ for the interest and advantage of such infant,’ used in the first section, must be limited to mean, * for the maintenance and education of the said infant,’ as spoken of in the latter sections of them; (q) and consequently, in order *207 to authorize a sale of an infant’s estate, under these laws, it must be stated and shewn, that he has no other property; that he has no other means of obtaining a maintenance and education from his property, from a parent or otherwise ; and that, under all circumstances, a sale of that, his only property, is indispensably necessary to place it in safety, and to secure to him, from it, a maintenance and education; and it is moreover my opinion, that all other and more latitudinous interpretations and applications of these laws, must be deemed unconstitutional and void.
These general and standing acts of Assembly extending to the utmost verge, and in some respects beyond the constitutional competency of the General Assembly, have clothed this court, unassociated with any other tribunal, with a large, entirely new, and exceedingly delicate discretionary power, as to the disposition of the real estates of infants. It is a power which can, in no case, be carried into effect, with the same degree of confidence as those which the court exercises in controversies between litigating adults; for, in whatever manner a suit of this kind may be instituted, it is obvious, that the whole proceeding must be substantially, and in fact, conducted without the actual appearance, or any expression of opinion from the only person whose interest and advantage is alone to be considered. It is a sort of judicial proceeding which may easily be got up, and brought before the court by persons actuated by motives entirely at variance with fhe interests of the infant; and which sinister motives cannot he so seasonably delected as to prevent the designed sacrifice of the infant’s interests. For, according to the general practice, in all cases where an infant is made a defendant, the plaintiff, or petitioner, names the commissioner, and has the carriage of the commission for taking the infant’s answer by guardian; and, in cases of this kind, the Chancellor having no means of obtaining information, hut through the petitioner, is under a sort of necessity of accepting his nomination of three freeholders, to whom the commission of view and valuation is to be directed. There evidently, therefore, can he no security that a correct description of all the several component parts of the infant’s real and personal estate has been given in the petition, or shewn in any way, (r) or that all the *208 material facts and circumstances of the case have been brought before the court, as a foundation for that decree for a sale, which it is called upon to pass. And after the sale has been made, and the estate converted into money, the money may lay for some time unproductive, as the court may have no means of making an immediate investment; and which when made, cannot be altogether so free from risk, or any thing like so absolutely secure as the real estate itself, the title to which was undisputed; and especially where it consisted of lands in the country, with a small proportion in value of perishable edifices. (s)
These laws authorize an application of this kind, as well for the benefit of a single infant, holding a real estate in severalty, as in behalf of a plurality of infants, possessed of a real estate as joint-tenants or tenants in common with each other. They authorize such an application in behalf of an infant or infants possessed of a legal real estate of inheritance, or of an equitable title to real estate, or who may be seised of a reversion, (t) dependant upon an estate for life; and they apparently embrace real estates of the greatest value and largest annual profits, as well as the smallest and least productive. In order to obtain a decree for a sale it is declared, that the court must be satisfied, that it would, under all circumstances, be for the interest and advantage of the infant. Thus calling for the exercise of a large and indefinite discretion, apparently regarding the interests of none but the infants; yet it is declared, that, in case of the death of the infant without issue, the proceeds of sale shall descend as lands. Hence it is evident, that although the realty is to be converted for the benefit of the infants; the sale is not allowed to operate as a total and immediate conversion ; but, during the minority of the infants, the estate is, for certain purposes, to retain its original character, and remain in a transitive condition. But the placing of it in such a situation may be productive of much inconvenience, as regards the interests of the infants themselves, and may create much embarrassment as to all others who may have any concern with it. (u)
*209 An application for the sale of the real estate of a single infant can only be sustained because of the wasting, depreciating, or unproductive nature of it, and the necessity of obtaining for him an adequate maintenance from that, his only property; and the reasonable certainty, or very strong probability, that by a sale, the proceeds may be invested in some manner nearly or altogether as safe, and much more productive than the land itself, by its annual rents, or by its reasonably probable appreciation of value in the lapse of some ten or twenty years during the minority of its owner. But where the application is made on behalf of a plurality of infants, who hold as joint-tenants or tenants in common, although these reasons for a sale may not be shewn to exist with the same force, or to the same extent; yet as, in general, it is much more beneficial to every one to hold in severalty, than as co-tenants with others, it must, in most cases, he to the interest and advantage of such infants to have a partition made of their estate; (w) and therefore, if it should be shewn, that the real estate is of such a nature, that a partition cannot be made of it, without loss, or disadvantage to the parties ; and, that a sale then, or at some future period, must be made, in order to effect a division of its value among its owners, that circumstance of the indivisible nature of the estate may be taken into the estimate as an additional reason why a sale should then be made as called for. (x)
Here the application for a sale has been made by the widowed mother of the infants in their behalf; and all the circumstances shew, that a sale would be for their interest and advantage. The infants have no other source of revenue than this farm, which consists of two distinct tracts of land, the one held as chiefly or altogether valuable, because of its furnishing wood for the other; and the principal tract incapable of partition into four parts without much loss or disadvantage because of its valuable improvements of mills; and a large amount in value of other perishable edifices; and which principal tract, from its location along the margin of two water-courses, and being intersected by much frequented public roads is exposed to great injury from freshets and depredations along its borders. These and the other circumstances mentioned *210 ■by the commissioners, taken together, form a sufficient ground for a decree for a sale as called for on behalf of its infant owners.
The law declares, that, in cases like this, if there be a widow and she assents to a sale of the whole estate, she shall signify her consent in writing, and the same shall be filed with the register; and thereupon the trustee shall proceed to sell the whole estate disencumbered of her right of dower, (y) And as to other cases it is declared, that before any sale of land shall be decreed, to affect the interest of a wddow, her consent in writing shall be filed. (z) But, in this instance, no separate express consent in writing of this widow can be deemed necessary to be filed before the decree or sale; because she herself is the petitioner who presents herself here as the widow of the deceased owner of the estate; and also as the guardian of his four infant children to whom it had descended, and for whose interest and advantage she prays to have the whole of it sold; and, therefore, her consent is thus as clearly given by her written petition, as if it had been distinctly expressed by a separate instrument of writing.
Decreed, that the lands and premises in the proceedings mentioned be sold, that Richard Potts he appointed trustee to make the sale, &c. having first given three weeks public notice inserted in sueh newspaper or papers as he shall deem proper, of the time, place, manner, and terms of sale; which shall be as follows : one-third of the purchase money to be paid in one, and one other third in two years, and the residue in three years from the day of sale, with legal interest on the whole from the day of sale; the purchase money to be secured by bond with surety to be approved by the trustee, &c. _
After which the trustee, by his petition,' asked leave to suggest to the Chancellor an alteration of the terms of sale prescribed by the decree, with a hope and under a belief, that the interests of the parties would be promoted by requiring a part of the purchase money to be paid in hand, and an extension of the time of payment of the balance; because much of the value of the estate depended upon the improvements upon it, consisting mainly of a costly mansion, and a large and very extensive mill; the loss of either of which, by fire, would impair the whole value of the estate to such a degree as to reduce the security contemplated by the reservation of the title until the whole purchase money was paid; *209 and further, because the habit of purchasers in said county is consistent with the payment of a third, or a fourth of the amount, and the extension of the credit for the residue would operate as an incentive to a more liberal competition among bidders who may be equal in general ability, but greatly differ in their facilities to command large sums at pleasure. He therefore submitted, that the decree should be so modified as to require one-fourth to be paid in hand, and the balance in five or six annual payments, to hear interest from the day of sale, and be secured by bond with surety.
7th June, 1828.
Bland, Chancellor.
This case having been again presented for further consideration, as to the terms of the sale, the proceedings were read and considered. The petitioner avers, that the amount for which the estate would sell, by a judicious investment of it, would yield and secure to the infants an income nearly three times greater than the net rents of the property, exclusive of the outlay for repairs and re-buildings. To maintain the infants, and to improve their income, by converting their estate into money, and investing it with as little delay and hazard as may be, are the chief objects of this proceeding. It is more necessary, in cases of this kind, where the court is, in effect, moving ex parte, for the benefit of infants, than in controversies to which adults are parties, that the estate should be advertised for sale at auction; and thus completely put into the market to prevent any unfairness, and to insure a sale at its full value, either at the appointed time of public sale, or at any subsequent period in another way, if a public sale cannot be made of it.
It is true as suggested by the trustee, that lands sell to greater advantage on long than on short credit; and it is better, in cases like this, to sell on an extended credit, with a stipulation, that interest shall be paid annually, than for cash; because the equitable lien is the best security the infants can have for the payment of the principal and interest of the purchase money. A sale on long credit, in cases of this kind, is always regarded by the court as being, in effect, an investment of the balance of the purchase money for the benefit of the infants. And, therefore, the purchaser ■will not be permitted to pay it before the stipulated day of payment, without paying the interest thereon, which would have accrued up to that time, so as to prevent any loss by the delay in making another investment. But on the other hand, if there is every reason to believe, that a good and safe investment may be immediately made; or if it appears, that there are any outstanding *212 incumbrances upon the estate, that it may be sold on a shorter credit, or: for such a-proportion of cash as may be necessary to clear off any then existing incumbrances, as dower, mortgages and the like.
The court can have no objection to an alteration of the terms of sale as proposed by the trustee; but in order to prevent a sale of the estate, at public auction, for less than its value; the trustee must fix a price, or have a reserved bid for the benefit of the infants. Under ordinary circumstances, where property is offered for sale at auction to the highest bidder, it is held at law, though doubted in equity, to be a violation of the terms of such an agreement, and a fraud upon the sale and the public to take advantage of the eagerness of bidders by screwing up the price by means of a puffer or bye-bidder; (a) nor can a purchaser, on the other hand, be allowed to depreciate the value of an estate intended to be sold. (b) But, to prevent a sale of the property for less than its value, where the sale is not made for the payment of debts; but merely to effect a division; and particularly, in cases like this, where the object is a conversion of'the property as necessary for the interest and advantage of infants, or of persons non compos mentis, it has been the practice here, as in England, to allow a reserved bid for the benefit of the owners, and to authorize the trustee to employ a bye-bidder accordingly. (c)
*213 Therefore it is Ordered, that the propei|j in the proceedings mentioned be sold upon the following tern i isC Hoi *214 fourth part of the purchase money to be paid on the day of sale, or on the day of the ratification thereof; and the residue in five equal annual payments to be accounted from the day of sale; the whole purchase money to bear interest from the day of sale, and to be secured by bonds with surety to be approved by the trustee. And the property may be sold entire, or in such parcels as the trustee may deem most advantageous to the parties. If the trustee should not be able to dispose of the same at auction, after having given public notice, as directed by the decree, then he may make sale thereof either at public or private sale, as he may deem most for the interest of all concerned. And it is further Ordered, that so much of the decree of the 24th of May last, as is in any manner incompatible with this order, is hereby rescinded.
After which the trustee reported, that in pursuance of the decree he first advertised the estate called Ceresville, in newspapers in Washington, Baltimore, and Fredericktown, for more than three weeks before the 24th of July, 1828; and, on that day, on the premises offered it to the highest bidder, reserving publicly one bid to prevent a sacrifice; and there being no bid beyond forty dollars per acre, which would have been a great sacrifice, the trustee was unable to sell; and now holds the same for disposal in parcels, as may suit purchasers, at private sale.
The trustee also reported the circumstances of the estate for di *215 rections as to renewal of existing leases until it should be sold. That the mill, mill-house, and appurtenances were then under lease at six hundred dollars per annum, subject to the cost of necessary repairs, to expire on the first day of August then next, and which the then tenant was desirous to continue for another year. That the ferry and ferryman’s house, and blacksmith’s shop were under lease to the then tenant for one year from the fourth of May then last, at one hundred and thirty dollars; that the farm, being the residue and bulk of the estate, and embracing all the arable land, was under lease to Daniel Hughes, for one year, from the first, of April then last, at a rent of eight hundred dollars, subject to necessary repairs. In addition, the trustee suggested the necessity of some authority to make such repairs of enclosures as had been injured or swept away by inundations of the Monocacy river;, and the necessity of renewing the lease of the farm some months before the termination of the lease; and for further directions and orders in the premises.
29th July, 1828.
Bland, Chancellor.
There seems to be no doubt, where the property in litigation, or its profits are in danger of being materially injured or lost, that this court has the power to interpose for the purpose of preventing its waste or destruction. It is upon this ground, that it grants an injunction to stay waste pending the prosecution of an action of ejectment, or any other suit to try the right, (d) And in other cases grants an injunction or appoints a receiver to save the property in controversy from injury or loss, (e) Upon the same principles, where a real estate had been decreed to be sold, and the trustee appointed to make the sale, reported on oath, before he had made sale of it, that the occupying tenant, or others, were committing, or were about to commit waste, an injunction was granted to prevent it; (f) because a decree for a sale to effect a partition or to pay debts virtually takes possession of the estate and vests it in the court for the purpose of distribution, (g) And so where the property taken under a sequestration was of a perishable nature, and was then likely soon to go to decay, it was ordered to be sold, for the benefit of all concerned, to prevent a total loss. (h)
*216 In cases where real estates have been sold, and the purchaser, who has been let into possession, refuses to pay the purchase money; because, as he alleges, the title of the vendor is defective ; and yet continues to hold the estate, the court, on a bill by the vendor for a specific performance will set an occupation rent for the estate, which the vendee will be compelled to pay pending the litigation, upon the ground, that the party might recover at law for use and occupation, (i) And an occupation rent may be set of the estate as against a mortgagor, on a bill to have the mortgage redeemed, until the suit can be determined, (j) So too where a purchaser, under a decree of this court, after having been let into possession, failed to pay the purchase money; and, yet continued to hold the estate, after he and his sureties had become insolvent, the court set an occupation rent for the estate, which the purchaser, holding the possession, was compelled to pay, pending the proceedings to effect a re-sale for the payment of the balance of the purchase money. (k)
Where, on a decree for a sale of a mortgaged estate to satisfy *217 the mortgage debt, on the trustee’s reporting, that he had been unable to effect a sale; that the estate was unproductive; and that the buildings and fences on it were going to ruin by reason of the estate’s being left unoccupied, and unprotected, he was ordered to rent the estate, from year to year, in the best manner he could; and, from the rents, to have the buildings and fences kept in repair, until a sale could be effected. (l) And, where, after a sale, the proceeds have been collected by the trustee, or have been brought into court; and are likely, from the nature of the controversy, to remain for some time unproductive, they may be ordered to be invested in some safe stock, or otherwise so as to he made profitable, pending the litigation, for the benefit of the parties interested. (m)
In this case it would obviously he more advantageous to all concerned, that the estate should be so disposed of as to prevent the buildings and fixtures from being injured, or going to ruin; and, that the estate should be made to yield some profit for the maintenance and benefit of these parlies.
It is therefore Ordered, that the trustee be and he is hereby authorized to lease or rent the property in the proceedings mentioned in such manner, and upon such terms as he may deem most advantageous; Provided, that no part thereof be leased for more than one year, and so from year to year until a sale can he effected according to the terms of the said decree ; and subject to the further order of this court. And the trustee is hereby authorized and required to cause to be applied so much of the rents and profits as he may deem proper, to the making of necessary repairs in the buildings and fences.
On the 4th of May, 1829, the trustee reported, that he had advertised the property to be sold at auction ; but having received no bid for it, but what was obviously below the value, he then advertised it to be sold at private sale; and for that purpose had caused a lot of land to he laid off forty and a half acres and seven perches, including the mill, mill-house, and ferry, and other buildings appurtenant to the same, with the privileges of water and water-rights, &c.; which he had on the first day of May, 1829, *218 sold to Cornelius Shriver for the price of twelve thousand dollars payable as follows: three thousand dollars payable on the first of May then next; and the balance in four yearly payments, that is, two thousand dollars a year for the first three years, and three thousand dollars the fourth year, to be secured by bonds with good sureties, bearing interest from the first day of May, 1829; from whom he had also received $400 for rent, after deducting his account for repairs.
The trustee further reported, that he had, on the same day, sold the residue of the estate called Ceresville, containing four hundred and seventy-nine and a half acres and eight perches, to Charles W. Johnson, at the price of fifty dollars per acre, on the following terms: six thousand dollars to be paid on the first day of May then next, and the balance to be paid three years from the first day of May next, with interest from that date payable annually thereon, to be secured by bonds with two good sureties, &c. &c. That the amount of the sales, exclusive of the rents not due which were passed to the vendors, was thirty-five thousand nine hundred and seventy-seven dollars and fifty cents. And, that the wood lot yet remained unsold. These sales were finally ratified on the 6th of July, 1829.
The widow and petitioner Susan F. Williams, filed an affidavit of a person, not interested in the case, in which it was testified, that she was then, on the 16th day of July, 1829, between forty and fifty years of age, and that she then enjoyed and was in full and good health. Upon which she submitted the case, that a proportion of the proceeds of the sales might be allowed to her in lieu of her dower in the real estate which had been sold.
17th July, 1829.
Bland, Chancellor.
As regards the proportion of the proceeds of sale to be awarded to the widow, as the present value of her dower, which is the matter now submitted for determination, there is a material difference between the rule prescribed by the acts of Assembly and the rule of this court. I had, on considering this matter, thought it would be well to have but one general rule, which should apply indiscriminately to all cases; and, as the court could not in any way depart from the express provisions of the act of Assembly, I suggested the propriety of obtaining from the General Assembly an act, which should establish such- a general rule of apportionment as would embrace all cases. A move for that purpose was made in the Senate; (n) and *219 a hill passed accordingly; which however, failed in the House of Delegates. After which, a case was determined in the Court of Appeals, in which, that tribunal seems to have so highly approved of the rule of this court, (o) that I now feel indisposed to alter it; although considered as the mere judicial legislation of the court, it might be presumed to be repealable at its pleasure, until the matter shall have attracted more attention, and become more fully understood. I shall, therefore, pass the subject for the present, without further consideration; and, as I am hound to do, follow the legislative rule, (p) in awarding to this widow an allowance out of the proceeds of the sales already made, in lieu of her dower.
Ordered, that the said Susan F. Williams be and she is hereby allowed one-seventh part of the net proceeds of the sales of the property in the proceedings mentioned for and in lieu of her dower.
The auditor reported, that he had examined the proceedings, and stated an account in which the proceeds of sales, $35,977 50, and the rents, $400 47, received by the trustee were applied, in the first instance, to the payment of the trustee’s allowance for commissions and expenses, the costs of suit, $1,192 89; the widow’s allowance, in lieu of dower, §4,969 23, and her proportion of the rents, $133 49, and the balance was distributed among the deceased’s children, and heirs at law.
31st July, 1829.
Bland, Chancellor.
Ordered, that the foregoing report of the auditor be and the same is hereby ratified and confirmed; and the trustee is directed to apply the proceeds accordingly with a due proportion of interest that has been or inay be received.
Elizabeth C. Williams, one of these parties, by her petition stated, that since the bill had been filed, and since her answering thereto, she had arrived at her age of sixteen years, and had become entitled to receive her proportion of the proceeds of the sales; and prayed that the amount might be directed to be paid to her, &c.
21 st August, 1829.
Bland, Chancellor.
Ordered, that the share of so much of the balance of the money, now in court, as the said Elizabeth C. Williams is entitled to, be paid to her as prayed by the foregoing petition, (q)
*220 On the 21st of December, 1830, the trustee further reported, that he had, on the 17th day of December, 1830, sold the woodland at private sale, in two parcels, on the following terms, that is to say, he had sold two lots of said land to Charles W. Johnson, containing together one hundred and one acres and three-quarters, more or less, for the sum of twelve hundred dollars; and two other lots containing together one hundred and one half acres, more or less, to John Derr, for the sum of one thousand dollars, all to be paid in cash on the ratification of said sales. These sales were finally ratified on the 26th day of February, 1831.
On the 18th of March, 1831, the auditor reported, that he had examined the proceedings and stated an account, in which the proceeds of the last sales, $2,200, and the rents, $15, received by the trustee, were applied to the payment of the trustee’s allowance for commissions and expenses, county taxes, additional costs, $126 82; and the widow’s allowance in lieu of dower, $296 17, and her share of the rent, $5, and had distributed the balance amongst the deceased’s children and heirs at law.
From the reports of the trustee, and of the auditor together, it appears, that the whole amount of rent received for one year’s rent of the estate, was $1,530; from which there was a deduction for repairs, presumed to be $130, leaving a net amount of $1,400 for rent; and that the net amount of the proceeds of the sales was $37,256 26; out of which there was awarded to the widow $5,265 30, in lieu of her dower.
21st March, 1831.
Bland, Chancellor.
This case is now sub - *221 mitted for the confirmation of the auditor’s report, in which he says, he has allowed to the widow one-seventh part of the net proceeds of the last sales in lieu of her dower. The question, as to what proportion of the net proceeds of the sale of the whole estate should be awarded to the widow in lieu of dower, is thus again presented for consideration. The inquiry is one of great importance, and the peculiar circumstances of this case afford the means of much practical illustration. I shall, therefore, avail myself of this occasion to take a larger view of the subject than might otherwise be deemed necessary.
There are many cases falling within the jurisdiction of this court, in which it becomes necessary to put a present value upon an estate for life. As where land is sold, so that those who have a particular life interest in it, are to have an equivalent in value awarded to them out of the proceeds of sale; (r) or where the expense of renewing a lease is to be apportioned between the tenant who renews, and he who takes in remainder or reversion; (s) or where the value of the estate of an expectant heir, or of one who takes after a life in being, is to be ascertained; (t) or where a sum of money is directed to be paid after the death of a person then alive; (u) or where the expense of repairs is to he apportioned between a particular tenant and a reversioner or remainder-man ; (w) or where the burthen of an incumbrance is to be taken off in due proportion by several particular tenants and the owner of the inheritance; (x) or where a person charged with the payment of an annuity becomes insolvent, or dies leaving an insufficiency of assets to pay all; (y) or where there is not a sufficiency of assets to pay all the legacies and annuities given by the testator ; (z) or where an annuity given as an advancement is brought into hotchpot; (a) or where a pension or annuity for life has been given by the government. (b) In these and all similar cases, where the corpus, or whole body of the estate is to be disposed of *222 and distributed at once in just -proportions, a determination of the present value of all the life interests is necessarily involved. And that constitutional rule which requires every citizen to contribute his proportion of public taxes according to his actual worth in real or personal property, seems to have involved the legislature in a similar necessity of determining the proportional value of life interests. It is thus evident that the principles upon which the court is now called upon to act, have a most important and extensive bearing; and therefore, will merit a careful and comprehensive consideration.
The earliest case in relation to this matter I have met with, is one which was decided by the High Court of Chancery of England in 1661, and from the language used, in the report of it, there is room to infer, that it was the first in which any question as to the proportional value of a particular estate, and a reversion or remainder had ever been presented for determination. It appears, that Hannah, the widow of Sharp, who had left her a considerable estate, married Geering, her second husband, who settled upon her certain land for life as a jointure; that they mortgaged the jointure; after which Geering died, and she married Rowel, with whom she filed a bill to redeem; and a question arose in what manner a redemption should be made, and by whom ; whether by Hannah; or by the infant heir of Geering; and by whom the mortgage money should be paid. Upon which it was said, that the court conceived it most just, that Hannah and the infant heir should proportionably pay what was due upon the mortgage, at the time of the death of Geering the mortgagor, rating the estate for life of Hannah at one-third, and the reversion in fee at two-thirds, from the time of the death of Geering, (c) In the year 1671, the same rule of proportion was applied in a similar case. (d) In 1682, on a bill to redeem, it was declared to be the ordinary rule of the court, that one-third of the redemption money should be paid to the tenant for life, and the residue to the remainder-man. (e) In 1692, on a bill by a reversioner against- the tenant for life to discover incumbrances, and to compel him to bear his proportion, it was held, that the tenant for life should pay two parts in five of the debts, and the remaining three-fifths by the re *223 versioner. (f) In 1696, it was again, in each of two distinct cases, laid down, that on a bill to redeem, the tenant for life must-pay one-third, and the reversioner two-thirds of the mortgage debt, (g) In 1710, on a bill by a remainderman to compel the tenant for life of a lease for years to have it renewed, it was held, that the tenant for life should pay one-third of the expense of renewment, and the remainderman the residue. (h) In 1718, on a bill brought by creditors, it appeared, that the deceased debtor had, on his marriage, covenanted to settle lands that should be of the value of sixty pounds per annum, upon his wife for life, which he had failed to do. Upon which it was held, that the wife should come in only as a specialty creditor; and in order to settle the quantum of her demand, an estimate was directed to be made of the value of her estate for life, at so many years purchase, upon which she was to be let in as a specialty creditor for so much money, (i) And in 1750, a similar question having arisen, it was determined, that the tenant for life should pay one-third of the fine and charges of renewing a lease, and that the two-thirds should be paid by the remainderman. (j)
No explanation is to be found in any of these-cases of the principles of equity upon which the court proceeded in fixing the proportion in which the tenant for life and the reversioner should contribute ; nor is the age or health of the tenant for life, spoken of in any of them. It does not, however, seem to have been adopted as an absolute rule,but rather as one of convenience; as a medium by which to apply the rule of equity; for, in a case of this kind, determined in 1697, it is said, that in adjusting what each estate was to pay, each was to be valued at what they were respectively worth to be sold, (k) In the first of the before recited cases, it is, in general terms, asserted to be most just; yet it is fair to presume, that Hannah at the time of the death of her second husband, when her life estate was estimated as being equal to one-third of the whole, must have been far advanced in life. The proportions fixed by the case decided in 1692, seems to have been considered in 1720, as a departure from the general rule. (l) In one of the cases decided in .1696, it was said, that the rule seemed hard, be *224 cause an estate for life was then worth nine or ten years purchase, whereas formerly it was worth but seven; (m) and in the case determined in 1750, it was said, that the computation of the tenant for life bearing one-third, was wrong as being too low; (n) that is, as not laying enough on the tenant for life. (o)
In the year 1717, an executor having paid debts to a large amount, and doubts having arisen about the application of the different kinds of assets, there being a deficiency of personalty to pay all the debts, he filed a bill to obtain the direction of the court. Upon which it appeared, that the testator, being seised in fee of .some land, and possessed of a lease for years, in other lands, and indebted by specially and simple contract, devised an annuity of forty pounds a year, out of the lease for years to one grandson, and the lease itself to another grandson, and likewise devised all his lands in fee to A. and his heirs. None of the devisees were his heirs at law. It was held, that, to prevent the disappointment of the testator’s intent, the devisee of the fee simple estate, and the devisees of the lease, and of the annuity, should each contribute to the debts by specialty. And, for that purpose, it was, among other things, directed, that the master should ascertain what, at the testator’s death, was the value of the lands devised in fee, and of the lease, and also of the annuity; and, to lay the said deficiency rateably upon the same according to their respective values; and to state what part necessarily must, and what part most conveniently might be sold for that purpose, (p) In 1726, on a bill by a devisee in remainder of an estate pour autre vie, it was held to be personal estate which could not be devised away from creditors ; nevertheless, being a specific devise, that all the rest of the testator’s personal estate, not specifically devised, should be first applied to pay the debts; and, if there were any other specific devise it should come in average with this, and pay its proportion; but if that would not serve, that then all should be sold to pay the testator’s debt. (q) And in 1749, it was held, that a devisee of an annuity for life charged on the personal estate, where there was a deficiency of assets, should abate in proportion with the other legatees. (r)
*225 In the year j 738, in a case of bankruptcy, it appeared, that the petitioner had, in the year 1720, paid three hundred pounds for an annuity of thirty pounds per annum for her life, payable out of the estate of the bankrupt. Upon her petition, to be admitted as a creditor for the whole three hundred pounds, it was ordered that the commissioners settle the value of her life; and that she be admitted a creditor for such valuation, and the arrears of her annuity, it being unreasonable, that she should have the whole three hundred pounds, when she had enjoyed the annuity eighteen years, (s) The same principles are evidently as applicable to a condition of insolvency, as to that of a condition of bankruptcy ; and therefore, to abolish a technical distinction which had been introduced by the courts of common law in relation to insolvency, (t) it has been recently enacted in England, that a present value shall, in all such cases, be put upon the annuity, and the annuitant be let in to that amount only as a creditor against the estate of the insolvent. (u)
In 1687, on a hill to be relieved against a conveyance, it appeared, that the plaintiff being entitled to an estate tail, after the death of his father, in lands which, if in possession, were worth, to be sold, about £800, did in 1671, for £30 paid and £20 per annum, secured to he paid to him during the lives of him and his lather, absolutely convey his remainder in tail to the defendant’s father and his heirs. The conveyance was set aside as being an unrighteous bargain in the beginning. (w) In the year 1716, on a bill brought to set aside a sale of a remainder, the case appeared tobe, that the plaintiff’s father was tenant for life, remainder to the plaintiff in tail, remainder over to a third person ; that the plaintiff had married, and had a son. After which the plaintiff being about thirty years of age, and his son ten years old ; and when the plaintiff’s father was ancient and sickly and in declining life, the plaintiff sold his estate in remainder, which was worth £150, to the defendant for £1,050. The Chancellor decreed relief on the payment of principal, interest and full costs; upon the ground, that the amount paid for the estate in remainder dependant upon so frail a *226 life was so entirely too low as to be evidence of an unconscionable bargain which was altogether unfit to be sustained, (x) In 1734, on a bill to be relieved from an assignment of a legacy, it appeared, that Andrew Mackean had, by his will, given a legacy of £500 to his nephew Martin, if he should survive the testator’s wife Catharine, who, by the will, was to have the interest of the £500 for her life, as also the principal in case she should survive Martin. The nephew Martin was about twenty-four years of age; had led an extravagant life, and had been some time in Newgate. The widow Catharine was about sixty-four years old; but as to her health there was a variety of evidence. Martin sold his interest on this legacy of £500 to Cole; for which Cole stipulated to give £100 to be paid in £5 per annum, with a proviso, that if Martin survived the widow, then what should remain due of the £l00, should be paid to him within a year after her death; but if he died in her lifetime, then the £5 per annum to continue payable until the £100 should be fully paid. The price thus stipulated to be paid for this legacy, was held to be so much below its real value that the assignment of it would have been set aside as unreasonable, had it not been solemnly and repeatedly confirmed by Martin. (y)
ft is not unlawful for a remainderman or a reversioner to sell his 'estate. Such sales are only set aside because of some fraudulent conduct in the purchaser, or because of his having taken some undue advantage of the seller of such an interest. Among other circumstances, inadequacy of price, may, in all such cases, be taken into the consideration as evidence of fraud. But inadequacy of price can only be shewn by making an estimate of the then value ó'f the life estate, and deducting that value from the then price of the inheritance, or the absolute or renewable estate. Some such proportional valuation must have been made in each of these cases, as well as in those which relate to the discharge of mortgages, or other incumbrances; yet there is nothing to be found in the reports of any of them, or in the reports of those which involve the apportionment of incumbrances, or in those which relate to the abatement of specific legacies or to the adjustment of the amount for which an annuitant is to be admitted as a creditor against the estate of a bankrupt or insolvent, before the year 1750, which alludes to any positive rule of apportionment, or that indicates the principles by which the court was governed in putting a present value upon a *227 life interest of any sort, or of apportioning any burthen between such an estate and a remainder or reversion dependant upon it. (z)
The putting of a present value upon a life annuity, or upon a certain rent for life, or upon a specified annual life income of any description necessarily involves a consideration of the chances of life of the individual during whose life such an annual income is claimed; for although other matters must be taken into consideration in making an estimate of its present value; such as the sufficiency of the security, the probable punctuality of the annual payment, the general demand for the use of money, and the like ; yet, it would be difficult to make any calculation as to the duration of a single life without the aid of some general observations as to the rate of mortality, and the probable duration of such lives in like situations. .But a judicial controversy as to the present value of a particular life interest, being, in its nature, confined to an insulated subject, however dependant a full understanding and correct determination of it may be upon the doctrine of chances, cannot afford the means of collecting those facts and circumstances on which that doctrine rests, since the doctrine is itself the result of general observations upon those previously collected facts and circumstances, in relation to the duration of human life, whilst the adjudication must necessarily be, if it proceeds upon that doctrine at all, a mere application of it to the peculiar case. Hence it is, that, although judicial investigations may, in such cases, be greatly facilitated by a just application of that doctrine, there is no allusion to any rule for estimating the probable continuance of life to be met with, in any of the reported adjudications, until long after the publication of several essays upon the doctrine of chances in relation to the duration of human life.
Doctor Edmund Halley, an eminent mathematician of England, appears to have been the first who undertook to explain the doctrine of chances in relation to the probable duration of human life. About the year 1690, he published his Essay on the Determination of the Degrees of Mortality, in order to adjust the valuation of annuities on lives, founded, as he informs us, upon a table of observations of the births and deaths in the city of Breslaw in Silesia, (a) Soon after, the Observations on Chronology, involving similar considerations as to the duration of human life, were published by Sir *228 Isaac Newton. (b) In the year 1746, M. Deparcieux published his Observations on the Rate of Mortality as it occurred among the nominees of two tontines in France, from 1695 to 1740; and on great numbers of monks and nuns in France, who died in the century preceding, (c) Subsequently to which, Abraham de Moivre, then of England, published his Essays on the Doctrine of Chances, and on Annuities. And it is said, that towards the close of his life, which happened in 1754, he was consulted on all questions relating to chances, gaming, and annuities, and by his answers chiefly subsisted. (d) In the year 1740, Thomas Simpson, an eminent English mathematician, published a Treatise on the Nature and Laws of Chance; soon after which he published a small volume on the Doctrine of Annuities and Reversions, deduced from general and evident principles, with useful tables shewing the values of single and joint lives. And in the year 1752, appeared his work entitled, Select Exercises for Young Proficients in Mathematics, (e) In the year 1771, Doctor Richard Price, an eminent Englishman, published his celebrated work in relation to this matter, entitled, ‘Observations on Reversionary Payments,’ &c. The seventh edition of which enlarged and improved by William Morgan, was published in 1812. (f) The public attention, in Great Britain, bad not only been thus repeatedly called to this subject, by the publications of these eminent men ; but a very great importance had been given to it by the formation, or legal incorporation, from the year 1706 to 1765, of many societies and bodies politic, for the granting of annuities and insurances upon lives; (g) and still more so, by the government’s undertaking in 1692; and still continuing to raise revenue by the sale of annuities for life and for years, (h) In reference to which governmental interest in the matter, it has been lately taken up in the House of Commons, and investigated with great care. (i)
. In every judicial inquiry, instituted for the purpose of ascertain *229 ing the present value of life interests, it is necessary, in the first place, to determine what may be regarded as the expected duration of the life in question; and in the next place, what is the value, all other circumstances considered, of that specified estate which may be held during the length of time so ascertained. But as has been justly observed, ‘the basis of all questions having reference to the failure or continuance of life, is well known to he the law of mortality, or the probability that a human being, who may be in any given year of age, will die in that same year. If this he accurately determined for each and every single year in the natural life of mankind, all other questions whatever, of a financial nature, are capable of precise solution, being merely so many arithmetical results. The said probability, however, can only be arrived at through the experience of what has already happened to a great number of other human beings, all in the very same circumstances with the person whose case is under consideration.’ (j) It is, therefore, clear, that to form a just estimate of the present value of a life interest, the expected duration of the life upon which it depends must be first ascertained.
In all our inquiries for this purpose, it should be borne in mind, however, that it appears from observations every where, that there is an ultimate term beyond which human life cannot be extended; that the days of our years are threescore years and ten, and if by reason of strength they be fourscore years, yet is their strength labour and sorrow. (k) And that the extreme term of existence is not surpassed, because a greater number, under some favourable circumstances, approach it. The boundary seems to have remained impassable since the days of Eli the priest, a period of at least three thousand years, who was ninety and eight years old, and his eyes were dim that he could not see; and he died, for he was an old man and heavy, and had judged Israel forty years, (l) Neither does it appear that the ordinary events of forming connexions in marriage, and rearing families at the usual periods of life, have at all varied within the same length of time, (m) It must also be recollected, that it has been observed every where and at all times, that although more males than females are bom; (n) yet from birth (o) to old age, through every period of life, even that which is most perilous to females, the time of child *230 bearing, (p) the expectation of life is greater in favour of females, than of males. (q) There is, however, some reason to believe, that although an unquestionable state of celibacy, as that of the condition of nuns in a convent, has no effect in shortening female life before fifty; yet that after that age the mortality among them becomes more severe, (r) So that it must be regarded as an established truth, and a general rule, that there is something in the physical constitution of males more frail and delicate than in those of females; or that, in general, there is a greater degree of tenacity of life in females than in males. (s) And it must likewise be borne in mind, that in fixing a general rule, or adjusting a table of the duration of human life, so far as any judicial inquiry is concerned, the object is not to lay down a rule which may be safely or profitably followed by an insurance company, but to establish the truth, which involves nothing more than a consideration of those facts in relation to the actual continuance of human life in the place where the specified life exists, so as to calculate from them a proper average as to its reasonably expected duration.
It seems to be generally admitted, that marriages are not more fruitful now than in past ages, and in stages of society having much less of the comforts, or even of the necessaries of life, than at present; that the poor bring forth more children than the rich, but preserve fewer; (t) and yet that the population increases much more rapidly in modern than in ancient times, (u) These facts only shew, however, that the present is more friendly to human life than the past state of society; and that the probability, as well as the average duration, or mean term of life, as people advance from a savage to a highly civilized state of society, have improved with their improved habits and condition; which has certainly been the case in England, and much more so in France since the revolution in that country, (w) The duration of the lives of those who come into existence, is not only very materially affected by the greater abundance of the means of subsistence with the increase and variety of comforts to be had, in a generally improved state of society, but also by the climate and salubrity of the coun *231 try or situation in which such lives happen to be placed, as well as the political causes, such as the arbitrary nature of the government, or the grade of society under which they may be cast. (x) It has been observed, from a very remote period, that the high and mountainous regions of Germany have always been much more healthy than the low margins of its great rivers and sea coasts; (y) and indeed over the whole world the degree of salubrity often varies with a mile of difference in location. It is universally admitted, that large cities are less favourable to the duration of human life than country situations; insomuch so, that great cities have been justly termed ‘ the sepulchres of the dead and the hospitals of the living.’ The difference between the duration of human life in all cities of such magnitude as London, Paris, Vienna, Berlin, and the country, have always, and at all times, been very great. But this difference lessens with the smaller towns ; so that, as between mere villages and the country, it is nothing at all. (z)
The expectation of life varies not only with country and place, but also according to the grade and condition of individuals in society; and such variations are most remarkable in those countries in which the grades and conditions are most strongly distinguished. In England as well as in all the other countries of the old world, the expectation of life is greatest in favour of those of the middle classes, and least favourable to those of the aristocratic orders, whose lives are curtailed by their intemperance and debaucheries ; (a) and to those of the mere operatives whose lives are shortened by the oppressions and privations under which they suffer. (b) Consequently, a table formed for a whole country collectively, cannot be altogether correct for every particular situation, or for each class of society of the same country.
It often happens however, that in the inquiries which have been made concerning the duration of human life much has been said as to the insalubrity of particular situations; as to the causes, prevalence, and cure of diseases; and also as to the political causes which materially affect the continuance of human life; but with all, or any of those causes, or with the prevention, or removal of any of them, a court of justice, when called upon merely to deter *232 mine the present value of a life estate, can have no concern, further than may be necessary to enable it to derive information by-analogy.
There are few situations as to which any observations have been made, from which tables have been formed; and yet, without any allowances for differences, those few tables have been used as if they were alike applicable to all times and circumstances. This is a great error. Such tables, as regards other situations, can only be used by way of analogy, and can be relied on, in so far only as it can be shewn, by adverting to all the causes which materially affect human life, that the situation to which the tables are proposed to be applied for information are altogether, or very nearly similar to that for which they were made. Tables shewing the expectation of life at different ages over the whole of Sweden, for instance, could not be followed as safe guides for ascertaining the expectation of life, at the same ages, over the whole of Hindostán. And so too, it would be improper to take the tables of expectation formed for the city of London as rules for ascertaining the expectation of life in Wales. The causes materially affecting the duration of human life, at the time and place for which a table has been made, must, therefore, be understood and compared with those of the place where the life in question exists, before such allowances can be made for the differences, should there be any, as will warrant the use of such table as a means of ascertaining the value of each life.
But, as it is to those tables to which the modern English adjudications refer, in speaking of the means of ascertaining the present value of a life interest, it will be proper to advert to some of the principal circumstances of time and place from which the most approved among them have been formed. It seems, that the formation of tables of the expectation of life, at various ages, calculated from observations made, some time prior to the year 1679, at Breslaw in Lower Silesia, as to the duration of human life, originated with Dr. Halley, of England. But it is now admitted, on all hands, that those tables are so imperfect as to be wholly unlit for use; thus leaving to the Doctor no other merit, in this respect, than that of having been the first to shew the use of such tables, and how they might be constructed from correct observations, (c) The next tables are those which may be called the London tables, *233 formed by Mr. Simpson from the bills of mortality for London for ten years, from 1759 to 1768; and as these gave the values of lives among a body of people taken, in the gross, in one of the worst of all situations, they are by no means fit for common use; and are therefore, now never resorted to as a means of ascertaining the value of a life even in London itself. (d)
The next set of tables are those formed by Dr. Price from bills of mortality kept in the parish of All Saints in the town of Northampton in England, during the years 1735 to 1780. Northampton stands on a high region in the midst of England, and contains at present about eight thousand four hundred inhabitants. It is situated on the river Nen, and is chiefly built on the slope, and near the top of a hill, and is generally clean and pleasant. The parish of Ail Saints embraces about half the population of the town, (e) The next table is that which has been formed for Car-lisle, one of the most northerly towns of England. The situation of Carlisle is extremely beautiful; it stands on a gently rising ground in the midst of extensive and fertile meadows, terminated by distant mountains, and watered by the Eden, the Caldew, and the Peterill. The two former of these rivers flow on different sides of the city; and their banks, and contiguous meadow’s, afford a number of pleasant w’alks to the inhabitants. Carlisle contains, at present, about ten thousand inhabitants. The degree of salubrity of these two places, Northampton and Carlisle, and the diseases arising from the climate, with which they are visited, may be considered as sufficiently indicated by these concise descriptions of their situations. But it is not stated whether the population was stationary or not at those places when those tables were formed; and yet it is evident, that the migrations or shiftings of the population must necessarily affect all observations of the duration of life made from accounts of births and deaths alone. (f) The Carlisle tables wrere formed from the results of observations made during the years 1779 to 1780, upon a population of eight thousand persons in that place. But it does not appear whether the parish of All Saints in Northampton was inhabited exclusively or disproportionably by rich, or by poor; nor is it said of what class the eight thousand persons of Carlisle were composed. Both of these last mentioned tables are however, evidently formed upon *234 too narrow a basis to be applied to all England; and are the result of observations confined to too short a period of time, and are made without any discrimination whatever as to class, occupation, or sex. It must also be recollected, that the improved condition of the people, since those tables were formed, has added much to the average duration of human life. The Northampton tables are those however, which have been adopted by most of the insurance offices in England, as those upon which they still depend in cases of insurance for lives.
The Equitable Insurance Company of London is said to be the most wealthy and extensive institution of the kind in Europe. This company, from their own observations and experience, have formed tables, such as they have deemed safe to follow, with a view to profit. These tables, called the Equitable Tables, have been often resorted to as guides, and have been from time to time revised by the actuaries of the institution. (g) The next set of tables are those of Sweden, which appear to have been constructed in a very satisfactory manner, upon returns carefully collected in the years 1755 to 1776, and corrected from other returns from the years 1775 to 1796, and from 1801 to 1805, from the population of the whole of Sweden and Finland. These tables may be trusted as accurately exhibiting the chances of mortality amongst the whole population of those two countries, but not the relative chances amongst the different classes of that population. But the climate of those countries, the severe and fatal changes of the seasons, and other peculiarities, influencing health and longevity, differ so greatly from those of most other countries, as to render this set of tables, unaided by other evidences, insufficient for the determination of the exact average mortality amongst the population of any other and different regions. (h)
The last and most recently constructed set of European tables, are those formed about the year 1825, by John Finlaison, the actuary of the National Debt Office of England. These tables were deduced from observations upon the life annuitants of the English government, composed of all classes dispersed over all England, and amounting to nearly twenty-five thousand people, during a period of more than thirty years. But, against these tables it may be objected as against those of Sweden, that they appear to be based upon a view of the population of the whole *235 country, without distinction as to particular places of habitation, or any discrimination as to the people, other than the duration of life of each sex; and also, that those state annuitants may he regarded as a selection of the best lives from the common mass, (i) Nevertheless, these tables of Finlaison’s, are now considered by many as the most comprehensive, accurate, and generally trustworthy tables extant for England. (j)
The only tables of the expectation of life which have been calculated from any observations in this country are those founded on the results furnished by the records of the Episcopal Church, and of the Board of Health of the city of Philadelphia, which, it is said, have been adopted by the Pennsylvania Company for insurance on lives and granting annuities. (k)
All these tables however, relate simply to the expectation of the life of individuals at various ages, and nothing more. But, in many instances, the annuity, or life interest, is made to depend upon two or more lives of the same or different ages; and, consequently the expectation of each life must be considered, and the case thus becomes more complex; but being deduced from the same known facts, as to each life, an estimate of their joint value is still nothing more than the result of a regular arithmetical calculation according to rules and tables to be found in the books which treat of such calculations.
There are instances, however, in which the annuity or estate is made to depend upon other contingencies, in connexion with that of the expectation of the life of the individual; as where an estate is given to a person to hold until he shall receive an appointment to some office of profit, or so long as he lives unmarried ; in which case it is not only necessary to ascertain the expectation of life which may be allowed to the individual; but an additional estimate must be made of his expectation of receiving a profitable appointment, or of his marriage; and then, the value of the two contingencies taken together may be calculated in like manner as in the making of an estimate of the combined value of two or more lives; except, that in the case of two, or more lives, each life adds somewhat to the value of the expectancy, whereas a contingency annexed to a life diminishes its value. There may be very great difficulty in determining the *236 present value of a life interest subject to such superadded contingency even where there may be nothing in it that contravenes any general legal policy or constitutional provision. (l) Nevertheless, let the superadded contingencies be what they may, they do not prevent ascertaining the value; and therefore, they must be valued, if required, (m) For although it has been said, that an estate for life, depending upon the contingency of marrying and having issue, is, in general, not the subject of estimate or calculation. (n) Yet so far as any observations have been made upon the numbers who marry, and who do not marry, it is as easy, from such observations, to form tables of the expectation of marriage as of life; and both may thus be alike made the subject of estimate and calculation, (o) It is by no means uncommon to grant annuities and estates for life during widowhood, until marriage, or depending on marriage and having issue; (p) yet few observations have been made on the probabilities of marriage.
About the year 1825, Dr. Grenville, a physician and accoucheur of very extensive practice connected with the Westminster Dispensary, and several other public institutions in or near London, on being called as a witness before a committee of the House of Commons, stated, that his attention had been frequently directed to the statistical questions of the increase of population among the poor; and that therefore, availing himself of his various means of information, he had made an analytical register in which he had entered the information he had obtained from mothers. He ex-bited a register of the cases of eight hundred and seventy-six women, all of the lower classes, showing how many of that number had married in each year, from thirteen to thirty-nine years of age. Considering the state of society in England, the remark would seem to be just, that among an equal number from the middling, or the higher classes, we should not probably find so many as one hundred and ninety-five, or more than one-fifth married under the age of nineteen; or so few as one-sixteenth part, *237 after twenty-eight; or only one-thirtieth part, after thirty, as is shewn by the table of Dr. Grenville. (q)
From all these various tables I have extracted so much as relates to the expectation of life shewn by each, and placed it in a separate column opposite to a column of ages, so as, in this respect, to exhibit in one general table a comparative view of all of them, together with a column shewing the number out of eight hundred and seventy-six females, who were married at the several ages as stated by Dr. Grenville. It should be recollected, however, that in the language of mathematicians, who treat of this matter, the probabilities of life, and the expectation of life, are different. By the probabilities of life is meant the likelihood, that all who are born in any particular place or country, or that of any given number bom, so many will be found alive at any given age; as, for example, according to Dr. Halley’s tables, out of one thousand persons born, only five hundred and ninety-eight will live to reach the twentieth year of their age; but according to the London tables, of the same number bom, three hundred and sixty will reach that age; thus exhibiting a view of the waste of life from birth to that age. By the expectation of life is meant, that particular number of years which a life of a given age has an equal chance of enjoying; or the time that such a person may reasonably expect to live. Tables shewing the expectation of life are formed from those showing the probabilities of life. (r)
*238 A Table shewing the Expectations of Life.

*235

*240 A case which was determined, after much deliberation, about the year 1750, appears to have been the first in which any allusion was made, in the courts of Westminster Hall, to the mode adopted by eminent mathematicians for ascertaining- the present value of a life interest of any kind; (b) which mode, however, after that time seems to have been well understood; and has been often referred to in those courts, (c) It would seem, that so early as 1759, the arbitrary rule of considering an estate for life in land, as equivalent in value to one-third of the whole, was not implicitly followed, (d) In 1785, the rule was put aside as unjust; and each interest directed to be valued according to its actual worth, and in due proportion. (e) In the year 1787, it appears, that among other kinds of evidence, tables shewing the expectation of life were resorted to as a means of ascertaining the value of a life interest; (f) and it was declared, that the division which the court had formerly made of a burthen upon the whole, of one-third to the tenant for life, had been found to be arithmetically wrong, though the principle, that it should be borne in proportion, was right. (g) In the year 1798, this matter having been again submitted for consideration, the old rule was entirely exploded; and it was declared, that the doctrine of charging one-third upon the tenant for life could not hold, and was not to be applied in any case. That it w-as a most unreasonable and absurd rule; for, it being admitted, that every person should contribute according to his interest, a man of the age of eighty, with, perhaps, not a year to live, must be said to have as much interest as one of twenty. (h)
The matter, it is said, had, in some of the cases determined prior to the year 1804, been very anxiously, frequently and gravely considered, although it does not appear from the reports of them; because of the intricacy of the subject, and of its not being easy to follow a discussion upon so difficult a question in which such great nicety of fact and calculation were involved. And it was then finally laid down, as a general rule in all cases, where a present value was to be put upon an annuity for life, or any other life interest in properly, as well as where a burthen was to be borne by an entire estate which was held by a particular tenant, and a *241 remainderman, or reversioner, that the estimate must be made with reference to the then actual nature of the life; and, that an apportionment of the burthen must be adjusted between the several holders of the estate, so that, if the particular tenant was bound to pay in any degree, he was made to pay in proportion to the benefit he in fact took under the transaction; and that the remainderman, or reversioner, was made to pay with reference to his proportion of the benefit; which estimate and adjustment must be made upon facts, not upon mere speculation. (i)
In applying this rule for estimating the value of an estate for life, or in order to make an apportionment between the several owners of a real estate, it appears, that the English courts of justice have, latterly, in almost all cases, sought assistance from the tables formed by mathematicians of the expectation of life, without receiving them, except, perhaps, in the case of the distribution of the assets of a deceased person’s estate; (j) as in any respect conclusive, (k) Because, as a basis for all those tables a certain average rate of mortality being established or assumed, they are then the result of calculations upon mere age, taking all lives of the same age to be of equal value, considering none as bad, that are ordinarily good. But the constitutions of individuals differ essentially; the health of the same individual may have been materially affected by accident or climate; or he may have a latent disease which has in a greater, or less degree, affected his duration of life for many years. All such circumstances must be taken into consideration; and, therefore, no ordinary table of the expectation of life, although it may afford much useful information, can alone be taken as giving a correct general rule for estimating the value of the life of any particular individual. (l)
In cases of pensions or annuities for life granted by government; in cases of a life interest in land, not chiefly valuable because of *242 the-houses erected upon it, where the title is unquestionable; and in cases of setting a value upon a life interest in land in proportion to the estate in remainder or reversion in the same land under the same title, no contingencies, affecting its value, need be considered other than those of the expectation of the life. But, in making an estimate of the value of other kinds of life interests, there are other circumstances to be attended to besides the uncertainty of the life during which they were to be held; the frailties of the securities by which they are to be sustained during that time must also be considered. For instance, what an annuity is worth depends, in a great degree, upon the security given for its regular payment; and in examining that security it will be proper, not only to consider the pecuniary circumstances of the grantor; but his expectation of life, the hazardous nature of the business in which he may be engaged; (m) and also his prudence; for, although he may, at the time, be in circumstances altogether unexceptionable ; yet his death, his misfortunes, or his indiscretion in the management of his affairs may, in a short time, greatly impair, or totally destroy the security for the payment of the annuity. In these respects therefore, an annuity granted by a legally incorporated company must, in general, be considered as of much greater value than one of the same amount depending upon personal security alone ; because there is a steadiness in the transactions of such bodies politic which, being the foundation of their credit, gives a value to their security greater than that of an individual. (n)
In addition to all these various circumstances relative to the expectation of life, and the securities by which a life interest is to be continued and sustained, it will be necessary moreover to ascertain the annual product of the life interest in order to make a proper estimate of its present value; for, apart from those things having an imaginary value, such as jewels and the like, the true criterion of the value of all property is the actual profit it may be made to produce; and hence, it has always been considered most correct to estimate the value of lands, annuities, &c. at so many years purchase; or, in other words, that the whole estate may be estimated as equivalent to so many years of its income paid at the time of the purchase, (o) There is almost every where a material *243 difference between the amount of the annual legal interest on the purchase money of a fee simple estate in land and the annual amount of rents and profits. But to ascertain the amount of the legal interest on the purchase money of an estate, the amount of the purchase money itself must he first ascertained, which, without an actual sale, can only be done as a matter of opinion; and, therefore, as a guide to such an opinion reference is always had to the amount of its annual income; and as regards an estate for life in land the annual rents and profits afford the only means of making a correct estimate of its value. (p)
In making an estimate of the value of such an estate, there is, however, a material distinction between a tenant for life who is, and one who is not liable to impeachment for waste. A tenant for life, subject to impeachment of waste, cannot sell the timber growing on the estate, nor take the produce of mines unopened, both of which are the property of the person entitled to the inheritance; yet in cases where the estate has been sold to pay debts, the court, it is said, has given a life estate in the whole interest of the surplus money to the tenant for life, although the sum is increased *244 by that which belonged to the inheritance, either as the price of the standing timber which the tenant for life could not cut, or as the price of the remainder or reversion from which the tenant for life could have derived no profit; and therefore, it would seem to be clearly improper to award to him the interest upon any portions of the purchase money which represent those prices, (q)
There is yet one other matter which must be attended to, and that is, as to the point of time at which the valuation of the life interest is to be made. A valuation as of the time when it arose would, in many cases, give to the tenant for life its greatest value after he had enjoyed it many years; and therefore, it would seem to be most correct to have the valuation put upon it at that point of time when it was to be taken away or extinguished ; as in cases of dower, &c., at the time when the land was sold free of such claim; or where the life interest had been withheld, at the date of the order, by which a sum in gross was directed by the court to be given in place of it; leaving the previous income which had, or might have accrued, and should have been paid, to be accounted for as rents and profits. But where an annuity had been given to a child as an advancement, it was said, if it should be brought into ■hotchpot after the death of the parent, that a valuation ought to be put upon it as of the day .when it was granted; and so too, where a party comes as an expectant heir to set aside the contract on the ground of fraud and inadequacy of price, the valuation is to be calculated as of the day of the original transaction, (r)
But this whole matter, as well in regard to the expectation of life and the nature of the securities to support the life interest, as in regard to the exact point of time at which the valuation is to be adjusted, seems as yet, in England, to remain unsettled by any positive general rule, (s)
There are some cases, however, in which it has not been deemed necessary to put a present value upon the entire particular estate in comparison with that of the inheritance, in order to adjust the proportions in which the burthen should be borne by each. As in *245 the case of a real estate under an incumbrance, it is held, that the tenant for life in possession must keep down the interest of the debt. For although the whole is liable to the creditors; yet as between the tenant for life and him in remainder, it is said to fall in with natural justice, that those who have a divided interest of an estate, should keep down the burthen during their own time; and therefore, by a construction in equity, the tenant for life is held bound to keep down the interest to the whole amount of the rents and profits; as otherwise the creditor may come upon his life estate for the principal. Whence it seems to have been taken for granted, as a general understanding, and as a natural apportionment, in all such cases, that he who has the corpus shall take the burthen; and he who has only the fruit shall pay to the extent of the fruit of that debt; (t) or in other words, that the rents and profits of the incumbered estate must have been specially intended to meet and keep down the interest of the debt, leaving the principal only to be treated as an incumbrance upon the inheritance, or chief body of the estate. For it must he always remembered, that the tenant for life and the incumbrancers may at any time have the estate sold; and, after satisfying the debt, have the surplus, if any, apportioned among the tenant for life and the remainderman according to their respective interests. (u) This rule compelling a tenant for life to discharge the interest of mortgages and other real incumbrances, applies as well to tenants for years, (w) to tenant in dower, and a tenant by the courtesy, as to all other kinds of tenants for life; (x) except, that as to the dow'ress, she, being entitled but to one-third of the estate during her life, will not he compelled to keep down more than one-third of the interest of any charges affecting the real estate in which she is entitled to dower; (y) and as to her share of the principal, supposing that in order to he let into her dower she is obliged to redeem the whole mortgage, it is conceived, that she would have a claim on the estate for two-thirds of the interest, and the whole of the principal. (z)
*246 I am not aware that any observations have been made any where in the United States, as to the average rate of mortality, from which a table of the expectation of human life at the various ages could be formed ; except those before mentioned of the city of Philadelphia. A sensible writer has, however, intimated, that he had, for some years, been endeavouring to collect data upon which to found a calculation of the average duration of life in the •southern Atlantic states, comprising Georgia, the Carolinas, and Virginia, (a) But as it would seem the only materials which have, as yet, been collected which would be likely to afford any aid in the formation of such a table, are the few and imperfect bills of mortality which have been kept in some of the cities ; (b) the reports of the surgeons of the army as to the health of the troops at the places where detachments of them have been stationed, the pension list, and the census of the Union.
The Roman census was a numbering of the people with a valuation of their fortunes; which, although said to have been made every five years, was not always taken at certain intervals; and was sometimes omitted altogether. It does not, however, appear to have been, in fact, an enumeration of all the inhabitants, but was merely a numbering and classing of the citizens of Rome, and of the colonial cities; (c) and, being commensurate with property, ■power, and taxation, seems to have been, in many respects, more like what, in Maryland, is called an assessment law for the valuation of real and personal property for the purpose of taxing it, than such a census as is directed to be taken by the constitution of the United States, (d) It is said that a census of the inhabitants of England was taken in the time of Henry the 8th, the returns of which have been lost, (e) In the year 1753, a bill was presented to the House of Commons proposing to have a census taken of the people of England, but was rejected, (f) Since that time, however, there have been three census taken, one in 1801, another in 1811, and a third in 1821. (g) Before the adoption of the present constitution of the United States, Congress repeatedly recommended to the several states to take measures to ascertain the .number, of their inhabitants; (h) with which recommendation *247 Maryland and some other of the states complied. By an act of the General Assembly of Maryland, the assessors and commissioners of the tax of the several counties were directed to make returns of the number of inhabitants in their respective counties to the clerk of the house of delegates; (i) which returns, if ever made, are now lost. But it is believed, that in no country has there ever been taken a regular and periodical enumeration of all the people, like those taken under the constitution of the United States, (j) The census thus required to be taken every tenth year, might be so ordered as to collect a great variety of the most authentic and useful information, shewing, among other things, the average rate of mortality in each state, and indeed in each county of every state in the Union, as well as such other matters as are more immediately connected with its political objects. But hitherto little more has been done than to have returns made of the numbers of free persons and of slaves within certain specified ages. (k)
From such information, however, as we possess, it may be confidently assumed, that the average rate of mortality is, in general, not greater here than in any part of Europe ; and that taking into consideration all political and natural causes, as compared with England, in this respect, the most favoured portion of Europe, (l) the circumstances of these United States are, in general, fully as favourable to the duration of human life as any other country of the world. For, after making the largest allowance for the accessions to our numbers by emigration; (m) and for the greater number of marriages here than elsewhere, it will be found, that in no country has the population increased so rapidly as in the United States. Marriages, although earlier and more numerous, are, on an average, not much more fruitful here than in other countries, (n) And the general ultimate term of human existence, although extended here as far as any where, not having been materially enlarged, the rapid increase of our population can only, therefore, he accounted for by admitting it to be a fact, that of those bom here a greater proportion approximate to the ultimate term of life than in any other country; or, in other words, that the rapid du *248 plication of our population is more owing to a diminished mortality than to an increased number of births, or to any accessions from emigration, (o) This, however, is only a general conclusion deducible from the several enumerations of the inhabitants of the whole Union, which might not be alike applicable to every state, or even to any larger division of the confederacy. But it is a general conclusion which will be found to be mainly corroborated by a comparison of some of the principal causes affecting human life here, with those of a similar nature in other countries. Among citizens our government admits of no political distinctions; there are no aristocratic or religious classes hanging as a dead weight upon the rest of the community. There being fewer drones, and a larger proportion of active producers, the necessaries and comforts of life are more abundant, and more generally and equally diffused here than in any of the European nations. In addition to which the soil of our country being more fertile, and a greater proportion of it fit for cultivation, than that of Europe, the means of subsistence may be obtained here in larger measures with less labour than there; insomuch so, that no one has yet ventured to predict when our population will be so numerous as to have its further increase checked by the want of food. (p)
In the year 1751, it was estimated, that there were upwards of one million of English souls within the territory of the then colonies, afterwards thirteen United States, although it was thought, that scarce eighty thousand had been brought over sea. (q) In the year 1775, the population of all the United States was estimated to be about two millions and an half; (r) and by the first census, taken in the year 1790, the Union was found to contain a population of three millions nine hundred and twenty-one thousand three hundred and twenty-six. Compared with the second and third enumerations it was calculated, that the population doubled in a term of less than twenty-three years, while it appeared from the most authentic information, that a duplication of the population of Great Britain would not take place in less than eighty years, (s)
But however desirable it may be to obtain correctly formed tables of the expectation of life, as a means of estimating the value *249 of life interests in property; yet, from the continual oscilations of our population, it must be exceedingly difficult to make any correct-observations as to the average rate of mortality in any of our cities or counties, or even in any of the states of our Union, (t) The two strong ties, poverty and wealth, which prevent migrations, have been often broken by the oppressions of government in the old world; but in our country the universal parental care of the government and the equal distribution of property, lifting all above want, and dispersing, at short intervals, the great accumulations of wealth, leave it in the power of all to remove at pleasure; so that the peculiar temptations of advantage offered by the various regions of our country cause continual and most extraordinary shiftings of our population.
It is admitted as regards even the comparatively stationary circumstances of the cities of Europe, that a large allowance must be made for the adult population annually poured into them from the country, (u) But, as to the cities of this Union, the annual accession of some of them from the country has been so great as to confound all calculation. Philadelphia, perhaps, in this respect, the most stationary among them, far exceeds any one of Europe in its acquisitions from the country. (w) But the city of Baltimore, the great emporium of Maryland, which was but a poor village in 1776, at this time, (1831,) contains eighty thousand six hundred and twenty persons; and may be regarded as almost an entirely new aggregation from abroad within the ordinary term of human life. It would therefore be impossible, as yet, to form any correct table of the expectation of life within the city of Baltimore. (x)
The shiftings of the population of the several counties of Maryland have also been in many respects very extraordinary, and altogether dissimilar from any thing observed of any district of the country population of Europe. It appears, that, as a whole, Maryland has continued greatly to increase in population from its first settlement down to the last census, (1830;) and yet, that most of the lower counties within which the main strength of the state was found, during the revolutionary war, have latterly diminished in their population by having large portions of it, with a considerable increase, after deducting the great mass thrown into the new regions of the west, shifted into the upper counties; great spaces of which *250 ■were, during the revolution, almost entirely uninhabited, (y) And it also appears, from the periodical enumerations made under the authority of the Union, that although there are, every where, a much greater number of males than females born; yet the diminution of the males as they reach maturity, within many of the counties of this state, the salubrity of which has not been at all changed, is much more rapid than elsewhere, owing to the great emigration from them to the west. From a comparative view of the census of the several states of the Union, it will be seen, that in the elder and most densely peopled of them, the males are most numerous; while in those from which there has been the greatest emigration, and in the newest and frontier states there are not, in many instances, so many as ninety females to every hundred males. (z) Whence it appears, that now, as in the original peopling of Virginia by the English, the first plantings every where in this country, by enticing away the males, or bringing together a much larger proportion of adult males than females, has, by thus separating the sexes, so far operated as a check, instead of an encouragement, to the natural increase of population. (a)
The making of all observations as to the expectation of human life here are, however, not only rendered difficult by the extraordinary shifting of our population; but those difficulties are much increased by the changes continually going on in the salubrity of many situations in our country. The territory of Maryland, when the first settlers seated themselves upon it, was everywhere covered by a thick and lofty forest, and drained by innumerable rivulets, creeks and rivers all pouring into the great Chesapeake. A territory so shaded, and so netted with humid valleys and watercourses, many of them descending from rugged and elevated mountains, under a climate, ranging from such high degrees of heat in summer, to such low degrees of cold in winter, it is evident, must have been, in its primitive state, productive of causes affecting human life differing materially in malignity from those which had been found to arise over any equal space of Europe. But the active civilized people who took possession of Maryland as they increased in numbers and advanced, felled large spaces of the forest and laid bare, drained, and cultivated the soil. These operations by changing the state of things, may have produced some *251 changes in the climate; and have, no doubt, been attended by some ameliorations in the salubrity of the country which, it is more than probable, will continue to go on until our population becomes as dense as that of the best portions of Europe. (b)
The African race, in our country, are, in many respects, materially different from the European. The negro constitution has in it something peculiarly calculated to resist that malaria which is so deadly to the whites. A negro, it is well known, will enjoy good health during some seasons and in many situations in which the white man can scarcely exist. In all that concerns the probable or average duration of human life, as being in any way involved in a judicial determination upon a right of property, it would seem to be wholly unnecessary to extend our inquiries beyond Ihe class of free whites; because free negroes have little property, and negroes held as slaves can have none. But although slaves are incompetent themselves to hold property ; yet considered as property they have always been valued, assessed, and taxed in proportion to their ability of body, age, and sex; (c) and there is no legal reason why an estate may not be held during the life of a negro slave, (d) It is by no means uncommon for negroes to have legacies given to them for their support by way of an annuity for life, or to have small pieces of land given to them for life. Where slaves are given by a parent to bis child as an advancement, if, after the death of the parent, the child brings such advancement into hotchpot, in order to be let in as a distributee, the advancement, here as in England, must be valued as of the day when it was made; and, consequently, slaves so given, must be valued as of that day, exclusive of their subsequent increase, (e) And so too in all other cases where slaves are to be valued it must be with reference to their peculiar expectation of life as well as to their bodily ability, skill and other qualities. (f)
It is certain, that life interests in almost every form, such as estates for life in lands, in personal property, in annuities, &c. were fully recognized by the law of England from a very remote period; yet the doctrine of chances, in relation to the expectation *252 of human life, as a means of ascertaining the present value of such interests, is of comparatively modern date in England; and does not appear to have been, in any way, noticed in our law until after our Declaration of Independence. In several of the original states of our Union companies have been incorporated, with power to grant life annuities, and to make assurances of lives; (g) which, on the part of such bodies politic particularly, must necessarily involve a careful consideration of what may be deemed the expectation of human life at the various ages. And there have been other legislative enactments which appear to have involved a similar reference to the doctrine of chances, in regard to the expectation of life, as a means of making a just apportionment of taxes between estates for life and those in remainder or reversion in lands. But little is to be found in the judicial proceedings of our country in relation to this matter.
It appears, that in New York, in cases in equity, where it becomes necessary, or it is agreed to award to a widow a compensation in lieu of her dower, it is the course of the court to refer the matter to a master in Chancery to have a gross sum liquidated by the value of her life according to the tables of life annuities ; or to have the interest of one-third of the purchase money of the estate secured to her for her life; and yet it would seem, that the gross sum to be awarded to her must be no more than equivalent to the price of an annuity the same in amount as the annual rents and profits of her dower, (h) In Virginia it is said, that where the estate is sold, and the widow agrees to receive a gross sum in lieu of her dowrer, the court must direct an issue to have the amount ascertained ; (i) which, however, is only calling upon a jury to cut the knot, since they could not be more capable than the Chancellor of drawing from the evidence any settled precise idea of the value, (j) But if the widow refuses to accept a gross sum in lieu of her dower, then, it is said, that one-third of the purchase money must be set apart, and the interest thereof be paid to her annually during her life. (k) And in South Carolina, where in equity an estate is sold, it is laid down, that a reasonable compensation must be *253 allowed to the widow for her dower, without referring to any principles by which the amount of such compensation is to be ascertained by the master in Chancery hy whom it is to be adjusted. (l)
In Maryland there have been frequent and important occasions for recurring to the doctrine of chances in regard to the expectation of human life as a means of ascertaining the value of life interests in property; and the valuation of such interests has presented many and great difficulties to the minds of the legislative as well as to those of the judicial department; and therefore, it cannot be deemed amiss to bring together here all that is to he found in the books of our code in relation to this important matter.
An annual public tax upon land may, with propriety, be regarded, in most respects, as being of the same nature as a mere incumbrance imposed upon it by its individual owner. It is evidently one that hears upon it like the annual interest of a mortgage debt; which must be kept down by the particular tenant who takes its rents and profits. Bnt although that may be considered as a correct mode of adjusting such a burthen as between a particular tenant, paying no rent, and a mere naked reversioner or remainderman; yet as between landlord and a tenant rendering rent; and as between a tenant of a house rendering rent to a landlord, who himself pays rent over to a ground landlord for the same estate, the question is different; and the mode of adjusting the burthen of taxation, in such cases, is by no means so clear. The proportions and the mode in which a tax should be borne by those who hold distinct interests in the same land seems to have been attended with some perplexity every where; and it appears, that the matter remained long in doubt here, even if it can yet be considered as having been finally put to rest.
It has been laid down as a settled principle, that the citizens of every state ought to contribute towards the support of the government, as nearly as possible, in proportion to their respective abilities ; that is, in proportion to the revenue which they respectively enjoy under the protection of the state. The expense of government to the individuals of a nation is like the expense of management to the joint-tenants of a great estate, who are all obliged to contribute in proportion to their respective interests. In the observation or neglect of this maxim consists what is called the *254 equality or inequality of taxation, (m) All taxes ought to fall as equally as possible upon the fund which must finally pay them. The rent of houses, though it, in some respects, resembles the rent of land is, in one point, essentially different. The rent of land is paid for the use of a productive subject. The land which pays it produces it. The rent of houses is paid for the use of an unproductive subject. Consequently, a tax upon the rent of land falls ultimately upon agriculture, whereas a tax upon the rent of houses is paid finally from a revenue derived from the wages of labour, the profits of stock, &c. No tax should, if practicable, be allowed so to operate as to take away any part of the capital value of property; because it thereby tends to diminish the funds destined for the maintenance of productive labour. (n)
These general principles have been incorporated into our Declaration of Rights, which declares, ‘that the levying taxes by the poll is grievous and oppressive, and ought to be abolished; that paupers ought not to be assessed for the support of government; but every person in the state ought to contribute his proportion of public taxes for the support of government, according to his actual worth in real or personal property within the state; yet fines, duties, or taxes may properly and justly be imposed, or laid with a political view, for the good government and benefit of the community.’ (o) The restrictions and regulations as to the taxing power of the General Assembly contained in this article are of great importance; and therefore a few remarks as to their nature; and a cursory view of the manner in which they have been observed and applied, may throw much light upon the matter now under consideration.
A poll tax upon slaves is altogether different from a poll tax upon freemen. The latter is paid by the persons upon whom it is imposed; the former by a different set of persons. The latter is either altogether arbitrary, or altogether unequal, and in most cases is both the one and the other; the former, though in some respect unequal, different slaves being of different values, is in no respect arbitrary. Every master who knows the number of his own slaves, knows exactly what he has to pay. Those different taxes however, being called by the same name, have been often considered *255 as of the same nature. A tax of so much a head upon every slave is properly a tax upon the profits of a certain species of stock employed in agriculture; and as the greater part of the slave owners in Maryland are both cultivators and owners of land, the final payment of such a tax would fall upon them in their quality of land owners without any retribution, (p) A poll tax of forty pounds of tobacco on persons, called the assessment of forty per poll, was laid here under the provincial government, for the support of the clergy of the then established church, upon all male residents, and upon all female slaves, and free female negroes and mulattoes above sixteen years of age, except slaves adjudged by the county court to be past labour. (q) And besides this tax of forty per poll, there was also a poll tax imposed upon all the same description of inhabitants; (r) and at times upon bachelors, (s) to raise a revenue for the slate. It is sufficiently evident however, that all kinds of poll taxes upon free persons must be considered as having been denounced and totally abolished by this article, (t)
Under the provincial government, poor people who received alms from the county, were exempted from taxation. (u) Such a class of persons, it is evident, must necessarily be deemed paupers within the meaning of the second clause of this article. In other respects, however, it seems that the term pauper was not found to be altogether free from ambiguity; and therefore, the Legislature enacted, that all those whose property should not be valued above ten pounds, afterwards, forty dollars, should be declared paupers, and not charged with any tax. (w) But where the tax has been confined to county and special purposes, this pauper exemption, without apparently doing violence to the constitutional rule of equality, has been extended, in some counties, to those whose property was not assessed to one hundred dollars, or to three hundred dollars. (x) The first General Assembly of the Republic laid a tax upon every person having any office of profit of five shillings in the hundred pounds of the annual profits of such office; and also a tax upon every person practicing law, or physic, and upon *256 every hired clerk and factor of five shillings for every hundred pounds'of the yearly profit of such practice, wages, or factor-age. (y) A tax was also imposed upon all free able-bodied unmarried adult males, under fifty years of age; (z) and similar taxes were imposed upon other descriptions of persons. (a)
In what light are such taxes to be regarded ? Are they to be considered as poll, or capitation taxes, or taxes upon property, or upon wages or profits? or can they be considered as falling within any of the restrictions of this article ? The persons on whom these taxes were imposed, certainly could not be deemed paupers ; yet the law itself, directing the assessment, impliedly admits, that it was not a contribution of their proportion of public taxes according to their actual worth in property; nor is it intimated, in any of the acts by which they were imposed,' that those taxes were imposed with a political view for the benefit of the community.
It appears, then, from this article of the Declaration of Rights, that it must be regarded as a constitutional duty of the General Assembly so to lay all-taxes as that they shall bear upon each person in exact proportion to his actual worth in real or personal property; but it is presumed, that this rule extends only to such ■ taxes as may be laid to raise a revenue to the state, not to assessments for mere county or local purposes. A land tax assessed according to a general valuation, however equal it may be at first, must soon become unequal; and as to prevent its becoming so would require the constant and painful attention of the government to all the variations in the condition of every different farm in the country; (b) this constitutional rule cannot be so interpreted as to ■require that the contribution of each citizen should be in exact mathematical proportion to his actual worth in property; because to keep all taxes so continually and exactly proportioned, would be impossible; and therefore it can only be necessary that an assessment should be made from time to time according to as close an approximation to an exact proportion as, under all circumstances, is entirely practicable, (c)
This general rule, if it had been suffered to stand unqualified,
*257 would certainly have restrained the General Assembly from departing from any practicable degree of equality of taxation for any purpose whatever; but there has been engrafted upon it an excepting clause, which declares, thatc fines, duties, or taxes, may properly and justly be imposed or laid with a political view for the good government and benefit of the community.’ No exception can be allowed to have the same extent as the rule itself. Exceptions merely qualify the rule in some of its operations, or take from under it some specified cases. This exception does nothing more than limit the operation of the general restriction upon the right to impose taxes; it allows of a departure from the rule no otherwise than in the imposition of taxes. Fines, duties, and taxes, may be laid, it is said, with a political view for the benefit of the community. A citizen may have a fine imposed upon him as a punishment for his misdemeanor or crime; a duty may be imposed as a means of insuring good conduct, and in aid of the police, as in the form of a duty for a license to keep a tavern, to retail spirituous liquors, to keep a billiard table, &c.; a treble tax may be imposed with a political view, as upon non-jurors during a war, &e.; (d) and to prevent altercation about what should be deemed a money bill, it is declared by the Constitution, ‘that no bill imposing duties or customs for the mere regulation of commerce, or inflicting fines for the reformation of morals, or to enforce the execution of the laws, by which an incidental revenue may arise, shall be accounted a money bill.’ (e)
But all these expressions relate to the imposition of taxes, not to an exemption from taxation. There is nothing in these clauses, nor any thing in the whole of either article which authorizes the General Assembly to exempt any private property from taxation, or to exonerate any person, natural or artificial, from contributing his or its proportion of the public taxes according to his or its actual worth in property; nor is there any thing in any part of the Declaration of Rights, or in the Constitution and Form of Government of the state which admits of such an exemption in any manner or form whatever.
The English statute, passed in the year 1692, for the laying of a general tax, embraced all property of every description, real and personal, ready money and debts, as well as the shares of the New *258 River water-works, and the shares of stock held by individuals in other companies. The assessment upon land was made, not upon its capital value, but at the rate of four shillings in the pound of its annual rent; and that which did not rent for twenty shillings a year, was exempted from taxation, (f) But whatever may be within the uncontrolled power of parliament in this respect, it is laid down, that where any such equal contribution has been required, the king cannot, by any exercise of his limited sovereignty, grant an exemption to any one; because it would increase the charge upon all the lands of those who were not exempted; for the king has not the power to lessen a tax imposed upon one man and charge it upon another, (g) The non obstante power of the crown in this, and in all other respects, having been totally abolished. (h)
Here, however, it has been at different times declared, not merely that all public property belonging to the United States, to this state, to a county, to colleges and county schools, houses of worship, and burying grounds, should be exempted from taxation;' but that the property of foreigners coming' here to settle should, for a time, be exempted; that the crop and produce of the land, in the hands of the person whose land produced the same; plantation utensils ; the working tools of mechanics and manufacturers actually and constantly employed in their respective occupations ; goods, wares and merchandise imported; all home manufactures in the hands of the manufacturers; all stills; ready money, grain, tobacco, riding carriages, and all licensed vessels whatever, should be exempted from taxation. (i) And a similar exemption from taxation has been extended to, and attempted to be made perpetual in favour of lands held by an ecclesiastical body politic'; (j) and of the' property of some incorporated joint stock companies. (k)
Are not exemptions from taxation, like these, of private property, violations of the constitutional ride directing that each person shall be made to contribute his proportion of public taxes *259 according to his actual worth in property ? Or can the granting of any such exemption be within the delegated and limited authority of the General Assembly of Maryland, any more than within the scope of the limited prerogative of a king of England ?
In the Roman empire, under the reign of Augustus, a tax of five per cent, was imposed upon all legacies and inheritances of a certain value, which were not given to the nearest of kin on the father’s side ; so that, when the rights of nature and poverty were thus secured, it seemed reasonable that a stranger, or a distant relation, who acquired an unexpected accession of fortune, should cheerfully resign a twentieth part of it for the benefit of the state. (l) The British government has imposed a similar duty on legacies and shares of personal estate. The adjustment and imposition of which tax upon all subjects of testamentary donation, susceptible of being inspected, handled and valued, could give rise to no difficulty. But it is otherwise as to the valuation of a legacy given by way of annuity for life, which involves a consideration of the expectation of the life during which it is given. And therefore, as to such cases, the British statute has laid down certain rules by which the present value of such legacies given by way of life annuities might be calculated and ascertained, upon which present value the tax is to be imposed. (m)
This direction of the Declaration of Rights of Maryland, that every person ought to contribute his proportion of public taxes according to his actual worth in property, must be extended to all limited and life interests in property as well as to all absolute and unlimited estates; and therefore here, as under the British statute, to impose a tax in due proportion it becomes necessary, in like manner, to ascertain the present value of all life interests which may be made the subject of taxation. It would seem, that this rule has been taken from the most approved writers on political economy; according to whom, as we have seen, the contribution of each citizen should be in proportion to his abilities; that is, in proportion to the revenue which he enjoys under the protection of the state. If this be the true meaning of this constitutional rule, then he alone, who draws a revenue from his property, or has the present command of its profits, can be made to pay a tax upon it. A naked reversioner or remainderman cannot be taxed, as he not
*260 only then draws no revenue from such property; but, from the nature of his estate, he may never have it in his power to derive any profit whatever from it. But if, on the other hand, by the expression, ‘according to his actual worth in property,’ it was intended, that the contribution should be according to the capital value of property of all descriptions, without regard to any present profit which its owner might derive fr.om it; then it would seem, that as a naked unproductive reversion or remainder it must be regarded as property, as well as the highly profitable life estate upon which it depends, the owner of each interest must be made to contribute according to his actual worth in each of these kinds of property; and, that as the two estates together are no more than equal to a fee simple, so the tax upon each should be apportioned between the two, so as to be no more than equivalent to a tax upon the whole estate, if held altogether by one and the same owner.
The first General Assembly, convened under the constitution, in an act, the general frame of which seems to have been taken from the before mentioned English statute of L692, declared, that a rate of two shillings in the pound should be set on all real and personal estate including ready money, tobacco in warehouses, and plate, according to the true value thereof; not, as by the English statute, according to the annual rent of the land. Yet it was provided, that if any person should be compelled by the enemy to leave his habitation, or be rendered incapable of carrying on his business he might be exempted from taxation. And it was also declared, that where land stood charged with the payment of rent, the lessee might pay the tax, and have it deducted from his rent. Thus charging him who occupied without rent, or the landlord who received the rent with the whole tax. (n) According to this mode of making the assessment, therefore, it would seem, that the first General Assembly had adopted that interpretation of this constitutional rule which looked to a contribution from each person in proportion to his revenue as being the true understanding of what was meant by his actual worth in property, without including any mere abstract right of property, such as land which had been laid waste, or was then occupied by the public enemy, or a naked reversionary interest unattended by any present profit. But, however, that may have been, this mode of making the assessment was soon put aside.
*261 The laws for laying taxes passed by the succeeding General Assembly declared, that land under lease should be assessed to the lessor, proper allowance being made for leases for life, or lives, or for term of years outstanding, (o) In addition to which it was the next year declared, that the interest of tenant for life, or lives, or of lessees for term of years should be assessed according to their respective interests, due regard being had to all circumstances, and the value of the land; and that upon the same scale of proportion a distinct assessment should be made of the estate of tenant in dower, or by jointure on marriage, or by devise for life, or during widowhood, and of the reversion or remainder. (p) In the year following, it was declared, that where divers persons had particular estates in the same land, every such person should be assessed in proportion to his particular interest, so that the whole together should amount to the value of the land; but where a full rent was reserved, so that the interest of the tenant could not be considered as valuable, the whole tax should be assessed upon the landlord. (q)
It was the year after declared, that the interest of tenant by the courtesy, or tenant for life without impeachment of waste, who paid no rent, should be charged with the whole tax. (r) Again it was enacted, that a tenant by the courtesy, a tenant in dower, and a tenant for life, without any contigency and impeachment of waste, who paid no rent, should be charged with the whole tax; but that where divers persons had particular estates carved out of the same inheritance, as for years with reversion or remainder for life or in fee, a just computation thereof should be made in proportion to the value of their particular interests, so that together they should amount to the full value of the land; in which computation the length of the term for years, the age and health of the tenant for life, and the chance of the reversion should be considered. And it was further enacted, in the same law, that the lessors of ground rent, in Annapolis and other towns, to the amount of six pounds, should be assessed as for one hundred pounds capital, and so in proportion; and the lessees should be assessed on the actual worth of the improvements made since the lease, and the present value of the land, after deducting therefrom the value thereof, at the time of the lease, which value should be estimated at one hundred pounds for every six pounds of the ground rent, and so in proportion. (s) This last *262 mode of apportionment was entirely reapplied in the next year; (t) and also in the year following, with the exception of the provision in relation to ground rents in towns, which was omitted. (u)
In the year following the General Assembly applied different rules of apportionment by a law which declared, that where divers persons have particular estates carved out of the same inheritance, as in dower, or by the courtesy, or for life or years, with reversions or remainders for life, in tail, or fee simple, a just computation thereof should be made in proportion to the value of their particular interests, so that they amount to the full value of the land; and in making such computation the tenancy in dower, by the courtesy, or for life in possession, or estate for fifteen years without any valuable rent reserved should generally be considered as worth half the value of the fee simple; but this general rule might be departed from as justice might require, considering the age and health of the tenant in dower, by the courtesy, or for life, and the chance of the remainder or reversion, or the length of the term for years and the Value of the rent reserved; but w’here a full rent was reserved, so that the interest of the tenant could not be considered as valuable,the landlord should pay the whole tax. And further, that ground rents in Annapolis and other towns, of eight pounds, should be assessed as for one hundred pounds capital; and so in proportion: that the lessee should be assessed on the actual worth of the improvements made since the lease, and the present value of the land, after deducting the value thereof, at the time of the lease, which should be estimated at one hundred pounds for every eight pounds, of the ground rent reserved; and so in proportion. And moreover, that the lessors of houses in Annapolis, and other towns, yielding an annual rent, should be assessed for every sixteen pounds rent, as for one hundred pounds capital, and so in proportion; and upon leases for above three years, and where the value of the ground and improvements exceed the value of the rent, the lessee should be assessed upon the sum which the actual worth of the ground and improvements in ready money exceeded the value of the rent, calculating sixteen pounds at one hundred pounds capital. (w)
This mode of apportioning the burthen of taxation was continued for twelve years, when all the provisions respecting ground rents,- and houses in towns, were entirely put aside; and new rules were enacted by a law which declared that where divers per *263 sons had particular estates carved out of the same inheritance, as in dower, or by the courtesy, or for life, or for any term of years exceeding five years, with reversions or remainders for life, in tail, or in fee simple, a just computation thereof should be made in proportion to the value of their respective interests, so that together they should amount to the full value of the land. And in making the computation, the tenancy in dower, by the courtesy, or for life in possession, or estate for fifteen years, without any valuable rent reserved, should generally be considered as worth half the value of the fee simple; but that this rule might be varied from as justice should require, considering the age and health of the tenant in dower, by the courtesy, or for life, and the chance of the remainder, or reversion, or the length of the term for years, (x) But it was the next year declared, that the estates of tenant in dower, by the courtesy, or for life, should be assessed as estates in fee simple, and the reversion or remainder be exonerated. (y) This continued to be the law for several years, when it was modified by an act declaring that land held by tenants in fee simple absolute, or fee simple conditional or executory, fee tail, in dower, by the courtesy, for life, or for years, without any valuable rent reserved, should be wholly valued to such tenants; but that if the tenant should pay the public the sum valued for the estate of any landlord, he might have his action against the lessor for the sum so paid, or deduct it out of the rent reserved, unless otherwise agreed between lessor and lessee; and such is the law at the present time, (z)
It seems, then, that after many changes in the mode of making an assessment of public taxes, it has been latterly considered that, in general, the true understanding of the constitutional rule, which requires the contribution from each person to be in proportion to his actual worth in property, is, that the proportion must be according to his actual worth in such property as he has it in his power to make annually profitable; not in unproductive abstract naked rights of property, which may never be beneficial to him; and the title to which he cannot be compelled to litigate, (a) The *264 annual public taxes seem to have been thus assimilated to the annual interest of mortgages, and other real incumbrances, which must be kept down by the tenant for life in possession, upon the principle that the annual profits should alone bear the burthen not only of the annual interest of all mortgage debts, but also of all other' annual charges, as well public as private. And upon this principle, as it would seem, the collectors of the tax for some counties were authorized to sell timber suitable for cord-wood, or fence-rails, growing on land belonging to non-residents, to satisfy the taxes due thereon. (b) Hence as there is not, in such cases, any apportionment of the burthen of interest or taxes between the particular tenant and the remainderman or reversioner, the putting of a present value upon such estates is not called for, or ever made. But those legislative enactments which formerly, for the purposes of taxation, required a present value to be put upon estates for life, or during widowhood, and on terms for years, in such a variety of forms, and which must have been attended with much difficulty, to say nothing of the injustice of the operation of some of them, although now abrogated, are yet well worthy of attention in so far as they illustrate and afford evidence of the various bearings, and great, importance of the matter now under consideration.
In England, as it would seem, few’ cases arise in which a widow may have a proportion, or the annual interest on a share of the purchase money of an estate awarded to her in lieu of her dower; and therefore, there is little or nothing to be found in the English books as to what should be considered as an equivalent for such a life estate, (c) But here, where it so frequently becomes necessary, under the act to direct descents, to have lands, of which partition cannot be made without disadvantage, sold in order to effect a division of the proceeds of sale among the heirs; and also to make sale of the real estates of deceased persons for the payment of their debts, it often happens, that a widow may be called on to allow the estate to be sold free of her claim to dower, and to accept an equivalent portion of the purchase money in lieu of it.
In these and a variety of similar cases where relief has been sought by means of special legislative enactments, it appears that what should be deemed the present value of a life interest in land,, has been in a great many instances submitted to the consideration *265 of the General Assembly. In one of which the widow was to be allowed not more than a fifth nor less than an eighth ; (d) and in another not more than a sixth nor less than an eighth of the net proceeds of sale; (e) in others she was to be allowed one-eighth, or not exceeding one-eighth; (f) in others not more than a seventh nor less than a tenth; (g) in others the proceeds of sale were directed to be invested; and the widow to be allowed one-third of the interest or dividends during her life; (h) in others she was to have awarded to her a proportion of the net proceeds of sale according to the rule of the Court of Chancery; (i) or the land wTas directed to he sold without affecting the widow’s right of dower; (j) but in the greater number of eases the matter has been left entirely at the discretion of the. court, to award to the widow such a proportion of the net proceeds of sale as might be deemed equal in value to her dower. (k) And in cases of tenants for life, the whole proceeds of sale have been directed to be invested, and the interest or the dividends of the whole investment awarded to the tenant for life during her life. (l) The General Assembly have not, however, in any of these private acts, referred to any rule by which the value of a life interest in lands was to be calculated, nor have they indicated the principles by which they had been governed in awarding to the owner what they so specified as an equivalent, or by which the courts of justice were to he regulated in estimating the present value of such interests when the matter was in part or altogether left to their discretion.
Besides these various private acts, in the passing of which this subject appears to have been placed before the mind of the Legislature, there are several public and important laws in relation to the valuing of life interests, in the passing of which by the General Assembly, it is but reasonable to presume, that the matter must have been more fully and deliberately considered.
In the beginning of the year 1800, the then existing law regulating the descents of real estates, was so modified as to declare, that in case of a sale of the real estate of an intestate for the purpose of effecting a division of its value among the heirs, there should he awarded to the widow, according to her age, health, *266 and condition, not more than a seventh nor less than a tenth of the net amount of sales in lieu of her dower; (m) which provision has been embodied in the now existing general act directing the course of descents of intestates’ real estates, (n) The same range of allowance to the widow, according to her age, health, and condition, is declared to be the rule in cases, like the present, where lands are sold for the benefit of infants; (o) as well as in those cases where the court is authorized to sell the realty in order to save the personalty, (p) Dower is a life interest in one-third of a real estate; and, considered merely as such, it would seem necessarily to follow, that a similar rule and limited range of discretion might have been laid down for fixing the value of a life interest in the whole estate, as well as in the one-third of it only. But, in amending the act to direct descents, so as to provide for allowing an equivalent value to tenants by the courtesy, and to tenants for life, claiming by deed or devise, it was declared, that there should be ayvarded to such tenants for life such proportion of the purchase money as the court, upon consideration of the age, health, and condition of the tenant for life, should think just and equitable in lieu of such life estate; thus leaving the court’s range of discretion entirely unlimited. (q) And these amendments have been engrafted into the existing general act to direct descents, without any material alteration. (r)
There is nothing in any of these laws, which shews, that in estimating the value of a life interest in land any separation or distinction was distinctly directed to be made between that portion of the purchase money of the whole which should be regarded as the price of the life interest only, and that which was to be considered as the price of the remainder or reversion. But such a distinction does not seem to have been altogether lost sight of in all the laws in relation to this matter; for it is declared, that upon a sale of a reversion belonging to an infant, with the assent of the tenant for life, the court shall order the annual interest, or such part thereof as may be deemed equitable to be paid over to such tenant for life during his life, (s) Whence it is clear, that the Legislature has not deemed it just in every instance to award to the tenant for life *267 •all the annual interest, as it may arise, from the whole purchase money, including that proportion of it which must be considered as the price of the reversion, as well as of that which may properly be regarded as the price of the life estate. Apart from these legislative enactments in relation to these specified estates for life in land; and as regards all other life interests in land, annuities for life, &c. the courts of justice have been left without any positive or general rule as their guide, to adjust the value of life interests, when called upon, as they could according to the general principles of law and justice.
There can be no doubt, that long antecedent to the amendment in 1800, of the act to direct descents, there must have been brought before the courts of justice many cases in which it was necessary to make a valuation of a life interest; but no such case has been reported. In a case which was brought before this court in the year 1801, by a widow to obtain an allowance of a proportion of the proceeds of sale as a compensation for her dower, the Chancellor speaks of it as the first of the kind, within his recollection. In adjusting the proportion of the proceeds of the sale to be allowed to her in that case, he declares, that as she could not use her third part of the land as tenant in fee simple, she could not be entitled to one-third of the annual interest on the whole purchase money; but on consideration of all the circumstances, and without apparently adverting to the act providing, that in cases arising under the act to direct descents, the widow should be allowed not more than a seventh nor less than a tenth of the proceeds of sale, he awarded to her three-twentieths of the net proceeds of sale. (t) Some time after which, this matter, as to the *268 proper proportion of the proceeds of the sale of a real estate ■which should be awarded to a widow in lieu of her dower therein, seems *269 to hadü very strongly attracted the attention of Chancellor Hanson ;. and, as it would seem, without the slightest reference to any then: existing act of Assembly, or to any previous decision of his own, he accordingly took up the subject on the 14th of September, 1803, with an avowed determination to establish a general rule by which the court should be governed in all future cases, when called upon to award to a widow an adequate compensation for her dower.
‘Sometimes,’ says he, ‘when lands, subject to dower, are sold under the authority of this court, the widow and the persons concerned agree, that the Chancellor fix the value of the dower. There had prevailed an idea pretty generally, that the value of the dower, of a middle aged woman, was only one-eighth of the whole value of the land; and parties sometimes, in this court, have agreed, that one-eighth of the net money arising from the sale should belong to the-widow. The aforesaid idea is evidently borrowed from England, where the widow’s dower is estimated from the rents. For instance, land which would sell for £7,500, rents for only £300, or four per cent.; well; as the widow is entitled to one-third of the cent, viz. to £100 per annum for life, they calculate the present , ue of her annuity. If thirty years of age, or under, she has an equal chance of living twenty-four years ; for this they set down twelve years certain, and then calculate the present value of an annuity of £100 for twelve years. This they find about £937 10s. 0d.; calculating their rate of interest which is five per cent.; the said £937 10s. 0d. is just one-eighth part of £7,500.’
. ut surely the incontrovertible principle is this; as the widow is '■tied to one-third of the land for life, when she consents, that ¿i v ¡.and may be sold, she is entitled to the interest of one-third of money for life. Suppose then, the land sell for £3,000, the h-v. vest is £180, one. third of which is £60; suppose her of such au ago, that is, not exceeding thirty, as to have an equal chance of living twenty-four years; set down twelve years certain, and calcrl¡¡i,e [he present value of an annuity for twelve years of £60 per I calculate at compound interest of six per cent, and the said. \ Hue to be rather more than £500, which is one-sixth of the whole money, £3,000. Had I calculated at simple interest the value would have been still less; but compound interest surely is righ;, You wish to knowthe present value of £100 to be received twelve years hence ; you find it to be £50, because £50 at compound interest of six per cent, in twelve years amounts to £100, and *270 even a little more. Calculate at simple interest and the value of £100 receivable twelve years hence, is about £58 5s. Od.; because £58 5s. Od. at simple interest of six per cent, amounts, in twelve years, to about £100. Suppose a man accustomed to let money at interest, he can lawfully exact only six per cent, and must not charge interest on interest. Who is there, that- can afford to let money at interest, and dispose of his- surplus money in no other way, that would not be willing to receive twelve years -hence the sum of £10,000 for £5,000 now lent ? It is evident, that at simple interest, unless punctually paid and instantly let out, he cannot, in twelve years, convert his £5,000 into £10,000; at mere simple interest it amounts to only £8,600; because £300 is the interest of £5,000, and £300 + 12 = 3,600 -f 5,000 = £8,600.’
‘The Chancellor has taken the trouble to demonstrate clearly, that young widows have not generally received near the value of their dower. It is plain to common sense, that the dower of an •old woman cannot be equal in value to that of a young one. To fix one value of all dowers is therefore, preposterous. The Chancellor has, with great trouble, care and attention, calculated, on the principles here laid down, the value of dowers of women of different ages. It is certain, that the value of the dower of a healthy woman twenty years of age, who has an equal chance of living thirty, is more than that of a woman, who has attained thirty years; however, the Chancellor, under all circumstances, has thought proper to consider the dower of all women, not exceeding thirty years of age, to be no more than one-eighth of the net sum produced-by the sale of lands; and he thinks proper to pass a general order agreeably to which allowances for dower hereafter shall be made.5
‘A healthy widow, not exceeding thirty years, shall be allowed one-sixth of the net amount of sales; if above thirty and not exceeding thirty-seven, one-seventh; above thirty-seven and not exceeding forty-five, one-eighth; above forty-five and not exceeding fifty, one-ninth ; above fifty and not exceeding fifty-five, one-tenth; above fifty-five and not exceeding sixty, one-eleventh; above sixty and not exceeding sixty-five, one-twelfth; above sixty-five and not exceeding seventy, one-sixteenth; after that age all allowed one-twentieth.’
Some time after which, in the year 1804, the subject was again taken into consideration by Chancellor Hanson, when he thought proper to alter the graduation of the allowance to widows. ‘From the table and calculations,’ says he, ‘taken from Simpson’s Algebra, *271 of the probable duration of life, it appears, that the value of a woman’s dower is as follows. If under thirty years of age, one-sixth; above thirty and under thirty-six, two-thirteenths; above thirty-five and under forty, one-seventh; above forty and under forty-five, two-fifteenths; above forty-six and under fifty-one, one-eighth; above fifty-one and under fifty-six, one-ninth; above fifty-five and under sixty-one, one-tenth; above sixty and under sixty-seven, one-twelfth; above sixty-six and under seventy-two, one-fourteenth; above seventy-two and under seventy-seven, one-eighteenth ; and above seventy-seven, one-twentieth.’
On the 14th day of December, 1819, Clement Dorsey and Samuel Chapman, filed their bill in this court against Charles S. Smith, in which bill, among various other circumstances, it was stated, that Henry A. Smith, on the 17th of July, 1802, made his last will in which he said, ‘I do hereby give and bequeath to my said wife Dicandia S. Smith, during her natural life, all the land whereon I now live, near and adjoining Benedict, Leonardtown, in Charles county.’ And again, ‘After the death of my beloved wife Dicandia S. Smith, I give to my brother Charles S. Smith, all my land where I now live adjoining Benedict, Leonardtown, in Charles county, to him and his heirs for ever. My will is, that in one year after my brother enters into the possession of the above land, he pay to my sisters Margaret and Mary Wheatly, or to their heirs, five hundred pounds current money ($1,333 33 J) each, for the due performance of which I hereby make the said land liable.’ After which Henry A. Smith died leaving his widow, devisee, and legatees then alive, and his widow then and ever since a resident of Charles county. The plaintiff Dorsey married the widow Dicandia, and purchased of the defendant Charles S. Smith, the remainder so devised to him clear of all charge of the legacies for the payment of which it was so made liable. But the defendant having failed to satisfy those legacies, the plaintiff Dorsey, on the 17th February, 1817, bought one of them for the sum of $1,101, and claimed a credit for that amount on the bond by which he and the plaintiff Chapman, were bound to the defendant for the purchase money of the estate in remainder.
On the 9th of December, 1823, the auditor made and filed a report in which he says. ‘For the legacy bought by the complainant Dorsey, he has credited a sum, $560 22, as with simple interest for twenty-three years, the probable duration of Mrs. Dorsey’s life and one year after, would amount to A500; (1,333 33 §,) *272 and then such a sum, $349 06, also as, with compound interest, would amount to it. The calculation of the probable duration of Mrs. Dorsey’s life is made from Dr. Halley’s Table of Observations, which for a long time has been used as the foundation of such computations. The bill stated Mrs. Dorsey’s age to be between forty-two or forty-three, or thereabouts. The answer admitted it. In February, 1817, when the complainant Dorsey, bought the legacy referred to, she must have been about forty. She then had an even chance of living twenty-two years, and the legacy was payable one year after her death.’
This is an instance of a reversionary payment; and, being a legacy charged upon real estate, would, according to the English law, and perhaps also according to our law, but for a single expression of the will, have lapsed for the benefit of the inheritance, if the legatee had died before the day of payment; and consequently, in that case, to ascertain its value on the 17th of February, 1817, it would have been not only necessary to deduct from it the value of the life of the person until whose death it was not to he paid,"but also the value of the legatee’s chance of living until the day of payment. (u) ' But the testator says my brother shall, ‘pay to my sisters Margaret and Mary Wheatly, or to their heirs, five hundred pounds current money each;’ from which expression, ‘or to their heirs,’ it may be presumed, that he intended these legacies should vest immediately; and consequently, they are not subject to the contingency of lapsing for the benefit of the inheritance, or of being wholly lost by the death of the legatee before the day of payment.
Here, however, was presented to the court a case for ascertaining the present value of a reversionary payment. In which case, as in all others relative to the value of a life interest, the important point, from which the inquiry must set out, is, that of the proper expectation of life of the person upon whose existence the interest depends, or after whose death the sum is to become payable; and, that being determined, every thing else must be the result of calculation.
It will be seen by adverting to the preceding tables, that the expectation of life from which, in this case, the auditor might have-set out, ranges from nineteen to thirty-one years, according to the table from which Mrs. Dorsey’s expectation of life was taken. *273 After having determined what number of years, according to those tables, or otherwise, should be allowed as the expectation of life during which the payment of the legacy was to be deferred, the rule, according to Dr. Price, is, for example, to subtract the value of the life from the perpetuity, absolute property, or fee simple estate. Multiply the remainder by the product of the given sum into the interest of one hundred pound for a year; and this last product divided by one hundred pound increased by its interest for a year, will give the answer in a single present payment. Recollecting, that in proportion as the expectation is short, as taken from the London table, or long, as taken from that of Finlaison, so will the life interest to be subtracted be large or small; and consequently, the present value of the reversionary payment be little or much. (w)
Upon this case t wo questions arose. First. Whether the plaintiff Dorsey, was to be credited for the whole amount he paid for the legacy ? Secondly. If not with that amount, but with its true value on the 17th of February, 1817, when he bought it, then; How was that value to be ascertained ?
March, 1824.
Johnson, Chancellor.
‘By the agreement the legacies are not to be satisfied by Dorsey. If, therefore, he has undertaken to satisfy them, or purchase them, as between him and Smith, he is only entitled to their worth at the time of purchase, and not to their worth when they take effect in possession. According to calculations by which the extent of a widow’s dower in land, when converted into money, and by which legacies to be paid after a life estate, are regulated, the legacy purchased by Dorsey was only worth $560 22; indeed by the English rule, only $349 06. But as that rule is founded on compound interest, on the principle that the interest should, as there it may, be immediately vested, although wre adopt the time at which it is most probable the right to receive the legacy will arrive, yet its value is not come at by compound, but by simple interest; and by that rule Dorsey can only claim, in addition to the two payments, the sum of $560 22.’ (x)
From this decision of the Chancellor the plaintiffs appealed, and the same questions were submitted to the tribunal of the last resort for determination.

June, 1826.

The Court of Appeals.
‘The consideration of the *274 sum which should be allowed Dorsey for the legacy purchased by him, involves a question which has not been adjudicated by this tribunal. Should he be allowed what he proves he has paid for it ? We think not. By the contract he was not to pay the legacies ; it was Smith's business to disencumber the land. And, if he is made to suffer by the purchase, he has no person to blame but himself. When Smith refused to exonerate the land in violation of his contract, he subjected himself to the legal consequences of such an act; but it would be a most inequitable consequence of such refusal to say, that Dorsey was thereby constituted his agent, with unrestricted powers to make the purchase; such a result would have placed him at Dorsey's mercy. But equity demands, that having purchased the legacy he should be entitled to a credit, as against Smith, for the legacy at its fair value, from the date of the purchase, 17th February, 1817.’
‘By what rule is its value to be estimated ? The Chancellor, in his decree, has adopted that value which was ascertained by the auditor by a reference to Doctor Halley's table of observations, which have been used in England for the purpose of ascertaining the value of life annuities, and reversionary interests. These tables are framed upon long and accurate observations on the bills of mortality in England, and in other places; and may not be an unsafe guide for the purpose in the region or latitude for which they were calculated. But the probability of the duration or human life, cannot be the same in every latitude and climate. In the one it may be prolonged to the greatest age, in the other abbreviated to what, in a more healthy region, would be considered as but a middle age; and even, indeed, in the same district of country the chance for the duration of life is by no means the same. Thus would tables, suited for the lowlands of Louisiana, furnish any index of the duration of human life in the highlands of Maryland ? And, even in our own state, could any dependence be placed in the calculation of the value of an annuity, or of a reversion expectant upon a life, which would say, that as great a probability existed for the duration of human life amid the marshes of the Chesapeake Bay, as in the mountains of Allegany ? These observations will be found to be verified by an examination of Dr. Halley's tables, as suited to different parts of England, and to places on the continent. Whether these tables, upon which the Chancellor’s decree is founded, are suitable to this state, could only be told by a long series of observations here, which not *275 having been made, we conceive it would be unsafe to adopt them. In ascertaining the value of this legacy at the time of its purchase, we apprehend, there would be a much better chance of justice being effected by applying by analogy the rule adopted, long since, in the Court of Chancery, for the purpose of ascertaining the allowance to a woman, in lieu of her dower in land sold under a decree of that court. Mrs. Dorsey is shewn to have been about forty years of age at the date of the purchase, and the calculation should be made in conformity with the above rule. By such calculation the legacy was worth the sum of $761 90. With this value the appellants should be credited on the day of the purchase of the legacy.’ (y)
The manifest discordances of the rules which have been laid down, or adopted for the. government of this court, in cases of this kind, require some further remarks. The legislative rule, in regard to dower, which directs that, in certain specified cases, not more than one-seventh nor less than a tenth of the net proceeds of the sale of the whole estate, shall be awarded to the widow in lieu of her dower, fixes an arbitrary limitation, the reason of which is not apparent. As early marriages in our country are common, there must be many instances of young widows; and consequently, this legislative rule must embrace all cases of widowhood from fifteen to eighty years of age; with an expectation of life, according to Finlaison’s tables, ranging from forty-seven to no more than six years; and yet, bound by this rule, the court can, on the one hand, award to the life of forty-seven years expectation no more than a seventh ; and on the other must give to the life of only six years expectation, not less than one-tenth of the whole net proceeds of sale. This rule thus appears from itself to be in many of its bearings unreasonable and unjust.
In all inquiries as to the present value of a life interest in real estate, it is indispensably necessary to bear in mind the distinction between the interest of the particular tenant, and that of him in remainder or reversion; and also to take especial care, that neither should have awarded to him any thing which may properly be considered a part of the value of the estate which belongs to the other. Thus, supposing the whole estate were sold for $9,000; that sum would represent the entire value of the whole, including both interests, as well that of the tenant in dower, who was enti *276 tied to no more than one-third for life, as that of him who was entitled to the fee simple of two-thirds, and of the reversion of the one-third; and consequently, if the widow were allowed §3,000, she would have awarded to her, in that one-third, a sum of money which must be considered as including the full price of the reversion; to no part of which could she be entitled. It is clear, therefore, that she should not, in any case, be allowed as much as one-third of the purchase money of the whole estate. But, if one-third of the proceeds of sale were put out on interest, the interest which the whole third would so accumulate, would arise, not only from so much of it as represented the value of the widow’s dower, but also from that which must be considered as the price of the reversion. Hence it would be as clearly wrong to give to a widow the whole of the interest arising from one-third of the proceeds of sale as to award to her the one-third of the principal itself. This reasoning, it is obvious, applies with no less force to the case of a tenant for life of the whole as to the case of a tenant in dower. It would be, in each case, directly, or in effect, to take away a part of the property of the reversioner or remainderman, and to give it to the particular tenant. But it may well be doubted, whether a court of justice has the constitutional power, in such a manner, to divest one person of his property, and transfer it to another. Yet, in making the calculation for the Chancery rule it was assumed, as we have seen, that the widow was entitled to the interest of one-third of the proceeds of sale for life. This, therefore, is the first element in which the Chancery rule is radically wrong.
It should also be recollected, in all cases of this kind, where it may be required, out of the purchase money or value of the whole, to separate the value of the particular estate from that of the inheritance, that it is necessary, in the first place, to attend to the true legal extent of the particular estate. Tenants in dower, by the courtesy, &c. are not allowed to commit waste; that is, they cannot cut and sell timber; open, and work unopened mines, &c.; and being restrained from deriving any such profits from the estate, the value of it, in regard to all such profits, properly forms a part of the price of the reversion or remainder; and the value of such profits also represents that, which is the difference in price between a particular estate the tenant of which is, and one the tenant of which is not impeachable for waste. But this distinction does not appear to have been at all attended to in making the calculations *277 for the Chancery rule. This therefore is another element in which it must be considered as materially erroneous.
It appears, that the present value of a widow’s dower was calculated for the Chancery rule at compound interest; because in England the present value of such estates, it is said, is calculated upon the ground of compound interest. But then it is laid down in an English adjudication, that as the computation of compound interest proceeds upon the idea, that the interest is paid upon the exact day and immediately laid out, which is impossible, it is sufficient to compute compound interest at four per cent, or at something less than the legal rate of interest, (z) The calculations for the Chancery rule have, however, been made upon the ground of compound interest at the full legal rate of six per cent.; which, if wrong in England, where there are so many ways of making immediate and safe investments of money, must be much more so here. This, therefore, is a third element in which that rule is substantially erroneous.
It has been shewn by reference to good authority, that the observations of the rate of mortality at Breslaw, from which Dr. Halley constructed his tables of the probability, and of the expectation of human life, have been found to be so entirely inaccurate, that they have never, in any case, been resorted to for many years past. And it has also, in like manner, been shewn, that the observations of the waste of life in London, from which Mr. Simpson formed his tables, were, in so many respects, erroneous, that they have been considered as very unsafe guides in calculating the value of human life even in London itself; and as totally unfit for use, in making an estimate of the value of life any where else. But it appears, that all the calculations for the Chancery rule were taken from the observations of London, and the tables of Mr. Simpson founded on those observations. This therefore is a fourth element in which that rale is essentially wrong.
It is well known, that in our country early marriages are common ; and it appears from the observations of Dr. Grenville, that even in England, of eight hundred and seventy-six females, thirty of them had been married at or before fifteen years of age. Therefore as it may fairly he presumed, that there must be a great number of instances of widows under thirty years of age; and as according to Finlaisorfs tables, the expectation of female life, between *278 fifteen and eighty years of age, ranges from forty-seven to six years; any graduation of allowance in Jieu of dower, to be correct, should, at the latest, commence with fifteen years and extend as far as eighty years of age. But the Chancery rule assumes, that all lives, under thirty, are of the same value; and, commencing with that age, has graduated the allowance from that period, at intervals of five years, no further than seventy-seven years of age. It is therefore, confessedly nothing more than an approximation to truth; and is in this respect materially defective.
In England, and indeed, as it would seem, all over Europe, for a great length of time past, the most usual, or perhaps the only method of coming at the fee simple value of land has been, first to ascertain the fair rental value or price, by the year; and to multiply that by the number of years purchase which the existing demand for land will bear in the given situation at the time. The ratio between the rental and the sale value of land, in England, varies from twenty to forty years; that is, a parcel of land the fair rental value of which is one hundred pounds, is worth, in common cases, from two thousand to four thousand pounds. In England a very large proportion of the lands are rented out by the fee simple owners; and therefore, it may not be difficult there, in this mode, to make an estimate of the fee simple value of any estate; either from the rent of itself; or, by analogy, from the rent of other similar estates in its immediate vicinity. But here, more than nine-tenths of the actual occupants and cultivators are also the owners of the fee simple ; and, hence resort cannot be so readily had, here as in England, to the rental for the purpose of computing the fee simple value. But here, as in England, it appears, that so far as the rent or annual price can be ascertained, the ratio between the rental and the sale value ranges very wide; perhaps from fifteen to thirty-five years purchase.
In the case now under consideration, it appears, that the land actually sold for something more than twenty-six years purchase, and was valued, by the commissioners, at more than twenty-nine years purchase. This mode of estimating the value of property, by so many years purchase, has been applied not only to life estates and terms for years in land; but to annuities, terms for years, and life interests of all kinds, (a) In all cases there is a *279 material difference, in amount, between the annual legal interest of the purchase money of an estate, and its annual rents and profits. In a case, which not long since passed before this court, some lands in Prince George’s county were estimated to be worth no more than four per cent, per annum, on the gross value, thus reckoning the fee simple value at about twenty-five years purchase. (b) In this instance, the annual legal interest, on the whole purchase money, would amount to $2,235, when the net amount of the annual rent was no more than $1,400. It seems to have been admitted in this case, that before the sale, the widow could be entitled to no more than one-third of the rent: and, accordingly, of the rent actually received, that proportion has been awarded to her by the auditor; but, after the sale, instead of $466 66, as one-third of the whole rent, she is allowed to claim, at the rate of $745; the one-third of the legal interest on the whole purchase money. There is an apparent inconsistency in this. And thus, in place of taking the rent or annual price as the basis of the computation, the legal interest of the purchase money has been assumed as the foundation upon which the calculations for the Chancery rule have been made. This therefore is a fifth element in which that rule is materially erroneous.
It has been stated, that where the value of the fee simple has been properly ascertained, that of any inferior holding may be readily found from it by means of the general rules of calculation. But if that were so, then there could be no difficulty, in any case, like this, where the value of the whole had been ascertained by an actual sale under a decree, to ascertain by calculation, when the case again came before the court for further directions, the value of any particular estate which had been carved out of it. But such a sale of the whole determines nothing as to the proportion between the particular estate and the reversion or remainder; and therefore that proportion is left to be ascertained just as if no such sale had been made. In such cases, the particular estate is, like the fee simple, to be valued by a computation of so many years *280 purchase. A lease for a long term of years at a small rent may reduce the value of the remainder to very little; but a lease, at a nominal rent, for ninety-nine years renewable forever, would, in effect, annihilate the fee simple.
. Estates for life have an absolute, but uncertain limit. To ascertain the duration of such estates recourse must be had to some table, shewing the expectation of life, to find what may be deemed the length of the life of the tenant for life. And then a calculation is made, from the rental value, of the sale value of the estate for life of such a duration. In England, as we have seen, it was formerly the rule to consider an estate for life as equal to one-third of the whole, and to charge it with a proportion of all incumbrances accordingly. But for some time past that rule has been abolished; and the best life is not now reckoned to be more than equal to one-third of the whole; and all such estates are estimated below that at their actual worth, upon a consideration of the age and health of the tenant for life, and of all other circumstances.
In some of our revenue laws, as has been shewn, a life estate . and a term for years of not less than fifteen years duration was allowed to be computed as equal in value to one-half of the fee simple; but those laws have been disapproved of, and long since repealed. By the legislative rule, which allows to a widow, not more than a seventh nor less than a tenth, it appears, that by a seventh she will get nearly one-half of the net proceeds of the sale of that third of which she. is entitled to dower. Thus, for example, in this case, the one-third of the net amount of the purchase money is $12,418, and the widow has had awarded to her $5,265; which is not very far short of one-half of the price of that portion of the land which was charged with her dower; and even if she had been eighty years of age the court could have awarded to her no less than a tenth, or $3,725, which is not much below one-third of the price of so much of the estate as was charged with her dower. According to the Chancery rule, one-sixth of the whole, or $6,209, would have been awarded to her as a widow of no more than thirty years of age, which would be exactly one-half of the purchase money of the land charged with her dower. And from the principles of the Chancery rule it necessarily follows, that a tenant for life of the whole of no more than thirty years of age is entitled to one-half of the whole net proceeds of sale.
After having thus traced this important subject through a long and devious course of judicial and .legislative proceedings, it ap *281 pears from all that has been said, that a great variety and repeated efforts have been made, as well by the Legislature as by the judiciary, to fix upon some general rule by which the present value of a life interest might be ascertained ; and by which the proper proportions between such interests and the perpetual right, or estate of inheritance might be adjusted and determined. Much light has been throwm upon the subject, and some difficulties have been removed; but that rational degree of certainty, which is, in all respects, so desirable, has not yet been attained. The rules which have been laid down or adopted, in relation to this matter, are manifestly defective, erroneous, and unjust. They are so contradictory as to he utterly irreconcilable by any ingenuity or argument ; and yet being rules laid down by the Legislature, or approved by the• Court of Appeals this court cannot, as in some other cases, make an election to follow any one in preference to another of them; or adopt any new general rules applicable to the same and all other similar estates, which should more nearly coincide with reason and justice, (c) The subject can now only he extricated from the difficulties in which it has been involved by the Legislature.
The legislative rule, now in force in regard to dower, directs that where lands are sold for the benefit of infants, as in this instance; (d) or where the real estate is sold to save the personalty; (e) or where the real estate of an intestate is sold under the act to direct descents, (f) no more than a seventh nor less than a tenth of the net proceeds of the whole estate shall be awarded to the widow in lieu of her dower. But in regard to tenants by the courtesy and other tenants for life in real estate the matter has been expressly referred entirely to the discretion of the court to say what proportion of the whole net proceeds of sale should be awarded to them in lieu of their estates. (g)
As to all cases of dower, not embraced by the legislative rale, this court is governed by its own rule; which as it now stands, directs, that, cthe allowance to a healthy woman in lieu of her right of dower in land sold under decrees, to be as follows: If under thirty years of age, one-sixth; if above thirty and under thirty-six, two-thirteenths; if above thirty-five and under forty, *282 one-seventh; if above forty and under forty-five, two-fifteenths; if above forty-five and under fifty-one, one-eighth; if above fifty-one and under fifty-six, one-ninth; if above fifty-six and under sixty-one, one-tenth; if above sixty-one and under sixty-seven, one-twelfth ; if above sixty-seven and under seventy-two, one-fifteenth; if above seventy-two and under seventy-seven, one-eighteenth; if above seventy-seven, one-twentieth of the net proceeds.’
There being no difference between a tenant in dower and any other tenant for life; except, that the one is entitled to no more than a third and the other is entitled to the whole for life; and there having been no distinction made in relation to this matter between particular tenants who are and those who are not punishable for waste. And the rule of this court, in relation to dower, being a much nearer approximation to truth and justice than that of the Legislature; and having been approved of by the Court of Appeals, and directed to be applied, by analogy, to ascertain the present value of a reversionary payment, it has been deemed proper to follow out its principles, and to consider it as a general rule in regard to estates for life in land, and life interests of all descriptions, other than dower, or those embraced by any legislative rule, of which this court may be called upon to ascertain the present value; that is to say,
The allowance to a healthy person in lieu of his or her life interest in the whole to be as follows; if under thirty years of age, one-half; if above thirty and under thirty-six, nineteen-fortieths; if above thirty-five and under forty, eleven-twenty-fifths; if above forty and under forty-five, two-fifths; if above forty-five and under fifty-one, three-eighths; if above fifty-one and under sixty-six, one-third; if above fifty-six and under sixty-one, three-tenths; if above sixty-one and under sixty-seven, one-fourth; if above sixty-seven and under seventy-two, one-fifth; if above seventy-two and under seventy-seven, one-sixth; if above seventy-seven, three-twentieths of the net proceeds.
In all cases where there is a widow, or particular tenant who wishes to obtain a proportion of the proceeds of sale in lieu of such life interest, it has hitherto been and must still be regarded as the practice, that before the case can be sent to the auditor to state an account distributing the proceeds, such particular tenant should bring the case before the court by petition, by motion, or by submitting it to the Chancellor, with an affidavit of some disinterested and credible witness stating the age, health, and condi *283 tion of the widow or particular tenant; and if the widow should have married again it will be necessary that the testimony by affidavit should also identify, or shew her to be the same person under a different name, claiming with her then husband. (h) And as the valuation of the life interest is to be made as of the day of the sale by which it is extinguished, the age, &c. of the particular tenant should be shewn as of that day.
In this case the dower right to a part of the estate was extinguished by the sales made on the first day of May, 1829; and the order of the 17th of July, 1829, was made on the affidavit of the age, See. of the widow as of that day of sale. But as the residue of the estate was not' sold, and the dower right thereby extinguished until the 17th of December, 1830; the age of the widow had thus far advanced, and there might have been such a material change in her health, &c. as would have made a great difference in the amount to be awarded to her according to the Chancery rule; and therefore, there should have been, according to that rule, another affidavit as to her age, Sec. But as this is a case governed by the limited legislative rule, and no objection is made, such further proof, as to her age, &c. as of the day of the last sale may be dispensed with.
Considering the life interest as having been sold and extinguished by the sale of the whole; when that sale has been finally ratified, the real estate is thereby converted, and the proceeds thereof vested absolutely in those then entitled to them; and consequently, if the particular tenant should die after that time, his or her share of the proceeds, according to age, &c., on the day of sale, will not, as the particular estate would have done, revert or sink, but go to the assignee or legal representatives of the deceased particular tenant. (i)
Whereupon it is Ordered, that the foregoing report of the auditor be, and the same is hereby ratified and confirmed; and the trustee is directed to apply the proceeds accordingly, with a due proportion of interest.

 Crabtree v. Bramble, 3 Atk. 687.

 Doughty v. Bull, 2 P. Will. 320; Lechmere v. Carlisle, 3 P. Will. 211; Thornton v. Hawley, 10 Ves. 129; Ashby v. Palmer, 1 Meriv. 296.

 Inwood v. Twyne, Amb. 417; S. C. 2 Eden, 148 ; Lee v. Brown, 4 Ves. 368.

 Rook v. Worth, 1 Ves. 461; Ex parte Bromfield, 1 Ves., jun., 460 ; Oxenden v. Compton, 2 Ves., jun., 73.

 Winchelsea v. Norcliffe, 1 Vern. 435; Witter v. Witter, 3 P. Will. 99; Kirk v. Webb, Prec. Chan. 84; Terry v. Terry, Prec. Chan. 273; Mason v. Day, Prec. Chan. 319; Pierson v. Shore, 1 Atk. 480; Sergeson v. Sealey, 2 Atk. 413; Maynwaring v. Maynwaring, 3 Atk. 414; Rook v. Worth, 1 Ves. 461; Inwood v. Twyne, Amb. 417; S. C. 2 Eden, 148; Gibson v. Scudamore, 1 Dick. 45; Oxenden v. Compton, 2 Ves., jun., 73; Ashburton v. Ashburton, 6 Ves. 6; Ware v. Polhill, 11 Ves. 278 ; Ex parte Phillips, 19 Ves. 120 ; Webb v. Shaftsbury, 6 Mad. 100.

 Somerville v. Somerville, 5 Ves. 750; Potinger v. Wightman, 3 Meriv. 68; Desesbats v. Berquier, 1 Bin. 336.

 Dennis v. Badd, 1 Chan. Ca. 156; Ex parte Grimstone, Amb. 706; Shrewsbury v. Shrewsbury, 3 Bro. C. C. 125; S. C. 1 Ves., jun., 233; Chetwynd v. Fleetwood, 4 Bro. P. C. 435.

 Ex parte Ludlow, 2 Atk. 407; Ex parte Simon Degge, 4 Bro. C. C. 238, note; Oxenden v. Compton, 2 Ves., jun., 73.

 Rook v. Worth, 1 Ves. 461; Anandale v. Anandalo, 2 Ves. 383; Tullit v. Tullit, Amb. 370; Ex parte Ludlow, 2 Atk. 407; Ex parte Bromfield, 1 Ves., jun., 462; S. C. 3 Bro. C. C. 510 ; Oxendon v. Compton, 2 Ves., jun., 70; S. C. 4 Bro. C. C. 231.

 Chandos v. Talbot, 2 P. Will. 606; Story v. Windsor, 2 Atk. 630 ; Pulteney v. Warren, 6 Ves. 89; Rook v. Worth, 1 Ves. 461; Tullit v. Tullit, Amb. 370; Oxenden v. Compton, 2 Ves., jun., 70; S. C. 4 Bro. C. C. 231; Ex parte Phillips, 19 Ves. 119 ; Stoughton v. Leigh, 1 Taunt. 402.

 Bertie v. Abingdon, 3 Meriv. 568.

 Taylor v. Philips, 1 Ves. 229; S. C. 2 Ves. 23; Belt’s Supp. 120, 258; Harvey v. Ashley, 3 Atk. 613; Russel v. Russel, 12 Cond. Chan. Rep. 258; In the matter of—, a minor, 12 Cond. Chan. Rep. 259; Mackworth’s case, 1 Vern. 461.

 Exparte Phillips, 19 Ves. 123.

 1785, ch. 72, s. 6; 1800, ch. 67,s. 5; 1828, ch. 26, s. 3; 1829, ch. 222; 1833, ch. 150.

 1818, ch. 193, s. 8; Waring v. Waring, 2 Bland, 676.

 Doughty v. Bull, 2 P. Will. 320 ; Terry v. Terry, Prec. Chan. 273; Inwood v. Tyne, 2 Eden, 148 ; Webb v. Shaftsbury, 6 Mad. 100.

 Chambers v. Chambers, Eitzgib. 127; S. C. Mosely, 333 ; Terry v. Terry, Prec. Chan. 274 ; Harrison v. Hart, Comyns, 394; Rees’ Cyclo. art. John Law; Collyer on Partnership, 618; Chalmer v. Bradley, 1 Jac. & Walk. 59.

 Hoye v. Penn, 1 Bland, 41, note.

 Anandale v. Anandale, 2 Ves. 383; Oxenden v. Compton, 4 Bro. C. C. 235, note ; Oxenden v. Compton, 2 Ves., jan., 77.

 Ringgold’s case, 1 Bland, 26.

 Doughty v. Bull, 2 P. Will. 320 ; Partridge v. Dorsey, 3 H. & J. 307, note, 322.

 Goodier v. Ashton, 18 Ves. 83; Mondey v. Mondey, 1 Ves. & Bea. 223; Brookfield v. Bradley, 4 Cond. Chan. Rep. 298 ; Scholefield v. Heafield, 11 Cond. Chan. Rep. 528; Powel Mort. 983, 985.
Jones v. Betsworth. — This bill was filed on the 3d of September, 1795, by Thomas Jones against Samuel Betsworfh, for the recovery of a mortgage debt by a sale of the mortgaged property. The defendant answered, and the case was brought on for a final hearing.
17th January, 1798. — Hanson, Chancellor. — The said cause standing ready for decision, and being submitted; the bill, answer and all other proceedings were by the Chancellor read and considered; and it appearing to him, that the mortgage in the bill mentioned was duly executed, that there is due to the complainant, on the said mortgage, the sum by him stated to be due, with interest from the time of settlement; that it is reasonable to have the said sum, with interest and costs, raised by a sale of the mortgaged lands ; unless the defendant, within such time as shall be allowed by this court, shall discharge the said principal, interest and costs.
It is thereupon Decreed, that unless the defendant, on the 9th day of February, 1799, shall bring into this court to be paid to the complainant, or shall pay to the complainant the costs of this suit, and the sum of £771 18s. Id., which is the sum to be then due for the said principal of £777 19s. 2d., with interest from the 9th day of May, 1793, deducting the sum of £274 9s. 0d., paid on the 30th day of April, 1794; or unless the said defendant shall at any time before the said 9th day of February, 1799, bring into this court to be paid to the complainant, or pay to the said complainant, his costs of suit, together with the aforesaid sum of £777 19s. 2d., with interest as aforesaid, until the time of bringing in, deducting the paj'meut as aforesaid, made on the 30th of April, 1794, the mortgaged lands, viz: Betsworth’s Choice, 52£ acres; Providence, 215J acres; Colepit, SO acres; Baldridge, 80 acres ; and another tract, 2£ acres, lying in Somerset county, or so much thereof as shall be necessary, shall be sold for discharging the aforesaid principal, interest and costs. And Lambert Hyland, of said county, is hereby appointed trustee, &c. And the terms of sale shall be that the purchase money, at the election of the purchaser or purchasers, shall either be paid down to the trustee immediately after the sale, or be brought into this court, or paid to the said trustee immediately after the Chancellor’s ratification of the sale, which cannot be absolutely valid until ratified by the Chancellor, &c.
In consideration of the defendant’s allegation on oath, respecting the value of the lands, and of the payment by him made, as stated by the complainant, the Chancellor has allowed a considerable lime, as is usual in such cases, for paying or bringing in the principal, interest and costs, before the sale for ready money can take place. It is to be remarked, that it is not in the Chancellor’s power, without
*195 the consent of the complainant, to direct a sale of mortgaged land on credit, (1785, ch. 72, s. 3;) although it appears to him probable, that an immediate sale on short credit may be more advantageous to both parlies than a sale for ready money after a considerable lapse of time.
It is therefore further Decreed and Provided, that in case the complainant and defendant shall each subscribe a writing expressing his consent to the sale of the aforesaid lands on a credit of six months, the said trustee, after filing his bond and giving notice as aforesaid, may proceed with all diligence to a sale of the lands, either in one lot or parcels as aforesaid, at public auction, on the terms of the purchaser’s giving bond to the said trustee, as such, for paying the purchase money with interest, within six months from the time of sale. And if a sale on credit shall take place agreeably to the directions of the decree, the trustee shall, in every respect, pursue the directions herein before given relative to the return execution of a deed, and bringing money into court. He shall likewise return to this court the bond or bonds by him taken, and the writing expressing the consent of the parties to the sale on credit.
Immediately after signing the above as the decree, the following was subjoined : 17th January, 1798. — Hanson, Chancellor. — It appears on examination, that a mistake hath been made with respect to the debt to be due on the 10th of February next. However, the mistake could not be material, unless the defendant should actually bring the money into court on the said day without any discovery of the mistake. For in case the defendant shall not oifer to bring in on that day, it appears by the decree, that the sum to be raised by a sale is £777 19s. 2d., with interest from the 9th of May, 1793, after deducting £274 9s. 0d., as paid 30th of April, 1794. The sum to be due on the 10th of February next, is £706 19s. Bd.
After which a sale of the mortgaged property having been made and reported; and the usual order allowing cause to be shewn why it should not be confirmed having been published, the case was again submitted.
27th March, 1800. — Hanson, Chancellor. — No objection having been made to the sale of the trustee Lambert Hyland, although notice, &c.; and the complainant having by writing expressed his approbation ; it is Adjudged and Ordered, that the said sale made by the said trustee, as stated in his report, be and it is hereby absolutely ratified and confirmed.
It is further Ordered, that the said trustee for his whole trouble and expense, incurred in the execution of his trust, be allowed the sum of thirty pounds, out of the money to arise from the sale; that the sum of £ 20 12s. 1 %d., be applied to the discharge of costs as taxed by the register of the court; that the residue of the said money be paid to the complainant Thomas Jones, towards the discharge of the debt to him due on the mortgage stated in the bill. But as the complainant is the purchaser of the land sold, and passed his bond for the purchase money, there is no necessity for the money to be actually paid. And it is Ordered, that on his giving his receipt in writing to be here lodged, for the said residue, and on paying to the said trustee the said sum of thirty pounds, the said bond shall be given up to him to be cancelled, and the said trustee shall execute to him a deed, as by the original decree is directed. — M. S.
*196 A mortgage to secure the payment of money, being a creature of equity, can only be correctly understood according to those equity principles by which the contract is regulated. It having been assumed in regard to such a security, that the creditor might be sufficiently reimbursed by the payment of the principal of the debt, with legal interest, at any time after the day of payment, when, according to the terms of the contract, the condition having been broken, and the estate at law having thereby become absolute, it followed, that, in equity, the debtor might, within a reasonable time, redeem his estate on the payment of the principal of the debt, with interest; and that as the debtor might be allowed, on those terms, to redeem, the creditor could not, after the day of payment, have his estate made perfectly absolute without a bill to foreclose, the court of equity, to which he was thus under a necessity of addressing himself, for that purpose, might prescribe the terms upon which his title should be made absolute; which, among other things, should be, that the debtor should have a further specified time, after the date of the decree, to pay the debt, with interest; and so redeem his estate; and this specified time, on its being shewn that the mortgaged estate greatly exceeded in value the amount of the debt, might, to prevent a sacrifice of the property, be from time to time enlarged to a reasonable extent. — (Pow. Morig. 7, 108, 250, 961; 2 Mad. Chan. 492; Ismoord v. Claypool, 1 Cha. Rep. 262; Monkhouse v. The Corporation of Bedford, 17 Ves. 380; Novosielski v. Wakefield, 17 Ves. 418; Edwards v. Cunliffe, 1 Mad. Rep. 286; Parker v. Housefield,, 8 Cond. Chan. Rep. 63; Bruere v. Wharton, 10 Cond. Chan. Rep. 158.)
Such has always been the law of England ; and in Maryland the same principles of equity have prevailed, in so far as to allow, for the same reasons, on a decree to foreclose or sell, the further time of twelve or eighteen months to the debtor to make payment. — (Carroll v. Belt,1767; Burt v. The Commissioners of Washington, 1806; Craig v. Rusk, 1807.) — But as I never could satisfy myself of the propriety of thus extending the credit beyond the date of the decree, to the prejudice of the creditor, to whom mere legal interest could rarely be an adequate compensation for the delay of the payment of his money; (Reynolds v. Pitt, 19 Ves. 140;) and no such further indulgence being allowed to the debtor in mortgage cases any where but in England, where the practice of granting it has been regretted, and said to be unreasonable.— (2 Mad. Chan. 492.) — I have in all cases deemed it proper to limit the indulgence to one month, or to as short a time as was compatible with the observance of the rule, as one which had been expressly recognized by the General Assembly; (1785, ch. 72, s. 3;) since there can be no more just grounds for postponing the immediate execution of a decree in equity for the recovery of a debt in a mortgage case, than in suspending execution on a judgment at common law, in an action of debt on a bond under a stay law, which has been held to be unconstitutional, because of its impairing the obligation of the contract. — ( Campbell’s Case, 2 Bland, 237.)
But, in regard to infants, it has been declared, that where any person under twenty-one years of age, shall be possessed of any real estate mortgaged for securing the payment of any debt, and the day of payment has elapsed, the Chancellor may decree a sale of the mortgaged premises, or such part thereof as may be necessary to discharge the debt; or may decree a foreclosure of the whole or such part of the mortgaged premises as may be sufficient to satisfy the debt; and that too, as it would seem, without allowing the infant a day to shew cause ; or requiring the plaintiff, as formerly, to give bond to refund or reconvey, on its being made to appear within one year after his arrival at age, that the decree was erroneous or *197 unjust. — (1785, ch. 72, s. 1 and 2 ; 1832, ch. 302, s. 8; 1837, ch. 292; Booth v. Rich, 1 Vent. 295 ; Mallack v. Galton, 3 P. Will. 352 ; Winchester v. Beavor, 3 Ves. 317; Williamson v. Gordon, 19 Ves. 114.) — And it has been further declared, without distinction as to infants or adults, that in all cases to foreclose, in case the party against whom the bill shall be filed does not pay the sum due, by the time limited in the decree, the mortgaged premises, or so much thereof as may be necessary to discharge the money due and costs, may be sold for ready money, unless the plaintiff shall consent to a sale on credit; and the money raised by such sale shall be ordered to be brought into court to be paid to the plaintiff. — (1785, ch. 72, s. 3; David v. Grahams, 2 H. & G. 94.)
It appears to have long been the understanding of the profession and of this court, as indicated in the above case of Jones v. Betsworth, and in other cases, that the proceeds of the sale of the mortgaged property should be first applied to the payment of the costs, commissions and expenses, and the balance only to the satisfaction of the mortgage debt; or discounted from the debt, should the mortgagee himself be the purchaser, leaving the mortgagee to proceed otherwise against the mortgagor for the recovery of so much of the debt as was thus left unsatisfied._ (Ridgely v. Belt, 1805; Murdock’s case, 2 Bland, 464, 468.) — But in England it is otherwise; there, according to a recent decision, the whole amount of the proceeds of the sale must be first applied to the satisfaction of the mortgage debt._ ( Upperton v. Harrison, 10 Cond. Chan. Rep. 139; Ellison v. Wright, 3 Cond. Chan. Rep. 482.)

 Culpepper v. Aston, 2 Chan. Cas. 115; Oxenden v. Compton, 2 Ves., jun., 73; Maugham v. Mason, 1 Ves. & Bea. 415; Jones v. Jones, 1 Bland, 452.

 1785, ch. 72, s. 12; 1820, ch. 191; Corse v. Polk, 1 Bland, 233, note.

 Barlow v. Grant, 1 Vern. 255; Franklin v. Green, 2 Vern. 137; Harvey v. Harvey, 2 P. Will. 21; Davies v. Austen, 1 Ves., jun., 248; S. C. 3 Bro. C. C. 178 ; Lee v. Brown, 4 Ves. 362 ; Walker v. Wetherell, 6 Ves. 474: Beasley v. Magrath, 2 Scho. & Lefr. 35 ; Ex parte Darlington, 1 Ball & Bea. 240 ; Ex parle M'Key, 1 Ball & Bea. 405; Ex parte Green, 1 Jac. & Walk. 253; Hooper v. Royster, 1 Mun. 119.
Hanson v. Chapman. — This bill was filed on the 8th of August, 1796, by Samuel Hanson and others against Henry H. Chapman. It states, that the late Samuel Hanson, by his will, bequeathed certain legacies to the plaintiffs; and on the death of his grand-daughter Anna H. Chapman, and his daughter Eleanor Chapman, without issue, directed that his real estate should be sold for the payment of those legacies. That he appointed George Lee and Henry H. Chapman, his executors, and authorized them to make the sale; that Lee had renounced the executorship, and it was doubtful whether Chapman alone could sell and make a good title; and that the testator’s grand-daughter and daughter were both dead without issue. Prayer to appoint a trustee to make the sale, &c.
Henry H. Chapman, who alone was made defendant, answered, admitted the facts, and consented to a decree as prayed. Whereupon, it was, on the 8th of October, 1796, Decreed, in the usual form, that Henry H. Chapman make the sale, &c. Under which decree sales were made and ratified accordingly. After which, on a considerable amount of the proceeds being brought in, they were, by the direction of the court distributed among the legatees of full age.
11 ih September, 1801. — Hanson, Chancellor. — On the petition of several of the said devisees, it is Ordered, that the auditor state the sums of which each of them is entitled to out of the principal money arising from the said sale; and that he state the sum which each devisee is entitled to receive of the money brought into court, charging him or her with the payments already made to him or her. Out of the said money is to be deducted the trustee’s commission, hereby allowed him of £175, exclusive of all except personal expenses. And in making these statements he is to take into consideration the specific and contingent legacies given by the said Hanson’s will. It is the intent of this order, that if there be money brought in sufficient, after the aforesaid deductions, to pay unto each devisee of lawful age the proportion of the principal money to him or her due, the same shall be paid. The register is hereby directed to receive any money arising from the sale to be offered by the trustee; and, with the treasurer’s leave, deposite the same in the Western ¡Shore treasury, subject to future order. And it is the intent of this order, that the said money be brought into the account to be stated.
After which the case was again brought before the court at the instance of one of the infant legatees.
29i/i October, 1801. — Hanson, Chancellor. — It is represented to the Chancellor that William Baker, one of the children of Mildred Baker, daughter of the said Hanson, and mentioned in his last will, is nearly twenty years of age, and engaged in the study of physic; and that it wifi be of great importance to him to receive immediately the money to which he is entitled under his grandfather’s will. The Chancellor being satisfied of the truth of the said representation, and that the inte-
*199 rest of the said infant wilt most probably be best promoted by permitting him to receive the said money wherewith he may advantageously prosecute his studies. It is Ordered, that there be paid to the said William Baker, the money to which, agreeably to the auditor’s report, he is entitled, arising from the sale of the real estate of Samuel Hanson, deceased; and either here lying, or hereafter to be brought in, he giving a receipt for the same.
On the 25th of November, 1801, an order was passed in favour of Grafton D. Hanson, another infant legatee, similar to the foregoing. After which the case was again brought before the court at the instance of a purchaser.
26tA May, 1803. — Hanson, Chancellor. — Whereas, the decree for a sale In this cause passed, directs, that on payment of the whole purchase money, the trustee, Henry H. Chapman, shall convey to the purchaser in íbe ; and whereas, it is stated, that several of the purchasers have assigned; and that it would be convenient for the trustee to convey to the assignees. It is Ordered, that the said trustee, on the receipt of the whole purchase money, and on being satisfied, that the purchaser hath assigned his purchase; may, on application of the assignee, at his, the said trustee’s discretion, convey to the said assignee in fee; and provided an assignment of the purchase hath actually been made fairly, and without fraud and imposition, the conveyance shall operate in the same manner as if it had been made by the direction of the original decree in this cause. The Chancellor has been applied to for a decree directing a conveyance by the said trustee on the part of a particular assignee; hut the Chancellor conceives, that he cannot, with propriety, make an ex parte decree binding on a person who is no party in any suit here depending. But in case of a conveyance, under the foregoing order, to a fair assignee, there is no doubt, that the assignee’s title will be as good as if a conveyance had been made by the trustee to the purchaser, and a conveyance afterwards made by the purchaser to the assignee. — M. S.

 1715, ch. 39, s. 9 and 10; 1729, ch. 24, s. 12 and 13.

 1785, ch. 80, s. 9.

 1798, ch. 101, sub ch. 12, s. 7 and 10 ; Brodess v. Thompson, 2 H. &. G. 120.
Goltier’s Case. — This petition was filed on the 18th of December, 1810, by John Goltier, in the Orphans Court of Cecil county; and was soon afterwards, with the proceedings thereon in that court, removed to and filed here. The petition stated, that the petitioner had two children, hy his late wife, who were infants ; that in right of their mother, they had become entitled, by descent, to an undivided interest in a grist-mill, and about one hundred and forty acres of land; that after consulting with the petitioner, the other heirs, deeming it highly advantageous to all concerned, had contracted to sell the property to Alexander Scott for $6,424 25. Whereupon the petitioner prayed, that he might be enabled to convey the estate to the purchaser on behalf of his children, inasmuch as he verily believed, that such a sale would much promote the interest and welfare of his said children, and enable him to educate and support them more to their advantage than if no such sale were made.
12th December, 1810. — By the Orphans Court. — On due consideration of the allegations contained in the within petition, the court is of opinion, that the sale prayed for is to the advantage of the aforesaid Francis and Elizabeth, and should be confirmed; and that the petitioner John Goltier he authorized to make a conveyance of that part of his wards’ real estate which they have by descent from their cousin Jonathan Booth, and mentioned in the within petition. In testimony whereof, I have hereunto set my hand and seal of office, this twelfth day of December, in the year of our Lord eighteen hundred and ten. David Smith, register.
18th December, 1810. — Kilty, Chancellor. — Under the power vested in this court by the act of 1798, ch. 101, sub ch. 12, s. 10, the .above order of the Orphans Court is approved.— Chancery Proceedings, 1810, fol. 563.

 November, 1781, ch. 4.

 November, 1781, ch. 15; 1804, ch. 10.

 1784, ch. 28.

 1784, ch. 31; 1794, ch. 5; Evroy v. Nicholas, 2 Eq. Ca, Abr. 488; P— v. Bell, 6 Ves. 419; In the matter of Starkie, 8 Cond. Chan. Rep. 79.

 1784, ch. 51; 1801, ch. 82; 1802, ch. 67; 1803, ch. 91; 1810, ch. 58 and 71; 1811, ch. 88; Waring v. Waring, 2 Bland, 673.

 1791, ch. 48.

 1792, ch. 28.

 1805, ch. 28 and 33; 1809, ch. 21 and 72; 1810, ch. 57, 74 and 158; 1811, ch. 95, 149 and 209; 1812, ch. 83, 91, 175 and 186; 1813, ch. 19, 29, 54, 80, 93, 151 and 152; 1814, ch. 31, 44, 74 and 90; 1815, ch. 31, 117, 124, 130, 134 and 136; 1825, ch. 88; Campbell’s case, 2 Bland, 209.

 1816, ch. 154; 1818, ch. 133, s. 2, and ch. 193, s. 7, 12 and 13; 1S19, ch. 183; Tilly v. Tilly, 2 Bland, 436.

 Seys v. Price, 9 Mod. 220; Hearle v. Greenbank, 3 Atk. 695; Ware v. Polhill, 11 Ves. 278; Ex parte Philips, 19 Ves. 122.

 The Legislature has since authorized the real estate, chattel real, or trust interest of an infant to be sold, leased or mortgaged, 1831, ell, 311, s. 2,3 and 12; 1835, ch. 380, s. 9.

 Waring v. Waring, 2 Bland, 673.

 Corrie’s case, 2 Bland, 489.

 1816, ch. 164, s. 1, 6 and 8; 1818, ch. 133, s. 2.

 It is staled in this petition, that these infants had * no other source of revenue than this farm;’ whence it might be inferred, that they had no other estate whatever. Yet by the act of 1832, eh. 192; and their petition, filed here on the 28th of May, *208 1833, it appears, that they had inherited, and then held other real estate of considerable value. See also the bill of Henry L. Williams and others v. Susan F. Williams and others, filed here on the 1st of July, 1826, and the decree thereon, 18th July, 1826; Hoby v. Hoby, 1 Vern. 218; In the matter of Stiles, 1 Hopk. 341.

 Doughty v. Bull, 2 P. Will. 322; Oates v. Brydon, 3 Burr, 1898.

 Since extended to a remainder, by 1831, ch. 311, s. 9; and to trusts for infants, and to chattels real, by 1835, ch. 380, s. 9.

 Leigh & Dal. on Conversion, 87, 147.

 Abell v. Heathcote, 4 Bro. C. C. 284; Oates v. Brydon, 3 Barr, 1898__

 But if all the heirs be minors, the estate cannot be sold by any preceding ground merely on the provisions of the act to direct descents, until the eldest arrives at age, 1820, ch. 191, s. 9.

 1816, ch. 154, s. 10.

 1819, ch. 183, s. 2.

 Bexwell v. Christie, Cowp. 395; Howard v. Castle, 6 T. R. 642; Crowder v. Austin, 13 Com. Law Rep. 11; Moncrieff v. Goldsborough, 4 H. & McH. 282; Bramley v. Alt, 3 Ves. 620; Conolly v. Parsons, 3 Ves. 625, note; Townshend v. Stangroom, 6 Ves. 338; Smith v. Clarke, 12 Ves. 477.

 Sug. Ven. Pur. 16; Doolin v. Ward, 6 John, Rep. 194.

 Conolly v. Parsons, 3 Ves. 625, note; Smith v. Clarke, 12 Ves. 477; Jervoise v. Clarke, 1 Jac. & Wal. 389; Brooker v. Collier, 3 Cond. Cha. Rep. 439; Shelf. on Lunatics, 366, 368.
Kilty v. Quynn. — This bill was filed on the 4th of June, 1804, by John Kilty against John Quynn, and Kitty, Betsey, William, Allen, and Casper Quynn, the five infant children of Allen Quynn, Junior, deceased, and John Gassaway, a minor, and Eliza Gassaway, children of Polly Gassaway, deceased. The bill stated that Allen Quynn the elder being seised in fee simple of certain tracts, lots, and parcels of land, made his last will according to law and died, by which will he devised, with some particular dispositions, the whole of his estate, the one-fourth part to his son, the defendant John Quynn; one other fourth part to his son-in-law this plaintiff; one other fourth part to the, infant defendants the children of his late son Allen Quynn, Junior; and the other fourth part to his grandchildren the defendants John Gassaway and Eliza Gassaway, son and daughter of his late daughter Polly Gassaway; and appointed this plaintiff and John Gassaway his executors. That some of these devisees being minors, a division could not be effected without the interposition of this court, and without a sale of the property thus devised to them. Whereupon it was prayed, that a sale might be ordered; a .division made; and that the plaintiff might have such relief as was suited to the nature of his case, &c.
*213 The infant defendants answered by their guardian ady^m,, and the adult (tórendants also put in thoir answers. They all admitted the facls%b®^hjj»46erbíll, and consented to a sale and division being made as prayed.
18t/s February, 1805. — Hanson, Chancellor. — Decreed, that the lands and premises in the bill mentioned, together with any other land that Allen Quynn may have, by his last will, devised to the complainant and the defendants, he sold, and the money arising therefrom, under the direction of the Chancellor, after paying the costs of this suit, bo divided amongst and paid to the respective parties according to their several interests; that John Johnson, who is recommended by more than one-half in value of the persons interested, be appointed trustee to make the sale; that the course and manner of his proceeding he as follows, &c. &c., the sales to be on credit, bond with approved surety to be given to the trustee as such, for the payment of the purchase money as follows, one-fourth thereof; with interest on the same, on or before the expiration of one year from the day of sale; one other fourth thereof, with interest on the same, on or before the expiration of two years from the day of sale; one other fourth thereof; with interest on the same, on or before the expiration of three years from the day of sale; and the remaining fourth, with interest thereon, on or before the expiration of four years from the day of sale, &c. &c., and upon the approbation, ratification, and confirmation by the Chancellor, which will be, if at all, just six weeks from the day of sale; and upon receipt of the whole purchase money, and not before, the trustee by a good deed, &c. &c. The Chancellor considers the trustee as having the right or power of postponing a sale, if in the trustee’s opinion necessary; and likewise of having a bye-bidder.
The trustee Johnson reported, that he had given bond as required; and that he had on the 15lh of March, 1805, made sale of a part of the real estate of the testator. At the foot of which report there was a note in these words: ‘We the subscribers do approve of the sale made by the trustee to Mrs. Isaac Duckett, as contained in the aforegoing report, and request the Chancellor to confirm the same.’ Signed John Gassaway, guardian to Eliza and John. John Killy.
3d July, 1805. — Hanson, Chancellor.— Ordered, that the sale made by John Johnson of the real estate of the testator Allen Quynn, be absolutely ratified and confirmed ; that for his whole trouble and expense incurred, or to be incurred, in the execution of his trust, he be allowed the sum of £ 150; and that the auditor slate the application of the money arising from the sale, after deducting the said commission and costs.
The auditor reported a distribution of the proceeds of the sales, in which he awarded one-fourth of them to the plaintiff in his own right, and another fourth to him as the assignee of the defendant John Quynn.
Upon which the trustee Johnson, by his petition, staled, that he was desirous of closing his trust; and as the bonds, taken to secure the payment of the purchase money, would not become due for some time, he prayed, that he might be ordered to assign them to the several devisees in satisfaction of thoir respective shares.
10th July, 1805. — Hanson, Chancellor. — Ordered, that the trustee after receiving on each bond an equal proportion of the costs and expenses, as stated in the auditor’s report, assign to the respective parties entitled, the bonds as follows, to wit, to John Kilty the two bonds, one due on the 15th day of March, 1807, the other due on the 15th day of March, 180S; to the guardian of the children of Allen Quynn, the son, *214 deceased, one bond due on the 15th day of March, 1S09, and one bond due March 15th, 1806, equally to Eliza Gassaway the daughter of John Gassaway, and to the guardian of John Gassaway, Junior; Eliza to take in her own right, and the guardian of John Gassaway, Junior, to take for him. But the Chancellor wishes, and proposes, that the last bond be given up, and instead thereof, there be two bonds given, one for one-half of the sum to Eliza Gassaway, and another for the other half unto the guardian of John Gassaway, Junior.
It is declared that in case any sale shall be made on credit by direction of the Chancellor under the authority of the act of 1785, ch. 72, s. 9, he may direct any bond taken in consequence of such sale to be assigned to such mortgagee or creditor. It would seem therefore, that the assignment of the bonds here directed could not, in strictness, have been made under the authority of this act of Assembly; but as it has been held, in bankruptcy, that where a distribution is directed to be made, it may be made in kind, as well as in money, so here, an assignment of the bonds, as in this instance, may be entirely within the power of the court, and be regarded as, in many respects, the most beneficial distribution which the devisees or claimants could have. Hitchcock v. Sedgwick, 2 Vern. 158; Spurrier v. Spurrier, 1 Bland, 475; Coombs v. Jordan, post; Ex parie Boone, 2 Bland, 321; McMullin v. Burris, 2 Bland, 357.

 Duvall v. Waters, 1 Bland, 569.

 King v. King, 6 Ves. 172; Atkinson v. Henshaw, 2 Ves. & Bea. 85; Ball v. Oliver, 2 Ves. & Bea. 96; Beam’s Pl. Eq. 71.

 Clark v. Clark, 24 January, 1822, per Johnson, Chancellor.

 Shewen v. Vanderhorst, 4 Cond. Cha. Rep. 461.

 Wilcocks v. Wilcock3, Amb. 421; Mitchell v. Draper, 9 Ves. 208.

 Smith v. Jackson, 1 Mad. Rep. 618; Dakin v. Cope, 3 Cond. Cha. Rep. 66; Donovan v. Fricker, 4 Cond. Cha. Rep. 77.

 Wilson v. Metcalfe, 1 Russ. 530.

 Mackubin v. Farrall. — This bill, filed on the 25th of June, 1S23, stated, that the plaintiff George Mackubin, as trustee, had sold a tract of land to the defendant Walter Farrall for the sum of $5,656 75; for the payment of which the defendant gave bond with sureties; that the defendant had paid a small part of the purchase money; and that he, and his sureties, were then insolvent. Whereupon it was prayed, that the land might be re-sold for the payment of the balance of the purchase money. .The defendant, by his answer, said, that he had paid $720; and admitted the truth of the other facts set forth in the bill. Upon which it was, on the 8th of December, 1823, Decreed,, that the land be sold, &c.
After which the trustee by his petition, filed on the 30th of March, 1824, stated, that he had advertised the land for sale as directed by the decree, but could not sell it for want of buyers; and, that there was no prospect of his being able to sell it time enough for the purchaser to make a crop in the then present year; in the meantime the defendant was in possession, and interest was accruing on the claim upon it, and no benefit derived from the land, which was wholly insufficient to pay the amount of the claim. The trustee required to be directed whether he should rent the land for the valuation, that is, $125, &e.
30th March, 1824. — Johnson, Chancellor. — The trustee is authorized to rent the land, taking such security for the rent as he may judge sufficient. If an offer to purchase at private sale, during the time for which it is rented, should be made, the trustee will communicate the same, if he judges it advantageous.
Under this authority the trustee permitted the defendant to continue in possession at the specified rent; and afterwards sold the land, which sale was finally ratified. After which the trustee reported, that he had received three years rent; upon which he was allowed seven per cent, for his trouble.

 Mackubin v. Hogarth, 25th October, 1826, per Bland, Chancellor.

 Barker v. Harper, Coop. Rep. 32; Smith v. Jackson, 1 Mad. Rep. 618; Spring r. South Carolina Insu. Comp. 6 Wheat. 519; Latimer v. Hanson, 1 Bland, 51.

 Journal of the Senate, 6th and 18th of February, 1826.

 Dorsey v. Smith, 7H.&J. 346.

 1816, ch. 154, s. 10.

 When this order was passed, the law declared, that every female orphan *220 should be accounted of full age to receive her estate at the age of sixteen years or day of marriage, which should first happen.’ — (1715, ch. 89, s. 15; Woodward v. Chapman, 2 Bland, 72.) — And accordingly the Orphans Courts were only authorized to appoint a guardian to a female until the age of sixteen. — (1798, ch. 101, sub ch. 12, s. 1.) — But as the law now stands, she cannot be considered as of full age tor such purposes until she attains eighteen years of age or marries. — (1829, ch. 216, s. 5 and 6; 1831, ch. 305, s. 5.) — ‘Women,’ says Gibbon, in treating of the Homan law, ‘were condemned to the perpetual tutelage of parents, husbands, or guardians; a sex created to please and obey, was never supposed to have attained the age of reason and experience.’ — (Decl. and Fall Rom. Emp. ch. 44; 1 Blac. Com. 463.) — But by this peculiar law of ours, founded upon what principles or policy I do not understand, a female orphan is to have her property handed over to her, and to be left in a condition of legal infancy, formerly from sixteen, now from eighteen until twenty-one years of age, without a legal guardian or protector of any sort, unless by recourse to the Court of Chancery. — (Davis v. Jacquin, 5 H. & J. 100; Bowers v. The State, 7 H & J. 32; Fridge v. The State, 3 G. J. 115; Come’s case, 2 Bland, 501; Waring v. Waring, 2 Bland, 673.)

 Wells v. Roloson, 1 Bland, 457, note.

 White v. White, 9 Ves. 554.

 Collet v. Wollaston, 3 Bro. C. C. 228 ; Gowland v. De Faria, 17 Ves. 21; 1816, ch. 154, s. 13.

 1 Price Obser. 33.

 Strike’s case, 1 Bland, 77; 1830, ch. 99.

 Long v. Short, 1 P. Will. 403.

 1 Petersd. Abr. 710, 713; Ex parte Thistlewood, 19 Ves. 236; Johnson v. Compton, 6 Cond. Cha. Rep. 20.

 Long v. Short, 1 P. Will. 403; Devon v. Atkins, 2 P. Will. 381; Hume v. Edwards, 3 Atk. 693; Lewin v. Lewin, 2 Ves. 417; Will. Exrs. 836, 842.

 Kircudbright v. Kircudbright, 8 Ves. 51.

 1 Madison Papers, 280, 320 ; Act of Congress, 15; 1828, ch. 53; Speeches of Berrien and others, 19 and 29 April, and 15, 22 and 24 May, 1828.

 Rowel v. Walley, 1 Cha. Rep. 219.

 Cornish v. Mew, 1 Ca. Cha. 271.

c) Brent v. Best, 1 Vern. 70; Clyat v. Batteson, 1 Vern. 404; Thynn v. Duvall, 2 Vern. 117.

 James v. Hales, 2 Vern. 267 ; S. C. Prec. Cha. 44.

 Ballet v. Sprainger, Prec. Cha. 62; Flud v. Flud, 2 Freem. 210.

 Lock v. Lock, 2 Vern. 666.—

 Freemoult v. Dedire, 1 P. Will. 429.

 Verney v. Verney, 1 Ves. 428.

 Heveningham v. Heveningham, 2 Vern. 355.

 Anonymous, 1 P. Will. 680.

 Flud v. Flud, 2 Freem. 210.

 Verney v. Verney, 1 Ves. 428; White v. White, 4 Ves. 34.

 White v. White, 9 Ves. 557.

 Long v. Short, 1 P. Will. 403; Franks v. Cooper, 4 Ves. 763.

 Devon v. Atkins, 2 P. Will. 380; Lewin v. Lewin, 2 Ves. 415; Rogers v. Millicent, Dick. 570.

 Hume v. Edwards, 3 Atk. 693.

 Ex parte LeCompte, 1 Atk. 251; Ex parte Belton, 1 Atk. 251; Bothomly v. Fairfax, 1 P. Will. 334, note ; Ex parte Artis, 2 Ves. 490; Ex parte Carter, 1 Bro. C. C. 267; Ex parte Burrow, 1 Bro. C. C. 268.

 Cotterel v. Hooke, Doug. 97; Webster v. Bannister, Doug. 393.

 1 Geo. 4, c. 119, s. 10; 1 Petersd. Abr. 714, note; Smith Merca. Law, 409; Ex parte Thistlewood, 19 Ves. 249; Johnson v. Compton, 6 Cond. Cha. Rep. 20 ; Lyde v. Mynn, 6 Cond. Cha. Rep. 230.

 Nott v. Johnson, 2 Vern. 27.

 Twisleton v. Griffith, I P. Will. 310.

 Cole v. Gibbons, 3 P. Will. 290.

 Ryle v. Brown, 6 Exch. Rep. 265; Darley v. Singleton, 6 Exch. Rep. 426.

 Rees’ Cyclo. v. Halley.

 Rees’ Cyclo, v. Newton; 1 Niebuhr’s Rome, 285; 16 Westm. Rev. 328.

 Finlaison’s Report, &c. 8; 2 Price Obser. 454.

 Rees’ Cyclo, v. De Moivre ; 9 Westm. Rev. 421.

 Rees’ Cyclo. v. Simpson.

 Since that time Arthur Morgan, in the year 1834, published a set of ‘Tables shewing the total number of persons assured in the Equitable Society, (London,) from its commencement in September, 1762, to January, 1829,’ &c.

 1 Price Obser. 72, 97, 104, 109, 119, 142, 158 ; 9 Westm. Rev. 389.

 4 W. & M. c. 3, s. 18; 5 W. & M. c. 5 and 20; 1 Ann. Stat. 2, c. 5

 The reportfrom the select committee on life annuities, 4 June, 1829; The report of John Finlaison, actuary of the national debt, on the evidence and elementary facts on which the tables of life annuities, constructed by him, are founded, 31 March, 1829.

 Finlaison’s Report, 1.

 Psalms 90, v. 10; 2 Samuel 19, v. 32.

 I Samuel 4, v. 15-18.

 Finlaison’s Report, 18; 2 Malth. Popu. b. 3, c. 1, pt. 86; Reply to Malth. 247.

 2 Price Obser. 105, 127, 123.

 2 Price Obser. 106, 131.

 2 Price Obser. 408, 442.

 1 Price Obser. 8, 89, 95, 129, 186, 233; 2 Price Obser. 43; Rees’ Cyclo. v. Marriage and Mortality; 9 Westm. Rev. 397, 398; Seybert Stat. An. 44 ; 2 Southern Rev. 177.

 Finlaison’s Rep. 8; 2 Price Obser. 132.

 2 Price Obser. 111, 230.

 9 Westm. Rev. 413.

 2 Southern Rev. 178; 9 Westm. Rev. 402.

 1 Malth. Popu. 52, 385, 401, 413; 1 Price Obser. 182, 186 ; 9 Westm. Rev. 388, 395, 398, 399 ; 2 Southern Rev. 175.

 2 Southern Rev. 186.

 1 Malth. Popu. 380 ; 2 Price Obser. 242.

 1 Price Obser. 127; 2 Price Obser. 30, 33, 45, 49, 65, 83, 127, 218, 226; 1 Malth. Popu. 392; 2 Malth. Popu. 487.

 9 Westm. Rev. 388.

 9 Westm. Rev. 388 ; 14 Westm. Rev. 390, note; 1 Price Obser. 150; 2 Price Obser. 144 ; 3 Lond. and Westm. Rev. art. 8; 2 Sparks’ Franklin’s Works, 324.

 Ree’s Cyclo. v. Life Annuities and Mortality.

 1 Price Obser. 211; Ree’s Cyclo. v. Life Assurance and Mortality.

 2 Price Obser. 94.

 Ree’s Cyclo. v. Mortality.

 9 Westm. Rev. 393.

 1 Malth. Popu. b. 2, c. 2; 9 Westm. Rev. 386.

 2 Price Obser. 454.

 9 Westm. Rev. 388, 403.

 Seybert Stat. Ann. 51; Trans. Philo. Soci. Philad. vol. 3, No. 7, p. 25; 2 Malth. Popu. 16.

 Const. Maryl. art. 54; Heathcote v. Paignon, 2 Bro. C. C. 170 ; Kircudbright v. Kircudbright, 8 Ves. 51.

 Kircudbright v. Kircudbright, 8 Ves. 64.—

 Ardglasse v. Muschamp, 1 Vern. 288; Wiseman a. Beake, 2 Vern. 121; Nichols v. Gould, 2 Ves. 423; Bowes v. Heaps, 3 Ves. & Bea. 120; Baker v. Bent, 4 Cond. Chan. Rep. 398; S. C. 5 Cond. Chan. Rep. 432; Portmore v. Taylor, 6 Cond. Chan. Rep. 101, note.

 1 Price Obser. 45, 86, 88; 2 Price Obser. 105, 118.

 Henley v. Axe, 2 Bro. C. C. 17.; Davis v. Marlborough, 2 Swan. 149, note.

j) 9 Westm. Rev. 417.

 2 Price Obser. 4, 251, 254, 290, 297.

 Chesterfield v. Janssen, 2 Ves. 127.

 Nichols v. Gould, 2 Ves. 423.

 Lawrence v. Maggs, 1 Eden, 453; Pickering v. Vowles, 1 Bro. C. C. 198.

 Nightingale v. Lawson, 1 Bro. C. C. 440; S. C. 1 Cox, 181.

 Heathcote v. Paignon, 2 Bro. C. C. 167; Griffith v. Spratley, 1 Cox, 389.

 Stone v. Theed, 2 Bro. C. C. 243,

 White v. White, 4 Ves. 24; Penrhyn v. Hughes, 5 Ves. 107.

 White v. White, 9 Ves. 554; Allan v. Backhouse, 2 Ves. & Bea. 78.

 Ex parte Thistlewood, 19 Ves. 250.

 Heathcote v. Paignon, 2 Bro. C. C. 167; Griffith v. Spratley, 1 Cox, 389; Evans v. Chesshire, Belt’s Supp. to Ves. 306; Gowland v. De Faria, 17 Ves. 25; Ex parte Thistlewood, 19 Ves. 236; Ex parte Whitehead, 1 Meriv. 127 ; Davis v. Marlborough, 2 Swan. 147; Portmore v. Taylor, 6 Cond. Chan. Rep. 104; Newton v. Hunt, 7 Cond. Chan. Rep. 518; Wardle v. Carter, 10 Cond. Chan. Rep. 163; Ryle v. Brown, 6 Exch. Rep. 265.

 Gwynne v. Heaton, 1 Bro. C. C. 2; Heathcote v. Paignon, 2 Bro. C. C. 167; Gibson v. Jeyes, 6 Ves. 274; Ex parte Thistlewood, 19 Ves. 236.

 Ringgold’s Case, 1 Bland, 26

 Gibson v. Jeyes, 6 Ves. 274, 279; Ex parte Thistlewood, 19 Ves. 236.

 Freemoult v. Dedire, 1 P. Will. 429; Flud v. Flud, 2 Freem. 210; Badger u. Badger, Mosely, 117; Barnardiston v. Lingood, 2 *243 Atk. 135; Gwynne v. Heaton, 1 Bro. C. C. 2; Heathcote v. Paignon, 2 Bro. C. C. 167; Griffith v. Spratley, l Cox, 389; Gibson v. Jeyes, 6 Ves. 268; Peacock v. Evans, 16 Ves. 512; Ex parte Thistlewood, 19 Ves. 253; Chalmer v. Bradley, 1 Jac. & Walk. 59; Oliver v. Court, 3 Exch. Rep. 320; Ryle v. Brown, 6 Exch. Rep. 265.
Vulpean, in the time of the Emperor Justinian, A. D. 529, estimated the values of annuities as follows. — (Pandect. 35. 2. 68.)

Age. Years of purchase.

Under 20 30
20 to 25 28
25 to 30 25
30 to 35 22
35 to 40 20
at 41 18
42 17
43 16
44 15
45 14
46 13
47 12
48 11
49 10
50 to 55 9
55 to 60 7
above 60 5
It is uncertain whether in this computation he made any allowance for discount, or something equivalent in meaning; or whether, as is much more probable, this was his notion of the number of years which a life at each age was likely to live. If the latter be the meaning, the Romans must have had but a miserable chance of life in old age. — (Finlaison’s Rep. 19, note.)

 Badger v. Badger, Mosely, 117; Peacock v. Evans, 16 Ves. 516.

 Ex parte Artis, 2 Ves. 490; Tracy v. Hereford, 2 Bro. C. C. 138; Davis v. Marlborough, 2 Swan. 151, 153, note; Oliver v. Court, 3 Exch. Rep. 330; Attersoll v. Stevens, 1 Taunt. 183; Maccubbin v. Cromwell, 2 H. & G. 460.

 Ex parte Le Compte, 1 Atfc. 251; Ex parte Belton, 1 Atk. 251; Kircudbright v. Kircudbright, 8 Ves. 63 ; Gowland v. De Faria, 17 Ves. 24.

 Butcher v. Churchill, 14 Ves. 574; Ex parte Thistlewood, 19 Ves. 236; Ex parte Whitehead, 1 Meriv. 10 and 127.

 White v. White, 9 Ves. 560.

 Hungerford v. Hungerford, Gilb. Eq. Rep. 69; Revel v. Watkinson, 1 Ves. 93; Amesbury v. Brown, 1 Ves. 477; Saville v. Saville, 2 Atk. 463; Penrhyn v. Hughes, 5 Ves. 107; Powel Mortg. 921, note H.

 Amesbury v. Brown, 1 Ves. 480.

 Peterborough v. Mordaunt, 1 Eden, 478; Tracy v. Hereford, 2 Bro. C. C, 128; Shrewsbury v. Shrewsbury, 3 Bro. C. C. 126; S. C. 1 Ves., jun., 227; Bertie v. Abingdon, 3 Meriv. 560; Burgess v. Mawbey, 11 Cond. Cha. Rep. 96.

 Banks v. Sutton, 2 P. Will. 716.

 Palmes v. Danby, Prec. Chan. 137; Powel Mort. 923, note; 1 Mad. Chan. 238.

 2 Southern Review, 175.

 Seybert Stat. Ann. 49.

 Adams’ Rom. Ant. 89, 134.

 Gibbon’s Decl. and Fall Rom., c. 2, c. 6, and c. 17; 1 Niebuhr’s Hist. Rome, 340, 347.

 Seybert Stat. Ann. 17.

 Smollet’s Hist. Eng. ch. 8.

 Miller’s His. Gr. Brit. 470, 569; Seybert Stat. Ann. 25, 28; 8 Amer. Quart. Review, 388.

 Journ. Cong. 26 December, 1775; 1 April, 1782; 17 February, 1783; 24 September, 1785,

 1785, ch. 83, s. 25.

 Seybert Stat. Ann. 17.

 2 Price Obser. 54, 210; 1 Malthus Popu. 457, note, 476; Seybert Stat. Ann. 17, 19.

 2 Southern Bov. 153; 1 Malthus Popu. 477.

 Seybert Stat. Ann. 28, 30.

 2 Sparks’ Franklin’s Works, 313; 2 Price Obser. 42; 2 Malthus Popu. b. 2, c. 9 ; 9 Westm. Rev. 419.

 2 Price Obser. 51; 1 Malthus Popu. 386.

 Darby’s View U. States, 434 ; Seybert Stat. Ann. 51,52; 2 Sparks’ Franklin’s Works, 311; 2 Malthus Popu. 53.

 Spark’s Franklin’s Works, 319.

 Seybert Stat. Ann. 17; 1 Tuck. Life of Jefferson, 207; 1 Madison Papers, 431.

 Seybert Stat. Ann. 25, 27; 2 Malthus Pop. 525 ; Darby’s View U. S. 434.

 1 Malthus Pop. 22.

 1 Malthus Popu. 468.

 Seybert Stat. Ann. 48.

 Seybert Stat. Ann. 48 ; 2 Price Obser. Essay 2.

 Seybert Stat. Ann. 37.

 Seybert Stat. Ann. 40, 42,45.

 1 Burk’s His. Virg. 206; 1 Malthus Popu. 6; 2 Malthus Popu. 54.

 Darby’s View U. S. 421, 427; Hume’s Essays: Of the Populousness of Aneient Nations; Taylor’s Arator, Number 51, Draining.

 October, 1777, ch. 14, s. 4; October, 1778, ch. 7, s. 11.

 Biscoe v. Biscoe, 6 G. & J. 239 ; Hall v Mullin, 5 H. & J. 190; Cunningham v. Cunningham, Cas. Confr. North Carol. 353.

 King v. Worsely, 2 Hayw. 366; Warfield v. Warfield, 5 H. & J. 459.

 2 Southern Revi. 177, note; 1 Hume’s Essays, 225, note M.

 1807, ch. 68; 1813, ch. 101; 1827, ch. 189.

k) Tabele v. Tabele, 1 John. C. C. 45; Hazen v. Thurber, 4 John. C. C. 604; Titus v. Neilson, 5 John. C. C. 458; Swaine v. Perine, 5 John. C. C. 491; Everston v. Tappan, 5 John. C. C. 513 ; Hale v. James, 6 John. C. C. 263.

 Pollard v. Underwood, 4 Hen. & Mun. 459 ; Davison v. Waite, 2 Mun. 527.

 Griffith v. Spratley, 1 Cox, 390.

 Herbert v. Wren, 7 Cran. 380.

 Miller v. Cape, 1 Desau. 110; Miller v. Miller, 1 Desau. 111; Clifford v. Clifford, 1 Desau. 115; Rutledge v. Williamson, 1 Desau. 159.

 Smith’s Weal. Nations, b. 5, c. 2, pt. 2; Vattel, b. 1, c. 20, s. 240.

 Smith’s Weal. Nations, b. 5, c. 2, pt. 2.

 Decla. Rights Mary. art. 13; 1650, ch. 26, s. 3; Articles Confed. art. 8; 1 Madison’s Papers, 250, 260, 502, 503, 506,

 Smith’s Weal. Nations, b. 5, e. 2, pt. 2.

 1702, ch. 1, s. 3; 1715, ch. 15, s. 5; 1725, ch. 4; 1763, ch. 18, s. 23 and 81.

 1704, ch. 34; 1715, ch. 15, s. 5; 1754, ch. 9; 2 Bozman’s His. Maryl. 204.

 1756, ch. 5; 2 W. & M. c. 6, s. 11.

 1 Hume’s Essays, Exper. 8 of Taxes; 1 Madison’s Papers, 509.

 1715, ch. 15, s. 5.

 November, 1781, ch. 4, s. 68; November, 1782, ch. 6, s. 49; November, 1783, ch. 17, s. 36; 1784, ch. 56, s. 40; 1785, ch. 83,s. 17; 1792, ch. 71, s. 25; 1803, ch. 92, s. 18; 1812, ch. 191, s. 16; 1829, ch. 106, s. 6.

 1817, ch. 41 and 49.

 February, 1777, ch. 22, s. 5 and 6.

 October, 1778, ch. 7, s. 48 ; November, 1779, ch. 35, s. 57; October, 1780, ch. 25, s. 62; November, 1781, ch. 4, s. 66; November, 1782, ch. 6, s. 47; November, 1783, ch. 17, s. 35; 1784, ch. 56, s. 38 ; 1785, ch. 83, s. 16.

 1790, ch. 33; Egan 11. Charles County Court, 3 H. & McH. 169.

 Smith’s Weal. Nations, b. 5, c. 2, pt. 2; Gibbon’s Decl. and Fall Rom. Emp. ch. 17.

 1785, ch. 33, s. 1.

 March, 1778, ch. 15; June, 1778, ch. 9.

 Const. art. 11; 3 Hatsell's Precedents, 104.

 4 W. & M. c. 1; Gilbert’s Court of Exchequer, ch. 14; Brewster v. Kitchin, 1 Ld. Raym. 318; S. C. 2 Salk. 615; Whitfield v. Brandwood, 3 Com. Law Rep. 421.

 Sloane v. Pawlett, 8 Mod. 18.

 1 W. & M. sess. 2, c. 2.

 July, 1779, ch. 6, s. 6 and 8 ; 1780, ch. 25, s. 2; 1792, ch. 71, s. 1; 1797, ch. 89, s. 1; 1803, ch. 92, s. 1; 1812, ch. 191, s. 1

 1821, ch. 91.

 1799, ch. 16, s. 11; May, 1788, ch. 7; 1824, ch. 79, s. 9; 1826, ch. 249 ; 1828, ch. 113 and 177; Gibbon’s Decl. and Fall Rom. Emp. ch. 20.

 Gibbon’s Decl. and Fall Rom. Emp. ch. 6.

 36 Geo. 3, c. 52; 55 Geo. 3, c. 184; Matthews on Executors, 193, and App. B.; Ram on Assets, 251.

 February, 1777, ch. 21 and 22; June, 1777, ch. 14; October, 1777, ch. 14.

 March, 1778, ch. 7, s. 23; October, 1778, ch. 7, s. 27.

 November, 1779, ch. 35, s. 30 and 32.

 October, 1780, ch. 25, s. 25.

 November, 1781, ch. 4, s. 27.

 November, 1782, ch. 6, s. 24; Brockman v. Honywood, 1 P. Will. 328.

 1783, ch. 17, s. 18

 1784, ch. 56, s. 18.

 1785, ch. 53, s. 7 and 8.

 1797, ch. 89, s. 41.

 1798, ch. 96.

 1803, ch. 92, s. 40 and 41; 18l2, ch. 191, s. 35 and 36; 2 Eq. Ca. Abr. 62, 64; East v. Thornbury, 3 P. Will. 128; Nicholls v. Leeson, 8 Atk. 574; Gwynne v. Heaton, 1 Bro. C. C. 4, note; Sutton v. Chaplin, 10 Ves. 66; Adair v. The New River Company, 11 Ves. 429; Brewster v. Kitchin, 1 Ld. Raym. 318; Hughes v. Young, 5 G. & J. 68 ; Ram. on Assets, 134.

 Devonsher v. Newenham, 2 Scho. & Lef. 211.

 1826, ch. 170; 1827, ch. 110,114.

 Mole v. Smith, 1 Jac. & Walk. 653.

 1801, ch. 82.

 1815, ch. 45.

 1811, ch. 137, 149; 1813, ch. 152, 161.

 1811, ch. 45; 1816, ch. 246.

 1807, ch. 37, 135; 1809, ch. 49; 1810, ch. 138.

 1812, ch. 160; 1814, ch. 90; 1816, ch. 224.

 1819, ch. 129.

 1802, ch. 67; 1803, ch. 91; 1810, ch. 25, 74; 1818, ch. 31, 93, 161, 175; 1819, ch. 102; 1825, ch. 64; 1827, ch. 102.

 1808, ch. 15; 1816, ch. 50.

 1799, ch. 49, s. 6.

 1820, ch. 191, s. 28.

 1816, ch. 154, s. 10.

 1818, ch. 193, s. 8; 1819, ch. 143.

 1809, ch. 160, s. 4; 1810, ch. 25, s. 2 ; 1811, ch. 200, s. 2; 1812, ch. 181, s. 1.

 1820, ch. 191, s. 35, 36, 37 and 38

 1816, ch. 154, s. 13, which act has been explained and extended to remainders by 1831, ch. 811, s. 9.

 Maccubbin v. Cromwell, 2 H. & G. 457.
Cassanave v. Brooke. — This petition, filed on the 29th of October, 17.99, stated, that the petitioner was the widow of Peter Cassanave, who died seised of a large real estate in which she was entitled to dower; the whole of which, at the suit of the creditors of her husband had been sold for the payment of his debts; that the defendant Samuel Brooke, as trustee, had sold it, under a decree of this court, discharged of all claim of dower; and under that representation, it had been purchased by the then holders from the trustee. Therefore to quiet their titles; and that justice might be done to all, she prayed, that she might be allowed a proportion of the net proceeds of the sale in lieu of dower.
This petition was on the 29th of October, 1799, endorsed thus by the Chancellor. ‘Issue subpmna returnable immediately.’ After which the trustee answered on oath and admitted all the facts stated in the petition.
21 st May, 1801. — Hanson, Chancellor. — The said cause being submitted on the bill or petition and answer, the same were by the Chancellor read and considered.
*268 Thi3 is the first case ready for decree, that the Chancellor recollects in which it has been left to him to ascertain the proportion, which a widow is entitled to, on account of her dower, of the money arising from the sale of the whole interest in lands of which her husband died seised in fee having a legal title.
Inasmuch as she could not use her third part of the land as a tenant in fee simple might use it, it appears, that when the land is converted into money she cannot be entitled to the full present value of a third part of the annual interest of that money for life. The interest in the land which she parts with is such, that she cannot sell the timber off the land as a tenant in fee might do. The value then of the privilege of selling timber, &.c. is to be taken into the account.
Upon the calculation which the Chancellor has made, on the principles adopted in Europe for ascertaining the present value of all interests in land, and on making a reasonable deduction on account of the aforesaid privileges, it appears to him, that the right of dower of a healthy woman, thirty years of age, as the present petitioner is stated and admitted to be, is about three-twentieths of the net sum for which the whole interest in the land has sold or shall sell for.
It is accordingly Adjudged, Ordered and Decreed, that the petitioner Ann Cassanave, is entitled to and shall receive three parts out of twenty of the net money, arising from the sale of those lands, under the decree of this court, of which her husband appears, from the petition and answer to have had a complete legal title; and it is further Ordered, that the auditor of this court state the sum she is entitled to from the said sales, deducting the costs of suit and the trustee’s commissions.
The statement was made accordingly by the auditor, and the sum thus ascertained ordered to be paid. _
Greenwood v. Clarke. — This petition was filed on the 17th of January, 180J, to have a certain lot of land divided among the parties as the heirs of William Clarke, deceased. The defendants were all infants and non-residents. The petition stated, that the land would not admit of division and prayed a sale. Upon which an order of publication was passed to be inserted in the Baltimore Telegraph warning the defendants to appear, &c. The publication of which order was certified to have been made by the printer of that paper. On the 1st of July, 1801, it was decreed that the lands be sold, &e. Under which a sale was made, reported and absolutely confirmed, no cause having been shewn, &c. Upon which the Chancellor, by way of note said, ‘it is suggested, that there is a relict of the deceased, married to another man, who has joined her in a power of attorney to authorize the sale of her interest, and the taking in lieu of her dower such sum as the Chancellor shall think proper, &c. But there is not the least proof of her being Clarke’s widow, and entitled to dower. There is another defect of proof. It is material to know the widow’s age, because allowances are made according to age. These defects may be supplied.’ After which the proofs were exhibited and the case thereupon submitted.
17th November, 1804. — Hanson, Chancellor. — On the petition of Ann Bandall with her husband James Bandall, it is Adjudged and Ordered, that she, as relict of William Clarke, deceased, of Kent county, whose lands have been sold under a decree of this court, be allowed one-eighth part of the net money arising from the said sale as a compensation for relinquishing her right of dower. Let the auditor of the court state the application of the money, &c.

 1 Price Obser. ch. 3; Will. Exrs. 781; 1810, ch. 34, s. 4; Collet v. Wollaston, 3 Bro. C. C. 228.

 Price Obser. ch. 1,

 Dorsey v. Smith, 7 H. & J. 356.

 Dorsey v. Smith, 7 H. & J. 366,

 Nightingale v. Lawson, 1 Bro. C. C. 443.

 Ree’s Cyclo. v, Valuation of Lands; 1 Price Obser. 38, 200; 2 Spark's Franklin, 326. ‘Whatever a farm will sell for fixes its value as merchandise; but *279 by no means is it a fair measure of its value as permanent farming capital. The true value of land, and also of any permanent improvements to land, I would estimate in the following manner: ascertain as nearly as possible the average clear and permanent incomes, and the land is worth as much money as would securely yield that amount of income in the form of interest, which may be considered as worth six per cent.’ — Ruffin on Calcarious Manures, ch. 18.

 Addison v. Bowie, 2 Bland, 613.

 Higgs v. Warry, 6 T. R. 655; The Mayor of Southampton v. Graves, 8 T. R. 592.

 1816, ch. 154, s. 10.

 1818, ch. 193, s. 8 ; 1819, ch. 143.

 1820, 191, s. 28.

 1816, ch. 154, s. 13 ; 1820, ch. 191, s. 35, 36, 37 and 38.

 Greenwood v. Clarke, ante 268.

 Maccubbin v. Cromwell, 2 H. & G. 448; John Carr and others v. Itichard Watkins and others, 12 June, 1838. — M. S.

) Rees’ Cyclo, v. Expectation.

) 2 Price Obser. 313.

) 9 Westm. Rev. 403.

) This column is taken from a folio pamphlet, entitled ‘Tables shewing the total number of persons assured in The Equitable Society, from its commencement in September, 1762, to January 1st, 1829, &c. To which are added Tables of the probabilities and expectation of the duration of human life from these documents, &c.;’ by Arthur Morgan, the then Actuary of the Society, published in the year 1834. In the introduction prefixed to these Tables, after stating, that the expectations, as here set down, are the most correct, Mr. Morgan adds, ‘It has the advantage also of being the safer Table of the two for most of the practical purposes of a Life Assurance Office, giving the probabilities and expectations of life somewhat lower than those deduced from the mortality of separate classes, in a few cases where these latter have been sufficiently numerous to form some estimate.’

) 9 Westm. Rev. 403

) 9 Westm. Rev. 403

) Seybert’s Stat. Ann. 51.

) 9 Westm. Rev. 419.